**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
Tel: 512-420-8407

*Attorneys for Plaintiff Cindy Adam*
*and the putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY ADAM, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  vs.<br><br>FRANK V. BARONE; KIRILL CHUMENKO; GREEN POGO LLC (DELAWARE); GREEN POGO LLC (NEW JERSEY); NATURAL BEAUTY LINE LLC; VEGAN BEAUTY LLC; IMPROVED NUTRACEUTICALS LLC; FORTERA NUTRA SOLUTIONS LLC; ADVANCED BEAUTY LLC; SFLG INC.; KURT ELLIS; and JOHN DOES 1-10,<br><br>  Defendant(s) | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Violation of California's Consumer Legal Remedies Act;<br>(2) Violation of California's False Advertising Law;<br>(3) Violation of the Unfair and Fraudulent Prongs of California's Unfair Competition Law;<br>(4) Violation of the Unlawful Prong California's Unfair Competition Law;<br>(5) Violation of California's Automatic Renewal Law;<br>(6) Violation of the Electronic Fund Transfer Law;<br>(7) Civil RICO;<br>(8) Aiding and Abetting;<br>(9) Conspiracy.<br><br>**DEMAND FOR JURY TRIAL**. |

Plaintiff Cindy Adam, individually and on behalf of all others similarly situated nationwide and in the State of California, by and through the undersigned counsel, hereby

file this Class Action Complaint against Defendants FRANK V. BARONE; KIRILL CHUMENKO; GREEN POGO LLC (DELAWARE); GREEN POGO LLC (NEW JERSEY); NATURAL BEAUTY LINE LLC; VEGAN BEAUTY LLC; IMPROVED NUTRACEUTICALS LLC; FORTERA NUTRA SOLUTIONS LLC; ADVANCED BEAUTY LLC; SFLG INC.; KURT ELLIS; and JOHN DOES 1 THROUGH 10, collectively "Defendants," and allege as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The believed scope of the damages and number of class members are based on Plaintiff's investigation and the BBB report attached as Exhibit 1, as well as the information filed in prior lawsuits against Defendants as discussed further below.

2.     This court also has jurisdiction because Plaintiff's Electronic Fund Transfer Act claim, 15 U.S.C. § 1693e, arises under federal law.

3.     This court also has jurisdiction because Plaintiff's Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, 18 U.S.C. §§ 1961, *et seq.*, arises under federal law.

4.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

5.     This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do business in California, including this District. Defendants marketed, promoted, distributed, and sold their products in California, and Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through their promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this

Court permissible. As described in further detail herein, each Defendant purposely directed their conduct towards California residents.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events giving rise to Plaintiff's claims occurred while they resided in this judicial district, including signing up for a "free trial" of the products at issue.

## INTRADISTRICT ASSIGNMENT

7.      The Plaintiff is a resident of Daly City, CA and a substantial part of the events or omissions which give rise to the claim occurred there. Daly City, CA is located in San Mateo County. Pursuant to Civil L.R. 3-2(d), assignment is appropriate in the San Francisco Division or the Oakland Division.

## NATURE OF THE ACTION

8.      This suit involves a form of fraud and cybercrime that has become increasingly common across the Internet, known as the celebrity free trial scam. These scams entice consumers with fake celebrity endorsements, claiming that well-known celebrities have either endorsed or created a new line of cosmetics products. The operators of these scams offer consumers a "free trial"—just pay the shipping and handling, and you can try these amazing new products for free.

9.      But the products are anything but free. The scammers' only goal is to fraudulently obtain the victim's credit card or bank account information. And once they have it, they begin billing their victims for subscriptions they never signed up for, never agreed to, and were never properly informed of. Using multiple websites, the scammers present one face to the consumer—a website offering the free trial with no disclosure of a subscription, or a disclosure buried in a terms of service on a separate page—and a totally different face to any banks investigating complaints, a second website which appears to fully comply with the law and fully disclose those subscriptions. But that second website, the "false front," is never actually viewed by the consumer. Instead, the consumer signs up for the fake "free trial" from a well-hidden landing page on a totally different website.

Consumers are left with no recourse—the scammers have defrauded their banks into believing they consented to be billed, when in fact they did not.

10.     These scammers operate in rings, as described in Exhibit 1. Those rings generally include: (1) affiliates, who are paid to advertise the fake celebrity endorsements, (2) creators of the product, who sell it and commit bank fraud by operating the "false front" websites, (3) fulfillment companies, who ship the product for a variety of scammers under the pretense of being a "nutra" manufacturer, and (4) "crooked processors" who assist the scammers in avoiding detection by bank and credit card companies.

11.     These rings of scammers are structured in this way in the mistaken belief that the members of the ring will avoid liability by pretending to be legitimate businesses and pretending to have no knowledge of the actions of the others. But every member knows full well what they are doing—the fulfillment companies are often inundated with complaints, the creators of the product intentionally seek out affiliates to do their dirty work under the pretense of "independent contractor" agreements, and the "crooked processors" openly pitch themselves as being able to help their customers avoid fraud detection and chargebacks.

12.     Ms. Adam was a victim of these scammers—but many others have been as well. This lawsuit seeks to hold accountable the members of the conspiracy that defrauded her, defrauded her bank, and defrauded many other consumers as well.

## THE PARTIES

### Plaintiff

13.     PLAINTIFF CINDY ADAM is a citizen of the state of California and resides in Daly City, CA, and resided there at the time of her purchase of the Nuvega Lash products. On or around August 24, 2017, she signed up for a "free trial" of Nuvega Lash and was billed multiple times that day for their products. She was billed again without her permission on September 7, 2017 and September 8, 2017, resulting in an insufficient funds fee charged by her bank because of the unexpected billing. While she

received a partial reversal of some of the charges from her bank, ultimately she was unable to recover all of the money taken from her by the Defendants.

**The Defendants**

14.     FRANK V. BARONE is a resident of the state of New Jersey residing at 9 Crest Fruit Ct., Manalapan, NJ 07726. He is listed as a member or manager of the Green Pogo LLC entity incorporated in New Jersey and as that entity's authorized representative. He is a manager of Fortera Nutra Solutions LLC.

15.     KIRILL CHUMENKO is a resident of the state of New Jersey residing at 74 Thompson Grove Rd., Manalapan, NJ 07726-0772. He is the Managing Member of Vegan Beauty LLC. Along with Defendant Barone, Defendant Chumenko operated various websites promoting Nuvega Lash and related products through a collection of shell companies.

16.     GREEN POGO LLC (Delaware) is a Delaware corporation whose registered agent is The Company Corporation, 251 Little Falls Dr., Wilmington, DE 19808.  It was formed on January 29, 2016.

17.     GREEN POGO LLC (New Jersey) is an identically named New Jersey corporation with a registered address of 830 Bear Tavern Road, West Trenton, NJ 08628, and a main business address of 9 Crest Fruit Ct., Manalapan, NJ 07726. It was formed on February 16, 2016 by Defendant Frank V. Barone. Hereinafter the two Green Pogo LLC entities are collectively referred to as "Green Pogo." Together, these entities sold Nuvega Lash and related products through their websites.

18.     NATURAL BEAUTY LINE LLC is a Delaware corporation registered to do business in New Jersey with an address of 74 Thompson Grove Rd., Manalapan, NJ 07726-0772. The websites shopnuvega.com, www.nuveganlashes.com, and www.nuveganbrows.com state at the bottom of the website that they are operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Defendant Chumenko's home address).

19.     VEGAN BEAUTY LLC is a Delaware corporation whose registered agent is The Company Corporation, 251 Little Falls Dr., Wilmington, DE 19808.  It was formed on October 10, 2016. It has a branch office in New Jersey. Vegan Beauty LLC has previously been sued over a contract dispute involving its purchase of affiliate marketing services for the Nuvega Products. Defendant Kirill Chumenko is the Managing Member of Vegan Beauty LLC.

20.     IMPROVED NUTRACEUTICALS LLC is a Delaware Corporation whose registered agent is The Company Corporation, 251 Little Falls Dr., Wilmington, DE 19808.  It was formed on March 11, 2016. It operates the website nuvegavegan.com, listing its business address as 9 Crest Fruit Ct, Manalapan NJ 07726 (Defendant Barone's home address).

21.     FORTERA NUTRA SOLUTIONS LLC (previously Next Gen Health Solutions LLC) is a New York corporation with a New Jersey branch office located at 500 Campus Drive, Morganville, NJ 07751.[1] On information and belief, Frank Barone is a manager of the company, as evidenced by his amendment of its Articles of Incorporation on the company's behalf.[2] The manufacturer of the Nuvega Products, Nutracosmetic GmbH, has repeatedly shipped imported cosmetics to another Defendant also located at this address, Advanced Beauty LLC.[3] Numerous consumers have complained on the BBB page for Next Gen Health Solutions LLC that they were fraudulently billed for subscriptions of Nuvega Products which they did not sign up for.[4]

---

[1] Red Fortera Trademark, Amendment and Mail Processing Stylesheet, http://tsdr.uspto.gov/documentviewer?caseId=sn87736922&docId=AMC20181122063236#docIndex=5&page=1 (last visited Jan. 8, 2020).
[2] Certificate of Amendment of the Articles of Incorporation of Next Gen Health Solutions LLC, http://tsdr.uspto.gov/caseviewer/assignments?caseId=87736922&docIndex=0&searchprefix=sn#docIndex=0 (last visited Jan. 9, 2020).
[3] Import Genius Summary for Advance Beauty, https://www.importgenius.com/importers/advance-beauty (last visited Jan. 8, 2020).
[4] Next Gen Health Solutions LLC Better Business Bureau Page, https://www.bbb.org/us/nj/morganville/profile/vitamins-and-supplements/next-gen-health-solutions-llc-0221-90181958/complaints#280204376 (last visited Jan. 8, 2020).

On information and belief, Fortera Nutra Solutions LLC used its merchant account or accounts to bill victims of the Nuvega Lash scheme.

22.     ADVANCED BEAUTY LLC is a Delaware corporation whose registered agent is The Company Corporation, 251 Little Falls Dr., Wilmington, DE 19808.  It was formed on October 3, 2016. It has a New Jersey branch incorporated on April 20, 2017. Advanced Beauty LLC is located at the same address as Fortera Nutra Solutions LLC, and it has accepted shipments of cosmetics from the manufacturer of the Nuvega Products which, on information and belief, included Nuvega Lash. Advanced Beauty LLC is the company behind a product called Advanced Lash, also sold by Defendants Barone and Chumenko.[5] The company's address is listed there as: 3 Welner Court, Manalapan NJ 07726. On information and belief, a merchant account attributable to this shell company was used to bill Plaintiff Adam and other members of the Class under the name "Advancedlash."

23.     SFLG INC., previously known as Great Lakes Fulfillment Services, is a Maine corporation located at 41 Canal St., Lewiston, ME 04240. On information and belief, SFLG Inc. is currently owned by GLF 2.0 LLC, a Delaware corporation.

24.     KURT ELLIS is a resident of Maine. Mr. Ellis founded Great Lakes Fulfillment Services in 2002, serving as President of the company until it was acquired in August 2019 by Jet Mail Services.[6] As of August 2019, Mr. Ellis had agreed to remain with the company as its President.[7]

25.     DEFENDANTS JOHN DOE 1 THROUGH 10 are any other individuals, corporations, or entities responsible for advertising or promoting the Nuvega Products (Nuvega Lash, Nuvega Eyelash Serum, Nuvega Brow, Nuvega Eyebrow Serum,

---

[5] Advanced Lash Brow Formula, http://www.advancedbrowformula.com/terms.html (last visited Jan. 29, 2020).
[6] Jet Mail Services to Compete in the E-Commerce Fulfillment Sector, POST AND PARCEL, Aug. 20, 2019 at https://postandparcel.info/112643/news/e-commerce/jet-mail-services-to-compete-in-the-e-commerce-fulfilment-sector/ (last visited Dec. 11, 2019).
[7] Id.

Advanced Lash, Evolips, and Evolips Volumizing Gloss), and any individuals, corporations, or entities providing the capacity to evade fraud detection through services relating to credit card or debit card processing. The true names and capacities of the Defendants sued herein as JOHN DOE 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated as a JOHN DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the JOHN DOE Defendants when such identities become known.

## FACTUAL ALLEGATIONS

### Background on Free Trial Scams

26.    The Internet has been plagued in recent years by a flood of scams targeting consumers for "free trials" that are anything but free. Relying on fake news articles and fake celebrity endorsements, the scammers convince customers that they are signing up for a free trial of a product endorsed by a high-profile celebrity. But the customer soon discovers that they are being billed each and every month as part of a subscription they were never properly informed of and never agreed to. These scams are not just deceptive—they are criminal. This lawsuit seeks to shut down a ring of scammers who defrauded an unknown number of people, including the named plaintiff Cindy Adam.

27.    The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." Ex. 1. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the Federal Trade Commission, the report explains in detail the tactics used by scammers to exploit customers who are unaware of their fraudulent techniques.

28.    According to the report, these scams have "infested the internet and social media." Ex. 1 at 1. The report provides a detailed explanation of how the scams work—one that is virtually identical to the scam that was run by the Defendants here.

29.   "You've seen them on the internet: ads or links leading to pictures of celebrities and products that sound intriguing. The ads claim these 'miracle' products will help you lose weight easily, combat wrinkles or whiten teeth. Often, fraudulent operations involved with these types of ads employ the latest internet marketing techniques and professional looking websites. You may be enticed to try these products through a 'risk-free' trial. You might think they seem like a good deal. You only have to pay $1.95 for shipping and handling. The claims look plausible, and celebrities would not endorse a product unless they believed it works. There may be a risk that the product doesn't work as claimed, but it costs next to nothing to find out. Just enter your name, address and credit card number and act quickly; supplies are limited. Better Business Bureau's (BBB's) in-depth investigative study found that many of these free trial offers are not free. They do not just send free product samples to try. If you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more. In addition, the same hidden information may state that by accepting the offer, you've also signed up for monthly shipments of the products. Those also will be charged to your credit card and become subscription traps. Many people find it difficult to contact the seller to stop recurring charges, halt shipments and get a refund." Ex. 1 at 1.

30.   This is virtually a verbatim description of the illegal scam the Defendants perpetrated here, as described further below. And as the Better Business Bureau recognized in its study, the sellers of these products are not the only active participants in theses scams: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1 at 1.

31.   For example, the companies involved often hire "affiliates" to place advertisements for them or to create fake celebrity ads, paying them commissions. Ex. 1 at 3. Those affiliates are often hired or paid through a separate "affiliate network." *Id.*

32.     The Better Business Bureau describes the role of affiliates and affiliate networks as follows: "Many fake free trial offers use affiliate networks to advertise their products. Someone who wants to drive traffic to their website hires an affiliate network, which in turn hires individual affiliates to place advertising. The affiliates often buy space for ads or sponsored content on popular websites. Clicking on one of these ads will take people to a website where products are sold, or to a 'landing page' that then refers users to the main site for the product. Commissions are paid to the affiliate network, which in turn pays the affiliates. Affiliates can either be paid per click or per order placed. Commissions for these misleading 'free trial' offers can be $30 to $50 for every person who signs up." Ex. 1 at 6.

33.     Another typical player in the scam operations is the "fulfillment company"—the company that manufactures and ships the products to consumers. The Better Business Bureau study makes clear that these fulfillment companies are active participants: "The free trial offer operations also have to get the product shipped to victims. Often, fraudulent free trial operations use fulfillment companies to ship the products and, presumably, accept returns." Ex. 1 at 9.

34.     A final type of participant in these scams are third party companies which assist in preventing the scammers from losing their merchant accounts with credit card companies or otherwise being flagged for their fraud: "Using a crooked processor. Banks that offer credit card processing hire Independent Sales Organizations (ISO's) to solicit and sign up merchants for them. The banks require that these agents comply with detailed rules before opening accounts to determine if they are legitimate and to monitor their activity for signs of fraud, such as reviewing chargeback rates and other suspicious activity. But what if those providing processing services are in on the fraud? The FTC has sued a number of these ISOs over the years, often alleging that these third parties were aware of the fraud or actively assisted in helping a fraudulent company evade the rules of the credit card system. For example, in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11.

35.    The fact that "affiliate marketing" is rife with illegal scam operations is well known in the industry. At the Affiliate Summit West in 2019, the preeminent conference for affiliate marketers, the keynote speaker, Neil Patel, repeatedly acknowledged in frank language how widespread such scams are among Internet marketers and among attendees of the conference:[8]

> The sad reality is, at least for a lot of affiliates, the way affiliate marketing was a few years ago isn't gonna exist anymore and it's gonna get tougher and tougher. You know, I remember years ago in San Diego I was meeting some friends and they're like, yeah, we're selling some skin care product, we got to zero to $100 million dollars a year in revenue in twelve months with a brand new company. Those days are long gone. **As you can guess some of those guys probably got hit by the FTC as well.**

36.    Mr. Patel continued:

> I've got a marketing blog. I see what a lot of affiliate marketers think 'cause a shit load of 'em hit me up every single day, I think I'm number one on Google for affiliate marketing. I could be wrong, maybe number two. Either way I just get a ton of affiliate marketing traffic. So, let's go over fact number one: how affiliates currently make money. And hopefully you guys don't get offended, I'm just gonna be stating the facts. Churn and burn model with Facebook accounts. You guys know what I'm talking about, you used to pay people fifty bucks, it used to be crazy back in the day, people were paying hundreds of dollars for Facebook accounts and then they would churn and burn 'em. You guys familiar with this? No? I love it, you have the biggest smile and you're like, no, and now you're turning away, you're like don't look at me, hopefully no camera's on me. (LAUGHTER). That's okay. Everyone has to make a livin'. Hopefully you crushed it while you can. **The next model: fake news landing pages. "The Shocking Reason Why Joy Behar Is Quitting The View." Well it's because she took this new wrinkle cream.** (LAUGHTER). She looked ten years younger and now this is what she's selling. **And you know what? Joy's story is so amazing, on**

---

[8] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).

**that landing page is also a testimonial from her friend Oprah.** (LAUGHTER). On how this wrinkle cream also made Oprah look twenty years younger. And you know what? Oprah also lost ten pounds while taking this wrinkle cream. (LAUGHTER). She was so addicted to it she was taking it at night, but luckily when her power went off she had one of those flashlights, the survival ones. (LAUGHTER). Right? **That's how affiliate marketers make money. And again, I've seen it, there's nothing wrong with it.** Some of you guys do straight sells, so when they click from that Oprah landing page, they go into a straight sell instead of forced continuity. And that's fine as well. And again this is forced continuity, **you tell 'em it's a free trial, but they don't really see in the fine print that they're gonna get billed every single month. And then you target the older demographics who have no idea why they're continually getting rebilled. And then some of you guys have what's called a quote-unquote hell room that just deals with the calls. And the refunds. Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.**

37.    Mr. Patel acknowledged that a widespread FTC crackdown was occurring:

The FTC has been cracking down on certain companies and industries, hence you're seeing a lot less forced continuity. You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't know what the saying is but it's more so they're controlling where the chargebacks are going.

38.    Mr. Patel described the FTC efforts to target not just affiliate marketers but companies such as Facebook:

But they get pressure. 'Cause those old grandmas are like, hey! Facebook screwed me over! They sold me this wrinkle cream! One, I still have my wrinkles. Two, they keep advertising these false products. So they get pressure. The government doesn't just want to stop the companies, they go to the source and say, stop them from advertising.

39.     The attitude of Mr. Patel and others in the affiliate marketing "industry" that "there's nothing wrong with" this behavior is deeply disturbing: there is in fact something quite wrong with targeting the poor and the elderly with fake celebrity advertisements and fake free trials for the purpose of defrauding their credit cards for as long as possible until the victim finally notices. It is little more than outright theft conducted under the barest fig leaf of a "business"—and it is precisely what the Defendants were doing here.

40.     These free trial scams generally involve more than one individual or companies conspiring together and generally playing the roles described above. Believing that they can pretend that their affiliates are independent contractors, or that they can pretend to see no evil and hear no evil and thus escape legal liability, the conspirators work together as a group to profit from the fraud. But they are quite wrong to believe that they are safe—every member of these conspiracies knows full well what they are doing, and every member is jointly and severally liable for the conduct of the others.

## Plaintiff Cindy Adam's Experience

## With Nuvega Lash

41.     On or about August 24, 2017, Plaintiff Cindy Adam saw an advertisement for a cosmetics product called "Nuvega Lash" as she was browsing her SnapChat account. The advertisement claimed that Nuvega Lash was endorsed by Blac Chyna, a celebrity known for her appearances on multiple reality television shows, including Keeping Up With The Kardashians, as well as for various relationships with other celebrities such as Rob Kardashian and the rapper Tyga.[9] Ms. Chyna is further known for her brand of adhesive eyelashes called "Lashed by Blac Chyna," launched in 2013.[10] The advertisement Ms. Adam viewed featured a picture of Blac Chyna along with a claim that a "free sample" could be obtained for a small fee.

42.     The website viewed by Ms. Adam showed a number of five-star reviews of the Nuvega Lash products. It offered a free sample, stating that customers would only pay

---

[9] *Blac Chyna*, https://en.wikipedia.org/wiki/Blac_Chyna (last visited Jan. 1, 2020).
[10] *Id.*

for the shipping and handling. It did not disclose the recurring monthly payments which the Defendants intended to charge her. Unlike the initial advertisement, the website did not reference Blac Chyna. However, Ms. Adam believed that the website was legitimate because of Blac Chyna's purported endorsement in the advertisement, and she relied on that purported endorsement in making her purchasing decision.

43.    Ms. Chyna continues to sell her own brand of eyelash products.[11] But on information and belief, she has never endorsed Nuvega Lash or the related products, there is no connection between her and the Nuvega Lash products, and the purported endorsement in the Nuvega Lash advertisement was a complete falsehood.

44.    Ms. Adam recalls purchasing two "free samples" from the site, as well as one product for roughly $15. She received three products: eyelash enhancer, eyebrow enhancer, and a lip plumper.

45.    On August 24, 2017, Ms. Adam's credit card was charged $4.99 with a charge described as: "08/23 Advancedlash8007848531 800-8748531 NJ." On the same day, it was also charged $4.95 with a charge described as: "08/22 Nuveganlashes 800-771-6369 NJ." And also on the same day, it was charged $14.99 with a charge described as: "08/22 Nuveganbrows 800-577-7806 NJ."

46.    On September 6, 2017, Ms. Adam's credit card was charged $94.97 with a charge described as: "09/06 Advancedlash8007848531 800-8748531 NJ." On September 8, 2017, this charge was reversed.

47.    On September 8, 2017, Ms. Adam's credit card was charged $92.94 with a charge described as: "Recurring Card Purchase 09/07 Nuveganlashes 800-771-6369 NJ." Because the charge was unexpected, Ms. Adam had insufficient funds and was charged a fee by her bank of $34.00 on the same day.

48.    On September 11, 2017, after complaining to her bank, Ms. Adam received a temporary reversal of $92.94 and another reversal of the $34.00 insufficient funds

---

[11] Lashed Cosmetics, https://www.lashedcosmetics.com/ (last visited Jan. 2, 2020).

charge. Ms. Adam was only able to reverse the $34.00 insufficient funds charge because her bank permits her to remove one insufficient funds charge per year without cause. The Defendants' fraudulent billing damaged Ms. Adam because it forced her to exhaust that privilege for a charge she never should incurred.

49.     On October 30, 2017, Ms. Adam's bank, Chase Bank, undid the reversal of $92.94, reinstating the charge after an investigation. On information and belief, one or more of the Defendants made false statements to Chase Bank to the effect that she had agreed to the subscription and that it had been disclosed to her, and did so for the purpose of defrauding the bank and Ms. Adam.

50.     In total and after the partial reversals, Ms. Adam was billed $24.93 in initial shipping fees and $92.94 for a subscription which she was never informed of and did not consent to.

51.     Ms. Adam was shipped three products. These included a lip plumper called Evolips by Evo Beauty and Nuvega Lash, both made by a company in Germany called Nutracosmetic GmbH.

52.     When Ms. Adam noticed the unexpected charges on her bank account, she called her bank to inquire as to what they were. Her bank told her they would give her a temporary credit while investigating.

53.     She contacted Nuvega Lash directly and spoke to an individual representing the company. That individual told her that she had agreed at the time of purchase to pay the full amount that she had been charged if she kept the "free samples." Ms. Adam did not recall agreeing to this, and never would have agreed to this. She told this to the representative of Nuvega Lash, who responded that he would let her speak to his manager but it would take a while. After several long waiting periods, the individual finally told Ms. Adam that a manager was unavailable. Ms. Adam believed that the representative of Nuvega Lash was intentionally stalling her to force her to hang up. The representative refused to issue an immediate refund, and instead demanded that Ms. Adam ship the products back before the company would consider issuing one. Ms. Adam

understandably did not trust the company which had just fraudulently charged her credit card without consent, and thus refused this offer.

54.     Ms. Adam was right not to trust the Defendants. They never would have refunded the money anyway—this was yet another stalling tactic the Defendants frequently used in the hopes that their victims would give up and go away. As another victim reported to the Better Business Bureau about their own experience: "Item was returned and company received on March 21, 2018 (proof of receipt on file). As of today, May 1, 2018, I have not received a refund to my credit card. Have contacted company 5 times since return to inquire on refund. On April 10, was told 7-14 days. On April 26, was told escalated to corporate for refund. On May 1, told 30 BUSINESS days for all refunds and to call back in 2 weeks to check status!"[12]

55.     Ms. Adam was injured by the Defendants' misrepresentations and unfair and unlawful business practices. She suffered a loss of time, inconvenience, and a loss of money. She was deprived of her annual right to reverse an insufficient funds charge from her bank without cause. She further paid more for the products than she would have had she been aware that Defendants' representations were false, and ended up with products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore suffered injury in fact.

**The Nuvega Lash Scam**

56.     The "sales funnel" for Nuvega Lash—the series of websites which leads a victim through to signing up for a fraudulent free trial—is typical of the free trial scams that both the Federal Trade Commission and Better Business Bureau have issued repeated warnings to consumers about.

57.     The victim initially encounters an advertisement for the product on a third-party site. In the case of Ms. Adam, she viewed an advertisement on SnapChat claiming that the celebrity Blac Chyna had endorsed the Nuvega Lash products. The

---

[12] Green Pogo LLC BBB Page, https://www.bbb.org/us/nj/manalapan/profile/online-retailer/green-pogo-llc-0221-90178228/complaints (last visited Jan. 4, 2020).

advertisements tout Nuvega Lash, a cosmetics product which purportedly has achieved amazing results in helping women grow longer, fuller eyelashes.

58.    Many of these landing pages are hidden from search engines, are made inaccessible to anyone who does not view an advertisement, or are deleted after a few weeks or months to avoid detection. While the specific page or advertisement Mrs. Adam viewed is unknown, an exemplary affiliate advertisement for Nuvega Lash remains live on at least one website.[13]

59.    The Nuvega Lash affiliate page is titled "$4.95 All EyeLash Serum Gets Largest Deal in Shark Tank History."[14] The site is designed to mimic the format of a legitimate news article, with a logo at the top for "Entertainment Today – Insider News." A banner running across the top of the screen claims that Nuvega Lash has been featured in a variety of legitimate publications: The New York Times, Today, O Magazine, StyleWatch, and Redbook. A pop-up banner at the bottom urges victims to "Click to Get Your FREE Trial."



60.    The fake news article claims that the Shark Tank judging panel "unanimously decided to each invest over a million dollars" in Nuvega Lash, which was

---

[13] *$4.95 All EyeLash Serum Gets Largest Deal in Shark Tank History*, http://healthyhair.healthfindings.website/lash.html (last visited Dec. 18, 2019).
[14] *Id.*

purportedly a company run by two sisters named Anna and Samantha Martin. In fact there are no such sisters: the women pictured are Shelly Hyde and Kara Haught of Raising Wild Swimwear, who appeared on Shark Tank in Season 8, but who have no affiliation with Nuvega Lash.[15]

61.    The article claims that the Shark Tank judges were amazed at Nuvega Lash, touting that it was "FDA Approved"—a complete falsity. It features a photo of six of the "sharks," Mark Cuban, Robert Herjavec, Barbara Corcoran, Lori Greiner, Daymond John, and Kevin O'Leary. The "sharks" are pictured toasting with champagne, presumably to their new investment in Nuvega Lash. The website goes on to claim endorsements from a number of other celebrities, not just the Shark Tank cast. For example, Oprah Winfrey is quoted as calling Nuvega Lash "groundbreaking" and helping women "grow lashes in a natural and healthy manner." [16]



*"NUVEGALash Revitalization is ground-breaking. They are the only company in the world who are effectively helping women grow healthy lashes in a natural and healthy manner." - Oprah Winfrey*

---

[15] *Raising Wild: What Happened To Bathing Suit Sisters After Shark Tank*, 2Paragraphs, https://2paragraphs.com/2017/10/raising-wild-bathing-suit-sisters-schooled-by-corcoran-after-shark-tank-as-founders-learn-to-prioritize-launch-sunglasses/.

[16] *$4.95 All EyeLash Serum Gets Largest Deal in Shark Tank History*, http://healthyhair.healthfindings.website/lash.html (last visited Dec. 18, 2019).

62.     Other celebrities are pictured as endorsers as well. Jessica Alba is quoted as having used Nuvega Lash herself to "amazing" effect, calling Nuvega Lash her "eyelash secret." Sandra Bullock is quoted as having obtained "stunning results" with Nuvega Lash. And Jennifer Aniston is quoted as using Nuvega Lash on the sets of her movies.[17]

63.     The landing page could not be clearer in representing to the victims that what they are signing up for is free, that Nuvega Lash is "giving away samples," and that "[t]he only cost you will incur is the discounted rate of $4.95:"

### GIVE YOURSELF THE STAR TREATMENT

For a limited time anyone can try NUVEGALash Revitalization for free!

That's right, NUVEGALash Revitalization is giving away samples of their Instant Lash Conditioner to Americans for FREE.

The only cost you will incur is the discounted shipping rate of $4.95. The supplement will then be delivered straight to your door and ready to use immediately.

This offer won't last for long so make sure you follow the link below to claim your free sample today before they all run out!

64.     The affiliate landing page further repeatedly claims that there is a limited supply of Nuvega Lash remaining, and urges victims to act quickly before it runs out. Victims are told that the Free Sample Promotion will end on a specific date—but that date itself is a misrepresentation. There is in fact no end date. The website code simply automatically inserts the current date as the purported end of the free trial.

---------------------------------- LIMITED TIME OFFER FOR OUR READERS ----------------------------------

(FREE SAMPLES RUN OUT DAILY - CLAIM YOURS NOW BEFORE THEY'RE ALL GONE)
IMPORTANT: During clinical testing it was proven that you MUST use this product DAILY to achieve similar results.

✔ Update: Only 2 Free Samples Still Available Today. Free Sample Promotion Ends: Wednesday, December 18, 2019

---

[17] *Id.*

65.     Victims are again presented with a picture of Nuvega Lash and told that they will be signing up for a "Free Sample" and that they will "pay only $4.95 for shipping!"



66.     And finally, victims are presented with a serious of fake reviews at the bottom of the page purporting to come from real Facebook customers of Nuvega Lash.

67.     On information and belief, victims of Nuvega Lash who purchased from the Nuvega Lash website were all subjected to similar or identical representations, and were funneled from affiliate landing pages such as this one to a second landing page hidden on a Nuvega Lash website.

68.     The example affiliate landing page is old, and it is unclear which URL it linked to based on the source code. But on information and belief, that URL was http://trynuvegalashnow.com/v2/, a "landing page" on a website run by Defendants Chumenko, Barone, and their group of shell companies. The existence of this landing page is not immediately apparent to anyone other than the victims. Anyone visiting the site by typing in the main domain name, trynuvegalashnow.com, would be unable to find it and would never even know it existed. But websites for affiliate networks attempting to entice affiliates to advertise for Nuvega Lash make clear that these affiliates were

directing their victims to this specific landing page, and not to the main page of the Defendants' website.[18]

69.    A partial image of the landing page taken from a desktop computer appears below:[19]



70.    At the bottom of this landing page when visited on a PC desktop—but **only** on a desktop—there is a lengthy disclaimer in tiny print.



---

[18] OfferVault Nuvega Lash Offer Page, https://www.offervault.com/affiliate-offers/details/offerId/14580394/nuvega-lash-now-trial-us-survey-allowed/ (last visited Dec. 14, 2019).
[19] http://trynuvegalashnow.com/v2/ (last visited Dec. 14, 2019).

71.     If a user visits on mobile or a tablet (the source of the great majority of Internet traffic), the website is programmed so that this disclaimer is not visible at all. Instead, as show in the screenshot of the website taken from an iPhone below, nothing appears below the "Rush My Trial" button and the victim cannot access or see the desktop disclaimer:



72.     The disclaimer visible only to desktop users states in full:

Please read all packaging and labels carefully. Always consult your physician or healthcare provider before taking any supplement. If you have or suspect that you have a medical problem, please consult your physician or health care provider. The contents of this website are for informational purposes only. Not for use by children under the age of 18. These statements have not been evaluated by the Food and Drug Administration (FDA). Use only as directed. This product is not intended to diagnose, treat, cure, or prevent any disease or as a prescription for medication. Testimonial images are actor portrayals to protect the privacy of our customers providing testimonials. *If a hair follicle actually has died, it will not regrow hair. No products can make a hair follicle come back to life. The follicle however can still be alive but not growing hairs. We recommend using NUVEGALash

over an 8 week period. Everyone is different while we hope our product works for everyone we cannot guarantee it will. You have no obligation to buy anything in the future as long as you call to cancel. In most cases shipping takes 4 days to receive your product. After placing your initial order, you will have 14 days to try the product & determine the benefits. 14 days after you place your order, your credit card will be automatically charged the full retail price of $94.97. You must call during the 14-day try it before you buy it period to not be billed the full retail amount. If you choose to cancel within your 14 day trial period, you will be provided an RMA number and you will need to return the items back to us. Please note that to ensure you receive a refund or to ensure a cancel order please provide us with a tracking number for the item you are returning. You may cancel at any time by calling Customer Service at 1-800-918-9094. Customer Care representatives are available 24 Hours Monday through Friday / 8am to 8pm Saturday & Sunday.

73.    Buried within the middle of this wall of tiny text is the disclosure that customers must cancel within 14 days of their order or they will be billed $94.97 (and that in fact, they only have 10 days because shipping will take 4 days). Nowhere does this desktop-only disclaimer state that the consumer is signing up for a monthly subscription.

74.    Once a victim enters their personal information, they are taken to a check-out page. An image of this check-out page for the desktop version of the trynuvegalashnow.com/v2/ landing page appears below.



75.     Notably, there is no requirement that users click a box or take any other action to agree to any terms of service. Instead, the link to the terms of service is located at the bottom of the screen next to several other links, in small text, and it requires users to scroll down to locate it. On the phone or tablet, the design for this page similarly requires no assent to the terms of service in any way, and again requires scrolling to a small link at the bottom to even view the terms.

76.     Users signing up for a trial of Nuvega Lash through this landing page are subjected to a number of false or misleading representations. Most gallingly, victims are never told that they will be signed up for a monthly subscription for the product costing them $94.97 a month, plus $4.99 shipping and handling. In fact, they are told exactly the opposite: that they will "[j]ust pay a small shipping fee." And on the check-out page, victims are shown a graphic stating unambiguously that the price they will pay is $0.00, with $4.99 for Shipping & Handling.



77.     A few weeks later, victims who were told that they would pay $0.00 for the Nuvega Lash product are understandably shocked to see their credit card billed for nearly $100 they did not agree to. And if they do not immediately call to cancel, they find themselves being billed endlessly, each and every month. This is nothing more than credit card fraud—lying to customers about what they will pay, taking their credit card information, and billing them for something they never agreed to. But this is just the beginning of the Defendants' misrepresentations.

78.     Victims are also repeatedly told that the supply of Nuvega Lash is limited. On the first page, they are told: "Due to high demand, supplies are limited. Get your

order today!" When a victim proceeds to the shopping cart, they are presented with a graphic with a red bar supposedly describing the Current Availability as "LOW STOCK" and urging them to "Act Now!" and to "Act now so you don't miss out on this offer!"

**Great Job!** You're one step closer to beautiful brows.
Act now so you don't miss out on this offer!

Current Availability: ▇  **LOW STOCK.** Act Now!

Just pay a small shipping fee. Enjoy expedited delivery!
Your order is scheduled to arrive by **Sunday,
December 15, 2019**

79.    A prominent arrow below this claims there are "LIMITED QUANTITIES AVAILABLE."



80.    In fact, the graphic purporting to be a representation of "current availability" is simply a static image that does not reflect the current supply of Nuvega Lash at all. And these representations have been constant for years on end—when there is no shortage of Nuvega Lash, and on information and belief, there never has been.

81.    The landing page claims that using Nuvega Lash will permanently lengthen and strengthen a user's eyelashes: "NUVEGALash is an innovative, nature packed serum, made from a combination of natural herbs and oils to give your eyelashes a new rejuvenated look. Soften lashes in the evening with our NUVEGALash and wake up in the morning to feel the effects. The good news? The change is not temporary! NUVEGALash moisturises the eye follicles, helping promote longer and stronger lashes."

82.   If a user types in the URL trynuvegalashnow.com, they see an entirely different website—but one that is little better. A partial image of this website appears below:



83.   On information and belief, victims of this scam were directed to the /v2/ landing page, rather than the main page. But any victim who purchased from the main page would have been subjected to similar false representations to induce them to purchase.

84.   For example, at the top of the page, users are told that there is a limited supply of Nuvega Lash, and that "[d]ue to high demand from recent media coverage we can no longer guarantee supply." But this is false—there does not appear to have **ever** been any media coverage of Nuvega Lash. Instead, this false representation is designed to dovetail with the fake celebrity advertisements/articles which a victim would view before arriving at the website.

**ATTENTION:** Due to high demand from recent media coverage we can no longer guarantee supply. As of **January 9, 2020** we currently have the product IN STOCK and will ship within 24 hours of purchase.

85.   Visitors to the main page are also told that Nuvega Lash will give them "[e]yelashes from 30 to 50% longer, thicker, and darker in 6 – 8 weeks." The main page also claims that Nuvega Lash alters the functionality of the human eyelash as well as its hair cells: "NUVEGALash not only extends the growth cycle of lashes, but also nourishes and stimulates the hair cells."

86.   As of January 2020, the shopping cart on the main page is broken. But on information and belief, the following checkout page is at least one prior version of the desktop shopping cart for the main page of trynuvegalashnow.com:[20]



---

[20] Checkout Page, https://trynuvegalashnow.com/discount.php (last visited Jan. 9, 2020).

87.   This checkout page contains a lengthy "disclosure" paragraph in tiny text with the font color set to a light grey that is almost unreadable against the white background:



By clicking "RUSH MY TRIAL" you will receive one (1) Free Trial of NUVEGALash for the cost of shipping and handling (non-refundable). You then have 14 days from the date you place your order with us to evaluate the product. If you are unhappy with the product at any time during those 14 days, you must call us to cancel your Free Trial and any future shipments to avoid being billed. If you are satisfied with our product, do nothing and in 14 days, we will bill you for $94.97 for the supply you have already received to the credit card on file. Approximately 30 days after your initial order and every 30 days after that, you will be shipped a new supply of NUVEGALash and billed $94.97 plus $4.99 s/h to the credit card on file. You may cancel anytime by calling 1-800-918-9094. Cancel before your next shipment to avoid future billings.

88.   And again, the "disclosure" is coupled with express claims that the victim will pay "$0.00" for Nuvega Lash and will only pay a $4.99 shipping fee:

NUVEGALash Revitalization Serum

✔ DISCOUNT ACTIVATED, SAVINGS APPLIED!

| Product | | Price |
|---|---|---|
| NUVEGALash Serum | 1 | $0.00 |
| Shipping | 1 | $4.99 |
| Total | | $4.99 |

89.     On mobile, the shopping cart still appears to be active, and users visiting the main page of trynuvegalashnow.com are shown a small text disclosure of the subscription program paired next to a larger, bold-text claim that the user will pay "$0.00" for Nuvega Lash and $4.99 for Shipping:



90.     Because the desktop shopping cart is currently broken, is unclear whether the differences in the mobile and desktop disclosures of the main page of trynuvegalashnow.com represent the page as it always was, or whether there have been changes over time which these differences reflect. On information and belief, for at least some periods of time, the main page of trynuvegalashnow.com was being used to fraudulently convince bank employees that victims had purchased from that page, as opposed to the landing page to which affiliates and advertisers actually directed their traffic, trynuvegalashnow.com/v2/.

91.     Just as an old-time speakeasy would maintain a false front of a legitimate business operation to distract law enforcement from their criminal activities, the Defendants here also operate multiple other websites whose sole purpose appears to be to trick anyone conducting an investigation into the validity of these purchases (such as a bank or credit card company deciding whether to grant a chargeback to a consumer who complains).

92.     These "false front" websites are designed to appear legitimate. Unlike the website consumers actually see when they sign up for the free trial, trynuvegalashnow.com/v2/, these sites contain a prominent terms of service, requiring that a box be checked to purchase the product. And unlike the website shown to consumers, the "false fronts" explicitly disclose that a consumer using those websites would be signing up for an ongoing subscription. In all respects, they are designed to look like a legitimate company and not a scam.

93.     The maintenance of these false front websites is itself an act of deception, intended not just to hide from law enforcement but to prevent consumers from exercising their lawful right to a chargeback by their bank or credit card company for charges they never agreed to. Presented only with the false front, banks and credit card companies cannot know that there is fraud being conducted behind it.

94.     The Federal Trade Commission has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different

versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[21]

95.    This is exactly what the Defendants have done here. Defendants Barone and Chumenko operate a host of shell companies, all of which run websites promoting Nuvega Lash or its related products such as Nuvega Brow. Each presents itself to visitors as if it is the official website of the Nuvega Lash products, and each lists a different company as the one that is selling Nuvega Lash. On its surface this would appear to make no sense: there is no business reason to sell the same products from so many different shell companies, with so many different near-identical websites. But that is not the purpose. The purpose of these websites is to make it more difficult for banks to identify the Nuvega Lash operation as a fraud by separating out and controlling which merchant accounts and which shell companies the chargebacks are attributed to, and thus preventing or delaying any one merchant account from being identified as conducting a fraud.

96.    One group of these "false front" websites consists of www.nuveganlashes.com; www.lashesbynuvega.com, www.nuvegavegan.com; www.nuveganbrows.com; and www.shopnuvega.com. Each of these websites looks almost identical with very minor variations, except that they list a different corporate entity as the owner, listing different phone contact information, and different addresses as the location of Nuvega Lash (or in one instance Nuvega Brow). The "above the fold" section of these sites (the portion immediately viewed by the user before scrolling) appears as follows, taken from www.lashesbynuvega.com:

---

[21] Leslie Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal Trade Commission Business Blog (2017), https://www.ftc.gov/news-events/blogs/business-blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements (last visited Sept. 6, 2019).



97.     Unlike the actual site which victims view, trynuvegalashnow.com/v2/, these "false front" websites make a disclosure of the trial terms above the order button and require the user to click to agree to the terms of service.

98.     The website www.nuveganlashes.com states at the bottom of the website that it is operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Defendant Chumenko's home address).

99.     The website www.lashesbynuvega.com states at the bottom of the website that it is operated by Green Pogo LLC at 9 Crest Fruit Ct, Manalapan NJ 07726 (Defendant Barone's home address).

100.    The website www.nuvegavegan.com states at the bottom of the website that it is operated by Improved Nutraceuticals LLC at 9 Crest Fruit Ct, Manalapan NJ 07726 (Defendant Barone's home address).

101.    The website www.nuveganbrows.com states at the bottom of the website that it is operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Defendant Chumenko's home address).

102.   The website www.shopnuvega.com states at the bottom of the website that it is operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Defendant Chumenko's home address).

103.   Three other websites use an identical layout to the sites above, but list addresses that on information and belief are of friends or business associates of Defendants Barone or Chumenko.

104.   One of these three other websites, www.browbynuvega.com, states at the bottom of the website that it is operated by Nu Beauty Care LLC at 270 Arthur ave (sic), Englewood Cliffs NJ 07632. Nu Beauty Care LLC is the New Jersey branch office of an unknown corporate entity.

105.   Another site, www.bestveganlash.com, states at the bottom of the website that it is operated by Tykhe Enterprise LLC at 21142 NE 31ST Pl, Aventura, FL 33180. According to WhoIs data scraped from the ICANN registry, this website was registered historically to someone from the state of New Jersey.[22]

106.   Another site, www.bestveganbrow.com, states at the bottom of the website that it is operated by Tykhe Enterprise LLC at 21142 NE 31ST Pl, Aventura, FL 33180. According to WhoIs data scraped from the ICANN registry, this website was registered historically to someone from the state of New Jersey.[23]

107.   Tykhe Enterprise LLC is the name of a Delaware corporation with no current registered agent. A Florida corporation is named Tykhe Enterpris**es** LLC, (emphasis added), but it is unclear from publicly available documents how or whether these entities are related to the Defendants.

108.   A third "false front" website design utilized by the Defendants appears on www.nuvegalashforvegans.com, which applies a slightly different layout from the aforementioned "false front" websites, but again is designed to appear as if it is a

---

[22] Whoxy Search, https://www.whoxy.com/bestveganlash.com (last visited Jan. 7, 2020).
[23] Whoxy Search, https://www.whoxy.com/bestveganbrow.com (last visited Jan. 7, 2020).

legitimate website which discloses its trial terms to consumers. This website states at the bottom of the website that it is operated by Green Pogo LLC at 9 Crest Fruit Ct, Manalapan NJ 07726 (Defendant Barone's home address). A partial image of its front page appears below:



109.   If a visitor to www.nuvegalashforvegans.com clicks on the "Get My Free Trial!" button, they are taken to a checkout page hosted on nuveganbrows.com which makes a prominent disclosure of the terms at the top of the page, and requires the user to click a prominent box at the bottom to agree to the terms of service. To an unsuspecting bank employee reviewing this page, it would appear that Nuvega Lash victims had in fact consented to be charged—if only this were the website the victims had actually visited:

110.   On information and belief, the Defendants present these "false front" websites to customer's banks whenever a chargeback is being investigated, fraudulently representing to the bank that it was the website the customer used to sign up for Nuvega Lash. As the BBB report stated: "in one FTC case an ISO spread the credit card charges over 26 merchant accounts to disguise the fraud activity." Ex. 1 at 11. And here, the Defendants have spread their charges over multiple shell corporations (and presumably multiple merchant accounts) to avoid accumulating too many chargebacks on any one account and being flagged for the fraud they are conducting.

111.   One angry victim of the Nuvega Lash scam recognized this pattern in their bank statement and complained of it online, believing the tactic was designed to confuse consumers:[24]

> Ordered their $14.99 product after seeing their ad on the internet. They started charging $99 from next month for a product I never authorized them to sent me on monthly basis.
>
> Their customer service is very shady, they initially kept telling me to take a discount and keep the product but in the end said that by their policy they can only return 25% and I have agreed to but their products.

---

[24] Report Scam, https://reportscam.com/trynuvegalashnowcom (last visited Jan. 5, 2020) (emphasis added).

The confirmation email of $14.99 order I made has no mention of $99 monthly charge. **They keep changing the merchant name while making transaction so that you don't recognize them (VBEAUTY, ADVANCEDLASH, GRNPOGO)**

Called my bank to get the transactions disputed and further transactions blocked. Stay away from this CON company.

112.   Ms. Adam experienced the same pattern: she was billed from three separate merchant accounts for her shipping charges, and her subscription was billed from two different merchant accounts. But this is not a ploy to confuse consumers, but to defraud their banks. Instead what the Defendants did here was just what Neil Patel described in his keynote speech to a roomful of such scammers: "Or the credit card processors where you guys rotate up the chargebacks so then that way, then you guys can keep processing the money.... You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGS or the MIDS, I don't know what the saying is but it's more so they're controlling where the chargebacks are going."[25]

113.   Other victims explained in detail their experiences in online reviews or fraud reports, which were similar or identical to that of Ms. Adam.

114.   For example, the Amazon page for Nuvega Lash, sold there by Green Pogo LLC, is flooded with reviews from victims of the scam who say that they were billed without their consent—and that Nuvega Lash made it almost impossible for them to cancel the subscriptions they never agreed to in the first place. Many of these victim report that they purchased the product directly from the Nuvega Lash website.

115.   A victim posted on Amazon on January 5, 2019: "I signed up for their trial...nothing on the site said anything about additional charges. They've now charged

---

[25] Neil Patel, *The Future of Affiliate Marketing: It's Not What You Think*, https://www.youtube.com/watch?v=2hUdbztKLY4 (last visited Jan. 3, 2019) (emphasis added).

me two months in a row and no product. HOW DO YOU GET IN CONTACT WITH THEM? Thanks."[26]

116.   A victim posted on October 20, 2018: "Yes, I bought the 'free trial'. Never received the product, was then charged $94, with NO refunds. A complete scam, AND the money back guarantee is a lie."[27]

117.   Another victim posted on October 17, 2017 a review titled "Serum Isn't Worth Their Dirty Tactics." She stated:[28]

> I purchased the Nuvega lash and brow serum through an ad I saw (not Amazon) and it said nothing about the fact that I was signing up for a 14-day trial and that after the 14 days I would be charged $94 for one tube and $92 for the second tube. Once I saw the charges on my credit card I called to have them reversed. They said I had agreed to the terms of the trial, but no where when I ordered the product did it say anything about the trial or the subsequent charges. The person on the phone was rather incredulous and somewhat rude. They have a 30-day money back guarantee, but you are of course out the shipping to return it. They said the two tubes were a two month supply for lashes and brows, but the vials are so small I seriously doubt it would last that long."

118.   Multiple other victims of the Nuvega Lash scam responded to this review saying the same thing had happened to them. One said: "I had a similar experience, although I ordered directly from them -- no where did it say anything about a subscription, nor did the live person I spoke with say anything. Had a very difficult time stopping charges; it took a while, they would not even do anything before some time had passed, and of course the expected me to return the product, at my own expense...and that

---

[26] Nuvega Lash Amazon Page,
https://www.amazon.com/ask/questions/Tx10HCB3TU4N2PB/ref=ask_dp_dpmw_al_hza (last visited Dec. 16, 2019).
[27] Nuvega Lash Amazon Page,
https://www.amazon.com/ask/questions/Tx2SBA3B8LW7J1K/ref=ask_dp_dpmw_al_hza (last visited Dec. 16, 2019).
[28] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/RF36BYAN9POZG/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06XNKS7L6 (last visited Dec. 16, 2019).

I had used some of it was apparently a huge problem. The people on the phone -- I spoke with several, over several calls -- were uniformly rude and *extremely* evasive. The product seemed to work but never, ever will I do any business with the company again. Absolutely NOT TRUSTWORTHY."[29]

119.   Another victim replied to this review saying "They did the same thing to me. Luckily my credit card company declined the charge, TWICE. Do not order this product. I am putting a report on the BBB also."[30]

120.   Another replied: "thank God your bank notified you. I also signed up for a free trial and agreed to pay shipping and next thing i know they took $200.00 from me. i am going to call amazon and ask them to not let them even be on there. I am so angry at thieves. People don't need to rob your houses any more its too easy to scam you on line. Lesson learned do not go for free trials anymore on line and don't give out your card info for free trials. It pisses me off because i am usually so careful. Also the customer service numbers to talk to them are bogus, when you dial doesn't even ring, call immediately drops. SCAM SCAM SCAM CAN YOU SAY BIG SCAM."[31]

121.   Still another victim replied: "I have been duped by this company no replies to emails or messages. Does not answer phone any suggestions for help."[32]

122.   Another victim reported that she had to stop payment through her bank: "I fell for the same scam , said get this product free all you have to do is pay shipping , then a few weeks later my bank called saying there trying to take 95 out of my account I told them to stop payment , now I get a email saying they will knock off 50 percent if I still want product .. there words for sellers l8kw this ... I also fell for trap there's nothing there bout trying product for 14 days it says free I will not fall for this kind of top again and No never buy from them there very dishonest."[33]

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

123.   One victim reported in an Amazon review that the company was claiming that Dr. Oz had endorsed Nuvega Lash: "This is a scam to get your credit information. In less than 8 days after ordering a free sample you will be charged $94.97 and $89.97. Not enough time is given for the product to arrive and see any results. Avoid this scam at all costs. It is unlikely that Dr. Oz is aware of this product being advertised using his name, as stated in the ad. This is not a free trial. A free trial would send you a trial size sample and give you enough time to see results from a product. This product is extremely overpriced for what it is. DO NOT ORDER UNDER ANY CIRCUMSTANCE unless you like your credit card being hit at any time unexpectedly."[34]

124.   Another victim said: "This is a scam. There is no free trial and you are signing up fir a monthly membership which you cannot get out of."[35]

125.   Another victim said: [36]

I made the mistake of sampling this product via an ad on Instagram (stupid, stupid move) for the cost of shipping & handling. Later, my credit card was charged upwards of $150 for a subscription. There is apparently fine print (which is visible now from a laptop but was NOT shown on the mobile phone view.) As far as I can tell, the product works and well, but I cannot imagine supporting a company with such malicious tactics. I've reported the company to Citibank and am still waiting to see whether the charges will be dropped. Some research after the fact shows that I am one of many to fall for their trap. There are other similar products that work whose companies seem far more honest. Skip this stuff.

126.   Another victim said: "Happened to me to. I will always check now on Amazon for these reviews. What a sham...I thought I bought it for $5. Now I am paying

---

[34] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R10N9HKJ2ODBN0/ref=cm_cr_arp_d_rvw_ttl?ie=UTF8&ASIN=B06XNKS7L6 (last visited Dec. 16, 2019).

[35] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R3OD8G9X1F6G6U/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06XNKS7L6 (last visited Dec. 16, 2019).

[36] Nuvega Lash Amazon Page, https://www.amazon.com/gp/customer-reviews/R2UNWZN2N15T1S/ref=cm_cr_getr_d_rvw_ttl?ie=UTF8&ASIN=B06XNKS7L6 (last visited Dec. 16, 2019).

$90 for it, paying for return shipping for another product, and totally scammed by this company. Fraud ALERT!"[37]

127.   On ReportScam.com, a victim posted a report titled "I have been scammed by nuvega lash" on May 2, 2017: [38]

> I found this website online, and on their site it only says rush my free trial, it doesn't say anything about having 14 days to cancel your membership or you will be charged 119$. Now when they charged my card on the last day I called and asked why was I being charged and the agent I talked to was very rude to me and told me he could only refund me back 59$ I asked to speak to a supervisor or manager and he went off and would not let me speak to anyone. Left me feeling horrible and robbed! I still haven't received a refund, I may have to just go dispute this at my bank.

128.   Another victim posted on ReportScam.com about signing up on trynuvegalashnow.com in a post titled "Fraud Company - Will add you without consent to their $99 monthly scam:"[39]

> Ordered their $14.99 product after seeing their ad on the internet. They started charging $99 from next month for a product I never authorized them to sent me on monthly basis. Their customer service is very shady, they initially kept telling me to take a discount and keep the product but in the end said that by their policy they can only return 25% and I have agreed to but their products.

129.   A victim report on ReportScam.Com titled "Scammed by nuvegalashes" states that the Defendants simply quit answering their phone number: "I saw the advertisement for a free sample $5 shipping I tried it. It never said anything about canceling. When I check my account they charged me $95! When I called I was told I

---

would be refunded. It's been 2 weeks and still no refund and the company will no longer answer the phone!"[40]

130.   Another victim reported their experience with Nuvega Lash on ReportScam.Com:[41]

'Free trial offer...just pay for shipping!!'

I bought it, hook, line and sinker and ordered the "free trial". I get to the payment page and it shows me a brow enhancer and asks me to continue. I don't need brow enhancers as mine are already caterpillars!! I hit continue, 'BAM' another charge for S+H. There is no way to back up, they already have my credit card info.

Pissed off by now but I receive my two tubes, lash and brow. They are exactly the same...matter of fact, if you pull the 'brow enhancer' sticker off it says lash enhancer!!

I go online to see if anyone has left reviews on instructions for the product and find out I will be charged $119.99 + $9.99 S+H after a 14 day trial. I had to dig around for a phone number to contact them because it is not easily available. Coincidentally, the number that was on one of the NuVega sites is an attorney's office. Maybe we should all hire them because I also found that these 'Free Trial Scams' are now being prosecuted and companies are paying out in the millions.

I digress...once finding the number I contacted customer service and they gave me a return number to return my trial products.

No big deal! I am out $10.00 shipping and handling and will go nuts on someone if I am in fact charged.

LESSON LEARNED!!

---

[40] *Id.*
[41] Report Scam, https://reportscam.com/nuvegalashescom (last visited Jan. 5, 2020).

131.   Another victim warned on ReportScam.Com that despite promising to do so, the Defendants refused to refund money to customers after shipping the product back— and that it was so common their local USPS office knew about the issue already: "The company failed to honor the written agreement for a refund for returned product (ADVANCEDLash) and failed to answer the USPS inquiry for receipt of returned item. Per local USPS, the company has a history of this practice."[42]

132.   On a website called Scamion, Nuvega Lash similarly has an active page with multiple user reports. One describes taking screenshots of the advertisement and there being no disclosure whatsoever of the subscription:[43]

> Nuvega Lash advertises a 'free trial' size bottle/tube, in which you only need to pay $4.99 S&H. So I think I'm just purchasing a 'free' sample of the serum, and naively enter my name, address, & credit card number. I go away for 2 months, & when I return, I find out they've charged my account $99.96 each month!
>
> In shock, I try to call the number listed for them on my bank statement, & I was on hold for 10 min., then it hung up on me! I try to go to the web address listed for them on my shipping receipt, only to find out that the website no longer exists! So I'm now out $200 for what was apparently a 'subscription' of Nuvega lash that I in NO way knowingly authorized!
>
> I have a screenshot of their Ad, and it says NOTHING on that Ad about a 14-day trial, in which after 14 days, I would be automatically charged $99.96 every month. How can this even be legal?

133.   Another victim posted on Scamion and described the financial hardship she suffered from the Defendants' fraud: "Said it was a free trial. Made me pay $4.99 for shipping and kept charging my card $96 over and over. I called and told them I didn't want it and wasn't going to pay that much for eyelash serum. They told me to send the

---

[42] Report Scam, https://reportscam.com/nuvega (last visited Jan. 5, 2020).
[43] Scamion, https://www.scamion.com/nuvega-lash-30 (last visited Jan. 5, 2020).

producr back, which I did, because I never opened it. Then they continued to bill me. I'm a single mom and can't afford to keep having them take money out of my account!"[44]

134.   Another victim reported on the Scamion page for Nuvega Lash:[45]

Bought product on Wish app got product. Then received some brow product I did not order and then received eyelash product and brow product one month from original product. I called company got the Ran# returned product both lash and brow product that I had been charged on my credit card for 97.89 and 99.96 I kept the initial lash and brow product returned the second lash and brow for the 30 day guarantee.

Which states if returned in 30 Day (I have a tracking number ). We'll refund your money less shipping and processing. I still have not received my refund Have contacted customer service 6 times No refund. Please help if you look on line this company Check via address is known for this. Very frustrated

135.   These are just a sample of the many complaints about Nuvega Lash across various websites. It is not a coincidence that so many victims are reporting the exact same thing: that they were told Nuvega Lash would be free, that they later discovered they had been billed hundreds of dollars for a subscription they did not sign up for, and that when they tried to cancel their nonexistent subscription, the company made it as difficult as possible to do so. This was how the Defendants treated all of their victims—and the Nuvega Products were just a thin excuse to commit rampant credit card fraud.

**Misrepresentations Regarding Reviews and Endorsements**

136.   On information and belief, the Defendants marketed the Nuvega Products exclusively through affiliate marketing networks, such that every customer who purchases a product from them will be exposed to and view the fake celebrity endorsements described herein. Ms. Adam specifically recalls viewing an advertisement

---

[44] *Id.*
[45] *Id.*

stating that the products had been endorsed by Blac Chyna and relied on that in signing up for the "free trial."

137.   These celebrity reviews are material to the Defendants' customers and their decision to purchase the products at issue. Because these individuals are well-known with well-guarded reputations, portraying reviews as coming from them misleads customers into believing that the Defendants are a credible, well-established company. Because these celebrities are generally beautiful with desirable appearances, the fake quotes suggesting that these celebrities obtained that appearance by using the Nuvega products misleads customers as to the kinds of results they may expect from using the products.

**Misrepresentations and Omissions Regarding Free Trials**

138.   Another way the Defendants deceive consumers on their websites is to suggest that they are signing up for a "free trial," when in fact they are not. The first page a victim would view is a website such as healthyhair.healthfindings.website/lash.html, which expressly states that consumers are signing up for a free trial. The second page a victim would view is the sign-up page on trynuvegalashnow.com/v2/, which describes the offer as a "trial," lists the price for the product as $0.00 with the customer only paying $4.99 for shipping and handling, and falsely represents that the customer will "just pay a small shipping fee."

139.   On information and belief and based on the sales funnel structure, every customer who purchased Nuvega Products would have been exposed to these representations.

140.   The Defendants made material omissions regarding the "free trial" on their websites by omitting material information which they were under a duty to disclose relating to those trials. The Defendants failed to disclose to consumers who viewed the websites that the trial was not in fact free, and that they were signing up for a subscription for the Nuvega Products. These terms were concealed by burying them inside a terms of service on a separate page on the website.

141.   The Defendants under a duty to Plaintiff and the Class members because they made partial representations—that the cost would be $0.00 and that all they would pay for was shipping and handling—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that there would be an ongoing subscription, that it would include more products than the one the victims signed up for, and that it would be for nearly $100 per month in total.

142.   The Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the trynuvegalashnow.com/v2/ landing page and in any other places where references to a free or trial offer occurred.

143.   The Defendants' omissions regarding the subscription payments were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known they were not signing up for a free trial or that the actual cost would be more than $100 per month if they did not cancel virtually immediately, they would not have agreed to the offer.

144.   Ms. Adam was damaged by these misrepresentations and omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of its terms.

**Representations Regarding Limited Supply**

145.   The Defendants' web pages include representations of limited supply, as described herein. But on information and belief, those purported limitations and the representations that there was "low stock," "limited quantities available," or that there were limitations on how many people could sign up for the product were false.

146.   These misrepresentations are designed to induce consumers to sign up for trials and to create a false sense of urgency. As a result of these misrepresentations,

consumers purchase products they would not have or pay more for them than they otherwise would have, or they retain products for longer than they otherwise would have and are damaged by finding that they have been subjected to a subscription they did not agree to.

147.   The Defendants' misrepresentations regarding their limited supply are material to consumers. A reasonable consumer would attach importance to the truth or falsity of these misrepresentations in deciding whether to purchase the products because if they knew that the products were not limited in supply and could be purchased at any time, consumers would not feel the need to sign up for a "free trial" on impulse and under time pressure that did not exist based on these representations. Plaintiff and the Class members thus reasonably relied upon these representations in making their purchase decisions.

**Omissions Regarding the "False Front" Websites**

148.   The Defendants deceived consumers' banks and credit card companies, by maintaining "false front" websites at the various URLs described herein. These sites were created intentionally to make it appear to outsiders that the victims of the scheme had been informed of their subscriptions and had consented to them. The Defendants were under a duty to disclose to Plaintiff and the Class Members that they maintained these "false front" websites and to disclose that they routinely used those websites to deceive banks or credit card companies to prevent consumers from exercising their right to a chargeback.

149.   Plaintiff and the class were damaged by these omissions. All members of the class were damaged because had the banks and credit card companies not been unlawfully deceived, the scheme would have been shut down and none of the Class members would have been billed. The Defendants further owed duties to all of the Class members to inform them that there were "false front" websites, and the failure to do so injured every member of the Class.

150.   The Defendants made material omissions regarding the "false front" websites by omitting material information which they were under a duty to disclose relating to those sites. The Defendants failed to disclose to consumers who viewed the trynuvegalashnow.com website or its landing page at /v2/ that there were multiple other websites, that the Defendants planned to intentionally deceive the consumer's banks or credit card companies if they attempted a chargeback, and that they were not bound by any of the terms or other disclosures on the trynuvegalashnow.com website.

151.   The Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the Defendants had exclusive knowledge of material facts not known to them, namely that there were numerous other websites which were being used as a "false front."

152.   Plaintiff and the Class Members did not know this, and it was difficult to discover because that information was not located on the website they signed up for the trial from, because the trynuvegalashnow.com/v2/ website was designed to be inaccessible from its main page, and because the "false front" websites were placed on entirely separate URLs which were not linked to from the page on which the victims signed up for the trial.

153.   The Defendants were under a duty to disclose this information to Plaintiff and the Class Members because the Defendants engaged in active concealment, and have engaged in affirmative acts of hiding, concealing, or covering up this matter. The Defendants made efforts to hide their websites from view as described above, to make the landing page difficult to find, to delete various advertisements so customers could not find them again, and by creating the "false front" websites to conceal from their victims and others the actual landing page that the victims visited.

154.   The Defendants were further under a duty to Plaintiff and the Class members because they made partial representations to the banks and credit card companies—that they had sold the Nuvega Products to their victims—but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely that none of the

victims had actually signed up for the free trial on the websites which banks and credit card companies were presented. The Defendants further made partial representations to Plaintiff and the Class members—that they would receive a free sample—without disclosing that if they attempted a chargeback, the Defendants intended to lie about the terms of the agreement to their banks or credit card companies.

155.   The Defendants knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. Those omissions could have been corrected by including the omitted information in proximity to the trial offer on the trynuvegalashnow.com/v2/ landing page, or in follow-up e-mails to their victims, or in proximity to their representations to banks and credit card companies.

156.   The Defendants' omissions regarding the "false front" websites were material to consumers. A reasonable consumer would attach importance to the truth or falsity of these omissions in deciding whether to purchase the products because if consumers had known that the Defendants were maintaining a fake website for the purpose of defrauding their banks and credit card companies, they would not have signed up for the "free trial."

157.   Ms. Adam was damaged by these omissions individually as described herein, and relied on them in that she would not have signed up for the offer had she been informed of this information.

### The Barone / Chumenko Defendants

158.   In most free trial scams, multiple nominally distinct individuals and entities operate together to defraud their victims. The Nuvega Lash scam is no exception. The actual products at issue here appear to be made by (and trademarked by) a German or Swiss company called 8Alpha GmbH Corporation, and manufactured by a German

company called Nutracosmetic GmbH.[46] On information and belief, Defendants Frank Barone and Kirill Chumenko have the rights to sell or distribute the Nuvega Lash products in the United States, and they do so through a series of shell companies.

159.   Defendants Barone and Chumenko have long been business partners in similar endeavors. On February 4, 2004, they both filed a patent together for a topical compound that purportedly enhanced male erections.[47] Through a company named Barmensen Labs LLC, they sold such products as a male erectile enhancer called Maxoderm, a weight loss powder called Alvitum, and a migraine supplement called Miprovil.[48]

160.   In roughly 2016, Defendants Barone and Chumenko began promoting the Nuvega Products for sale through a series of shell companies.

161.   These companies include, at a minimum, Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC.

162.   Collectively, these Defendants are referred to herein as the "Barone / Chumenko Defendants" (Frank V. Barone; Kirill Chumenko; Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC).

163.   Plaintiff expects that additional John Doe shell companies will be identified through discovery which Defendants Barone and Chumenko used to assist in the scam, in particular by utilizing their merchant accounts to avoid fraud detection in the sale of the Nuvega Products.

---

[46]
[47] U.S. Patent. No. 7,214,390 B2 (filed Feb. 4, 2004) (available at https://patentimages.storage.googleapis.com/85/61/3c/10a733f512de10/US7214390.pdf).
[48] Barmensen Labs Website Archive, https://web.archive.org/web/20070726145752/http://www.barmensen.com/ (last visited Jan. 28, 2020).

164.   These shell companies do not follow corporate formalities and are operated as if they were a single entity or unit. For example, Green Pogo LLC purported to operate a website called greenpogo.com in 2016.[49] However, the trademark for the name of this website was held by Barmensen Labs LLC.[50] The product sold on greenpogo.com by Green Pogo LLC, Red Fortera, is trademarked by one of the other shell companies, Fortera Nutra Solutions LLC.[51] Red Fortera is sold by yet another shell company, Healthy Living Advancements LLC.[52] And as described further herein, the Defendants routinely presented different shell companies as the seller of the Nuvega Products (and used those shell companies to bill victims from their own merchant accounts to avoid fraud detection by the victim's banks).

165.   Defendant Barone is directly involved in the management and operation of these shell companies, and exercises control over their activities in selling the Nuvega Products.

166.   Defendant Barone's home address, 9 Crest Fruit Court, Manalapan, NJ 07726, is listed as the contact information for AdvancedLash, a product sold by Green Pogo LLC,[53] as well as Advanced Beauty LLC.

167.   Defendant Barone's home address is also listed on the website lashesbynuvega.com as the contact information for Green Pogo LLC as the seller of Nuvega Lash.[54]

---

[49] Greenpogo.com Website Archive,
https://web.archive.org/web/20161001155646/http://greenpogo.com/ (last visited Jan. 28, 2020).
[50] Greenpogo.com Trademark Status,
http://tsdr.uspto.gov/#caseNumber=78895441&caseType=SERIAL_NO&searchType=statusSearch (last visited Jan. 28, 2020).
[51] Red Fortera Trademark Status,
http://tsdr.uspto.gov/#caseNumber=87061053&caseType=SERIAL_NO&searchType=statusSearch (last visited Jan. 28, 2020).
[52] http://redforteraondemand.com/ (last visited Jan. 28, 2020).
[53] http://www.advancedlashbeauty.com/terms.html (last visited Jan. 2, 2020).
[54] https://lashesbynuvega.com/ (last visited Jan. 2, 2020).

168. Defendant Barone's home address is also listed on the website nuvegavegan.com as the contact information for Improved Nutraceuticals LLC as the seller of Nuvega Lash.

169. Defendant Barone is a manager of Fortera Nutra Solutions LLC and Green Pogo LLC (New Jersey).

170. Defendant Chumenko is also directly involved in the management and operation of these shell companies, and exercises control over their activities in advertising and selling the Nuvega Products.

171. On information and belief, Defendants Barone and Chumenko jointly control and operate the shell companies to sell the Nuvega Products and other products.

172. Defendant Chumenko was sued in Miami-Dade County's 11th Circuit Court on April 20, 2018, along with Defendant Vegan Beauty LLC. The action was filed by an affiliate network which had been advertising Nuvega Lash, The Affiliati Network, Inc.[55] This affiliate network alleged a breach of contract for a marketing contract which Defendants Kirill Chumenko and Vegan Beauty LLC entered into on January 12, 2017 to market the Nuvega Lash products.[56] The complaint attached a contract for affiliate marketing services signed by Mr. Chumenko on behalf of Vegan Beauty LLC as its Managing Member.[57] A number of invoices indicating that this affiliate network had been advertising the Nuvega Lash products on behalf of Mr. Chumenko and Vegan Beauty LLC were also attached.[58] According to those invoices, this affiliate network alone drove 2,265 victims to sign up for the Nuvega Lash "free trial" in the first few months of 2017—a number which likely amounts to hundreds of thousands of dollars stolen from those victims.

---

[55] Complaint, Affiliati Network Inc. v. Kirill Chumenko et al, No. 2018-012896-CA-01 (Fla. 11th Circuit Court Apr. 20, 2018).
[56] Id. at 3-4; id. at Ex. A.
[57] Id. at Ex. A.
[58] Id. at Ex. B.

173. The websites shopnuvega.com, www.nuveganlashes.com, and www.nuveganbrows.com state at the bottom of the website that they are operated by Natural Beauty Line LLC at 74 Thompson Grove Road, Manalapan, NJ 07726 (Defendant Chumenko's home address).

174. The Green Pogo Defendants—two identically named LLC's, one in New Jersey, the other in Delaware—are involved in the sale of the Nuvega Products, and are controlled and operated by Defendants Barone and Chumenko.

175. The Amazon page for Nuvega Lash lists the seller as "Green Pogo, LLC."[59]

176. Green Pogo LLC is listed on the website lashesbynuvega.com as the seller of Nuvega Lash.[60]

177. The Green Pogo LLC Better Business Bureau page gives the company the lowest possible "F" rating. And its page is littered with customer complaints dating back to January 2017 through October 10, 2019, with victims describing exactly the same experience as Ms. Adam had.

178. For example, a review from December 29, 2017 describes a victim's experience from start to finish:[61]

> I was on Facebook and this ad came on from this cosmetic company and I agreed to a one time $4.95 shipping charge of in product called Nuvega brow. Before I checked out I had to order another item that I didn't want it was the only way to check out on their site. As soon as I made the purchase I tried calling a phone number that was listed on this Facebook ad. There was a recording that said we appreciate your business please hold on and I heard that at least 18-20 times and each time I was disconnected. I called back at least 4 to 5 times and it happened exactly the same way and I could never get in touch with the company. So I called my ******** credit card open a dispute. The company sent information regarding my order and said I never called them to cancel so they charged me after the initial delivery on October

---

[59] Nuvega Lash Amazon Page, https://www.amazon.com/Nuvega-Natural-Eyelash-Eyebrow-Growth/dp/B06XNKS7L6 (last visited Jan. 2, 2020).
[60] https://lashesbynuvega.com/ (last visited Jan. 2, 2020).
[61] Green Pogo LLC BBB Page, https://www.bbb.org/us/nj/manalapan/profile/online-retailer/green-pogo-llc-0221-90178228/complaints (last visited Jan. 2, 2020).

26, I was supposed to have 18 days to call them, and finally I did receive all the information that ******** was provided and I called them on November 9 to cancel. That was the same day they charged my credit card for $92.94. I forgot to tell city bank that I called on November 9 to cancel so they sided with this scam of the company. I'm not happy because I tried my very hardest to contact the company first and when I couldn't get through, that's when I called ********. I have tried three times to talk to representatives from the company and they are saying they cannot give me a refund. The whole situation and this company is one big scam and as a senior I don't have $92.94 but they won't work with me.

179.   Another victim of Green Pogo LLC wrote on January 3, 2017: "I signed up and paid the shipping on a FREE trial of their product. If I keep the 'FREE' trial that they sent, I will get billed for the FULL amount of the product. They are saying the trial period to use their product is FREE. This is a scam. If you offer something for free.. that means it's FREE, no cost. So I said I would return it because they want it back. I believe they should send a shipping label if they want it back. Why should I have to pay to send something back that was supposed to be FREE. This is a terrible company."[62]

180.   Another Green Pogo LLC victim reported also experiencing the tactic of pretending that there was no manager on duty to speak to:[63]

Nuvega had an offer for "free trial" of Nuvega Lash which was supposed to help my eyelashes grow-which it did not-not only did they include a product I didn't ask for, after 14 days or so they charged full price for the "free" trial. It's apparently in the contract. However I spoke with someone at nuvega about the insane price of $94.00 for something I thought was free, she failed to mention that I was on a plan that would send me a new bottle every month & charge me $99.96 every month. I called again & was told I would only get 25% of a refund because I didn't use this new bottle. I find that outrageous. That amount of money is a lot for someone like me & the customer service was terrible, there was no manager on staff for me to speak with so apparently they are also working unsupervised, which is even worse.

---

[62] *Id.*
[63] *Id.*

181.   Another victim reported repeatedly attempting to cancel the subscription with Green Pogo LLC, only to be charged four more times without even being sent the Nuvega Products they were supposedly subscribed to:[64]

> I am so frustrated with the company GREEN POGO that has fraudulently charged on three of my credit cards. We payed for and received a trial but did not approve of further shipments or charges. They sent only 4 packages but keep billing me exuberant charges as noted above without sending more product. I called with a **** represented to cancel on 10/31/2016. They answered the phone once but disconnected, and wouldn't answer again with the **** representative on the line. **** told me to dispute the charges. I was told by the **** representative not to change my credit card number and that no further charges would be allowed to bill to my credit cards due to the disputes, yet I received no more product and was charged 4 more times, twice on each credit card. I called **** in Nov. again to make sure no further charges were being made and I cancelled the card numbers when we found more charges. Although, I was assured I wouldn't get charged again with a dispute open. I again called and spoke to **** last wed, and they promised to follow up and call me back. When I didn't receive a call back, I called today again on both cards. Two disputes were recharged before I even had a call back from ****. The **** representative and I called the GRNPOGO company together. They couldn't or wouldn't find all my accounts and check if they received the product back. I asked for a Rma number if I could track the packages and they refused. I called GRNPOGO to try and get a rma number to return the product and now they say since we disputed (which **** advised me to do) they will not issue a rma number or let me return the product. So frustrating, they change their response everytime we call.

182.   Green Pogo LLC was not the only shell company victims were billed by. Defendant Fortera Nutra Solutions LLC, formerly Next Gen Health Solutions LLC, was also used by Defendants Barone and Chumenko to bill victims of the Nuvega Lash scam as part of their scheme to prevent banks from discovering the fraud.

---

[64] *Id.*

183.   The Better Business Bureau page for Next Gen Health Solutions LLC, now Defendant Fortera Nutra Solutions LLC, reveals a number of victims complaining that the company billed them for subscriptions to the Nuvega Products. The company received the lowest possible "F" rating.

184.   For example, on October 24, 2018, a victim complained that Defendant Fortera Nutra Solutions billed them hundreds of dollars for Nuvega Lash after falsely telling them that the product would be free:[65]

> If I could give them zero stars I would. I paid $4.99 for my FREE Nuvega Lash and received it along with a letter stating once my trial is complete I would have to pay for the product! Do not believe anything this website tells you. After calling to cancel my alleged membership which i did not agree to they told me I had to pay to return their product and would not be receiving a refund for the 'FREE' product that I did not use. They are liars, and do not disclose all information on their website. Do not purchase from this website unless you want to be charged a monthly supply of $324.00!!

185.   On December 19, 2017, a victim reported that Defendant Fortera Nutra Solutions LLC billed them $400 for a "lash treatment" without disclosing that there would be an auto-shipment:[66]

> Ordered lash treatment item was received back in September for a trial price of $14 and then I was billed $94 for another item the next month and $99 the following month. There was NO clarity that there was an auto-ship that would be for almost $100 every month that you HAVE TO CALL TO CANCEL. I never recieved a written/paper copy of these terms and it honestly needs to be STATED UP FRONT not hidden in the terms and conditions! I contacted customer service and informed them. They would not listen to my concerns and kept pushing discounts to keep me as a customer...i'm sorry NO...i'm not paying your ridiculous prices for a product that didn't even work. Now i'm out almost $400. NOT HAPPY.

---

[65] Next Gen Health Solutions LLC BBB Page, https://www.bbb.org/us/nj/morganville/profile/vitamins-and-supplements/next-gen-health-solutions-llc-0221-90181958/customer-reviews (last visited Jan. 29, 2020).
[66] *Id.*

186. On January 31, 2018, a victim reported that Defendant Fortera Nutra Solutions LLC billed them for Nuvega Lash without sending any product, then refused to cancel a subscription despite multiple calls requesting to cancel:[67]

> I ordered a trial sample of Nuvega Lash on 10/12/17 and was charged $4.99. It wa supposed to be a 30 day trial. They proceeded to charge my card and additional $94.97 on 10/31/17 and did not send any product. I called a million times to cancel and get a refund and was put on hold listening to music. I called twice more on 2 seperate occasions and the same thing happened. I admittedly forgot about it until I recieved another tube right before the new year and then realized I was yet again charged another $99.96 on 12/12/18. I immediately called and got through to a gentleman with a thick accent who's name I could not understand. He said he could not process a refund as it was past the 30 day trail period!!!!!! He did supposedly cancel my account. We argued for a bit and he said the best he could do was refund half of one shipment which was $49.98(CONFIRMATION #*****). I proceeded to tell him this was false advertising and ended up hanging up on him. I called a week later(second week of January) to ask why I had not recieved any refund and was told that it was processed and to wait a few more days. I just called today(1/31/18) and spoke with Diego. I complained I had not recieved anything and he said he would re-process the refund of $49.98(which is ridiculous as they stole over $200 from me) (CONFIRMATION #**********)and I should expect it in 7 to 10 business days. I did a little research and found out this company keeps switching names, hence the reason why it is reported as OUT OF BUSINESS on the BBB site. They have also gone by the names Improved Nutraceutical, Nuvega Lash and V Beauty to name a few. How have they been able to continue this pattern and no one has caught on? This whole situation is extremely upsetting. SUCH A SCAM.

187. Multiple other victims reported to the BBB that they were scammed by Defendant Fortera Nutra Solutions LLC for subscriptions to Nuvega Lash or to unnamed eyelash products.

---

[67] *Id.*

188.   The Barone/Chumenko Defendants' failure to follow corporate formalities and use of their various shell companies confused at least one recipient of a refund check from Next Gen Health Solutions LLC (now Defendant Fortera Nutra Solutions LLC) because the Barone/Chumenko Defendants also identified the check as coming from one of the other shell companies, Defendant Improved Nutraceuticals LLC:[68]

> Received mail on 23 April 2018 from sender "Next Gen Health Solutions LLC, 500 Campus Drive Suite 203, Morganville, NJ, 07751". Only contents inside the envelope was a check addressed to my wife in the amount of $99.96. The only identification on the check sender was 'IMPROVED NUTRACEUTICALS LLC'. My wife and I discussed that we had not done any business with this company and became suspicious since there was no explanation correspondence with this check. We did not cash the check. Research on the ScamPulse.com website indicates that this company has a rating of "F". One of the posted ratings indicates in detail that the individual appears to have been taken advantage of by the company, charging their checking account, not responding to phone calls to resolve the problem. It appears that this company still is trolling for targets. Next Gen Health Solutions LLC, also is listed as contact info for Red Fotera: redfotera.com 800-908-6213.

189.   Defendant Advanced Beauty LLC is the company behind a product called Advanced Lash, also sold by Defendants Barone and Chumenko. On information and belief, a merchant account attributable to this shell company was used to bill Plaintiff Adam and other members of the Class under the name "Advancedlash." The manufacturer of the Nuvega Products, Nutracosmetic GmbH, has repeatedly shipped imported cosmetics to Advanced Beauty LLC.[69] On information and belief, those shipments contained the Nuvega Products, and Advanced Beauty LLC aided the other

---

[68] ScamPulse, https://www.scampulse.com/next-gen-health-solutions-llc-reviews (last visited Jan. 8, 2020).
[69] Import Genius Summary for Advance Beauty, https://www.importgenius.com/importers/advance-beauty (last visited Jan. 8, 2020).

Barone / Chumenko Defendants by assisting in the distribution of those products to victims.

190.    Defendant Natural Beauty Line LLC operated the websites shopnuvega.com, www.nuveganlashes.com, and www.nuveganbrows.com, and on information and belief, was used as one of the shell companies whose merchant accounts were cycled through in billing for the Nuvega Products to avoid fraud detection.

191.    The Better Business Bureau page for Natural Beauty Line LLC features complaints relating to the sale of Nuvega Lash. For example, a victim complained that after signing up for a trial of Nuvega Lash, Natural Beauty Line LLC shipped them products which the victim did not order:[70]

> I ordered some Nuvegalash trial for $4.99 in September 2018. I was forwarded some lash, & brow which I didn't order. The rep said she wasn't able to get my credit card to process so I asked her to cancel the order anyway. My acct was charged $94.97 on 9/24. I returned the products not satisfied with an RMA# on 10/5. It was delivered to the return address, ** ***** ******* *********** *****, on October 9, 2018. I called and spoke to Natalie, guess that was her name!, on 10/26 and she said the products has been received and the refund was in process and to check with my bank. I did and still no word from them to the bank so I filed a dispute. Bank of America then gave me a refund of $94.97 and investigated or said they did. On 12/24/2018 BOA charged my account back at $94.97 until they figured it out,I guess. I shared with BOA local rep the verification of return and receipt of products by the company. So there is very valid note company receiving the return of the products. Bank of America has closed the case and I have still not received my refund. I am hoping this group is investigated as soon as possible.

192.    Defendant Improved Nutraceuticals LLC operates the website nuvegavegan.com, and on information and belief, was used as one of the shell companies

---

[70] Natural Beauty Line LLC BBB Page,
https://www.bbb.org/us/nj/manalapan/profile/beauty-supplies/natural-beauty-line-llc-0221-90185499/complaints (last visited Jan. 29, 2020).

whose merchant accounts were cycled through in billing for the Nuvega Products to avoid fraud detection.

193.   The Barone / Chumenko Defendants purposely directed their activities towards California.

194.   The Barone / Chumenko Defendants committed intentional acts by running websites from 2016 through the present accessible to California residents with knowledge that California residents would purchase and were purchasing from those sites; by targeting California residents with advertisements; by intentionally defrauding the banks of California residents by presenting their "false front" websites to those banks as the sites California residents visited; by "churning" merchant accounts through various shell companies to intentionally defraud the banks of California residents; by hiring Defendants  Ellis and SFLG, Inc. to ship products to California residents, to accept and process returns and complaints from California residents,  and to  otherwise provide the services listed on their website in connection with California residents.

195.   These intentional acts were expressly aimed at California residents. The Barone / Chumenko Defendants targeted their conduct at California residents, including the Plaintiff, and knew they were California residents by virtue of their shipping addresses and other contact information. These acts involved ongoing, systemic, and continuous contact with California because the shipment of Nuvega Products occurred from at least late 2016 through late 2019, a three year period. Those shipments occurred as part of subscriptions, meaning that the Barone / Chumenko Defendants shipped continually and regularly to their California victims over long periods of time. The acts were entirely commercial in nature, as the Barone / Chumenko Defendants profited from selling the Nuvega Products.

196.   The Barone / Chumenko Defendants generated substantial profits from their acts aimed at California residents. They placed the Nuvega Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to

California residents and purchased by California consumers, and intending that California residents be defrauded.

197.   The Barone / Chumenko Defendants knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally ran "free trial" scams over a lengthy period of time. They knew that California consumers were being harmed by the scam, and specifically took action to ensure that those California residents would be unable to obtain refunds from the fraudulent charges. Had they not done so, the California consumers would not have been harmed because the Nuvega Products would not have been shipped to them and the Barone / Chumenko Defendants would not have defrauded these California residents and their banks.

198.   Because of these facts, personal jurisdiction is appropriate in California over the Barone / Chumenko Defendants.

199.   The Barone / Chumenko Defendants (Frank V. Barone; Kirill Chumenko; Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC) formed a joint venture, and each of the members of that joint venture, as well as the joint venture itself, are jointly and severally liable for the wrongful conduct of any members acting in furtherance of the venture.

200.   The Barone / Chumenko Defendants combined their property, skill, and knowledge with the intent to carry out a single business undertaking. That business undertaking was selling the Nuvega Products and operating the related websites, led by Frank V. Barone and Kirill Chumenko (who ultimately own and control the other corporate entities).

201.   Each of the Barone / Chumenko Defendants has an ownership interest in the joint venture. On information and belief, Frank V. Barone and Kirill Chumenko are the ultimate owners of the group of companies. Such agreement is further implied by the

members' conduct in creating and controlling the various websites promoting and selling the Nuvega Products.

202.   On information and belief, the Barone / Chumenko Defendants have joint control over the business, or agreed to delegate that control. Such control is implied by the member's conduct because both Frank V. Barone and Kirill Chumenko are members or managers of the shell companies selling the Nuvega Products, because their home addresses were used as the business addresses for those companies, because corporate formalities were not followed by Defendants Barone and Chumenko, and because of the longstanding business relationship between Barone and Chumenko.

203.   The Barone / Chumenko Defendants have an agreement to share the profits and losses of the joint venture. Such agreement is implied by the members conduct because of the overlapping corporate ownership and decision-making structure.

204.   Each member of the Barone / Chumenko Joint Venture is thus jointly and severally liable for the wrongful conduct of the other members.

### Great Lakes Fulfillment Services Defendants

205.   Essential to the Nuvega scheme is Great Lakes Fulfillment Services, now SFLG, Inc. ("Great Lakes Fulfillment Services").

206.   Great Lakes Fulfillment Services was founded by Defendant Kurt Ellis in 2002, who served as President of the company until it was acquired in August 2019 by Jet Mail Services.[71] As of August 2019, Mr. Ellis had agreed to remain with the company as its President.[72] On information and belief, Great Lakes Fulfillment Services was a smaller company throughout this period, and Mr. Ellis was intimately familiar with its operations and its customers.

---

[71] *Jet Mail Services to Compete in the E-Commerce Fulfillment Sector*, POST AND PARCEL, Aug. 20, 2019 at https://postandparcel.info/112643/news/e-commerce/jet-mail-services-to-compete-in-the-e-commerce-fulfilment-sector/ (last visited Dec. 11, 2019).
[72] *Id.*

207.   Defendant Ellis and Defendant SFLG, Inc. (the "Great Lakes Fulfillment Services Defendants") operated as the fulfillment company for the Barone/Chumenko Defendants. The Great Lakes Fulfillment Services Defendants shipped the Nuvega Products to consumers, handled returns and customer complaints via mail, and on information and belief provided other services including consulting on business processes and generally assisting the scheme.

208.   Great Lakes Fulfillment is listed as the "Return Department" for Nuvega Lash on the Contact page of trynuvegalashnow.com/v2/: "Attn: NUVEGA LASH/BROW Return Department. Great Lakes Fulfillment 41 Canal Street Lewiston, ME 04240."[73] It is likewise listed as the "Return Department" in the Terms of Service.[74]

209.   Great Lakes Fulfillment is listed as the Return Department for AdvancedLash, a product sold by Green Pogo LLC.[75]

210.   Great Lakes Fulfillment is listed as the "Return Department" for Nuvega Lash on the websites lashesbynuvega.com;[76] www.nuveganlashes.com;[77] www.nuvegavegan.com;[78] www.nuveganbrows.com;[79] www.shopnuvega.com;[80] www.browbynuvega.com;[81] www.bestveganlash.com;[82] www.bestveganbrow.com;[83] and www.nuvegalashforvegans.com.[84]

211.   On information and belief, Defendants Ellis and SFLG, Inc. were well aware that the Barone/Chumenko Defendants were operating a "free trial" scam and were billing their customers for subscriptions without obtaining permission to do so, and were

---

[73] https://trynuvegalashnow.com/v2/page-contact.php (last visited Jan. 2, 2020).
[74] https://trynuvegalashnow.com/v2/page-terms.php (last visited Jan. 2, 2020).
[75] http://www.advancedlashbeauty.com/terms.html (last visited Jan. 2, 2020).
[76] https://lashesbynuvega.com/contact.php (last visited Jan. 24, 2020).
[77] https://www.nuveganlashes.com/contact.php (last visited Jan. 24, 2020).
[78] https://www.nuvegavegan.com/ (last visited Jan. 24, 2020).
[79] https://nuveganbrows.com/ (last visited Jan. 24, 2020).
[80] https://shopnuvega.com/ (last visited Jan. 24, 2020).
[81] https://www.browbynuvega.com/ (last visited Jan. 24, 2020).
[82] https://www.bestveganlash.com/ (last visited Jan. 24, 2020).
[83] https://www.bestveganbrow.com/ (last visited Jan. 24, 2020).
[84] https://www.nuvegalashforvegans.com/ (last visited Jan. 24, 2020).

deceiving their customers into believing that they would pay "$0.00" for the products they had signed up for.

212.   Because Great Lakes Fulfillment Services was responsible for handling the returns of the products, it would have been the recipient of consumer complaints. In fact, the Great Lakes Fulfillment Services website makes clear that they handle returns themselves and then convey information about those returns to their clients: "Why worry about where your packages are going, freight optimization, logistics, handling returns and inventory on your own when you have so many other things to concentrate on? We will convey that information to you on a daily basis or as per your specific needs."[85]

213.   Great Lakes Fulfillment Services provides a suite of solutions to its customers that provide a turn-key service for anyone looking to sell a product with minimal involvement in the process. Those services include "Returns Processing," "Continuity/Autoship programs," "Order Management System," "Database Management," "Inbound Call Center," "Merchant Processing," and "Payment Processing," among others.[86] On information and belief, Great Lakes Fulfillment Services provided these services to the Barone/Chumenko Defendants. And because of the detailed knowledge of the business (and its credit card processing activities) these services imply, the Great Lakes Fulfillment Services Defendants could not have escaped intimate knowledge of the fraud.

214.   In fact, Great Lakes Fulfillment Services advertises a testimonial on the main page from one of their customers, the "Owner and CEO" of NetMarkets LLC. The testimonial promises that Great Lakes Fulfillment Services is not just a fulfillment company, but that they take customers under their wing and help them develop their business processes:[87]

---

[85] Great Lakes Fulfillment Services, https://www.glfulfillment.com/ (last visited Jan. 12, 2020).
[86] Great Lakes Fulfillment Services, https://www.glfulfillment.com/glf-services (last visited Jan. 16, 2020).
[87] Great Lakes Fulfillment Services, https://www.glfulfillment.com/ (last visited Jan. 12, 2020).

When we started our direct response supplement company in 2011, we knew nothing about the business. Thank goodness a major player in the space introduced us to Great Lakes Fulfillment, as we didn't even know who to go to, and they were the first fulfillment company we had ever worked with. **They "took us under their wing" and helped us understand the right way to get our orders processed correctly**. **Not only that, but over the next few years as we started growing and we had ideas about things we'd like to try to do to streamline our processes, Great Lakes stepped up with custom programming and procedures to help us really serve our customers in the best possible way.** At Great Lakes, they know that our #1 goal is to treat our customers like royalty... and Great Lakes consistently helps us achieve that mission every day. We can't say enough great things about them.  We are on track to have a record year in sales in the next 12 months, and there is no one we would trust that growth to more than Great Lakes.

215.   But NetMarkets LLC, the customer who Great Lakes Fulfillment Services "took under their wing" and brags about helping to grow and to develop their processes and procedures, itself is operating free trial scams.[88] NetMarkets LLC sells three products: Biogeniste, Juvamend, and NO2 Maximus.

216.   Biogeniste racked up numerous complaints by consumers claiming that they were victims of the exact same kind of free trial scam that the Barone/Chumenko Defendants operate. For example, a customer of Biogeniste said: "Biogeniste is perpetrating a classic fraud and scam! They offer a 'free' sample, get your credit card info and then charge you $89.76 plus $5.95 for an unwanted follow-up shipment as if you became a subscriber for their supposed 'anti-wrinkle cream'. These people are a typical example of American Greed, they should be banned from commerce and put in jail."[89]

---

[88] NetMarkets LLC Better Business Bureau Page, https://www.bbb.org/us/ny/brooklyn/profile/health-products/netmarkets-llc-0121-135028/complaints (last visited Jan. 12, 2020).
[89] Biogeniste Amazon Page, https://www.amazon.com/BioGeniste-Instant-Wrinkle-Reducer/product-reviews/B0076KS6NU (last visited Jan. 12, 2020).

217.   Biogeniste operated both a "false front" home page with a prominent link to the terms of service,[90] as well as landing pages for victims with that link removed.[91]

218.   Juvamend is likewise a classic version of the free-trial scam—complete with a "false front" home page where victims purportedly agreed to the terms of service,[92] a separate landing page which removed the link to the terms of service and the box requiring customers to agree to it,[93] and affiliate networks sending victims to the landing page where they would be unaware of the terms.[94]

219.   Similarly, NO2 Maximus has both a "false front" which requires customers to agree to a prominent terms of service,[95] as well as a separate website which does not contain the click box and does not notify customers of the subscription.[96]

220.   This is who the Great Lakes Fulfillment Services Defendants "took under their wing"—and who they chose as their primary reference account to attract new customers in this "industry." It is no surprise that the deceptive tactics NetMarkets LLC was using found their way to the Barone/Chumenko Defendants.

221.   The Great Lakes Fulfillment Services Defendants' role in handling product returns means that they necessarily would have had knowledge of customer complaints about the Nuvega Products. On information and belief, they would have received

---

[90] Biogeniste Home Page, https://web.archive.org/web/20140207233332/http://biogeniste.com/ (last visited Jan. 17, 2020).
[91] Biogeniste Landing Page, https://web.archive.org/web/20140211200157/http://www.biogeniste.com/200JB/index1.php (last visited Jan. 17, 2020).
[92] Juvamend Home Page, https://web.archive.org/web/20130417081643/http://tryjuvamend.com/ (last visited Jan. 17, 2020).
[93] Juvamend Landing Page, https://web.archive.org/web/20130404235856/http://www.tryjuvamend.com/20W/index.php (last visited Jan. 17, 2020).
[94] Cactus Media Facebook Page, https://m.facebook.com/cactusmedia/posts/433813593365539 (last visited Jan. 17, 2020).
[95] NO2 Maximus Body Website, https://no2maximusbody.com/ (last visited Jan. 17, 2020).
[96] NO2 Maximus Website, http://no2maximus.com/ (last visited Jan. 17, 2020).

numerous complaints similar to the ones flooding various Internet pages regarding the Nuvega Products.

222.   In fact, Great Lakes Fulfillment Services' description of itself on its Better Business Bureau page makes clear that the company was receiving complaints from customers: "Great Lakes Fulfillment (GLF) is a 3rd party fulfillment center.  GLF packages and ships the orders only and is not involved with processing orders, billing, or refunds.  UPS requires GLF to put their name and address on all packages shipped by their service.  For complaints involving these issues please file against the business from whom you purchased the products originally."[97]

223.   Not only is this statement evidence of the Great Lakes Fulfillment Services Defendants' knowledge that victims were complaining, it is itself an intentional act of deception designed to hide their role in the fraud: the Great Lakes Fulfillment Services Defendants falsely told victims and the Better Business Bureau that "GLF packages and ships the orders only and is not involved with processing orders, billing, or refunds" when its website makes clear that it provides an "Order Management System," "Payment Processing," "Merchant Processing," "Returns Processing," and an "Inbound Call Center."[98]

224.   The Yelp Page for Great Lakes Fulfillment Services features multiple negative reviews blasting the company for its involvement in free trial scams. On information and belief, the Great Lakes Fulfillment Services Defendants were aware of these reviews and yet continued to participate in the fraud, acting as a consultant not just to the Barone/Chumenko Defendants but to a wide variety of Internet scammers operating similar schemes.

---

[97] Great Lakes Fulfillment Services BBB Page, https://www.bbb.org/us/me/lewiston/profile/merchandise-warehouse/great-lakes-fulfillment-services-0021-103120 (last visited Jan. 17, 2020).
[98] Great Lakes Fulfillment Services, https://www.glfulfillment.com/glf-services (last visited Jan. 16, 2020).

225.   A victim of an unidentified scam posted on the  Great Lakes Fulfillment Services Yelp page on November 22, 2019: "This is a scam operated company, they advertise a 30 day supply of product, for 9 dollar shipping cost, then without notice charged my card  $90.00 plus , so the 30 day supply is not true for the shipping cost !! I will pursue a complaint with the better business bureau and state govonors office !!"[99]

226.   Another victim posted regarding another scam that was apparently being shipped through Great Lakes Fulfillment Services:[100]

> The name that these people operate under is Ortho Molecular Therapeutic Research.  They take your $$ but then are very slow to send out the product.  Then the order was CANCELLED BEFORE it was even shipped, however, they sent it anyway and then said "try it, try it".  The product doesn't work then when you try to get your $$ back, that is when the nightmare begins.  DO NOT SEND THESE PEOPLE YOUR MONEY!!  They force you to take the shipment then when you return it, they fight you on giving you back your money.  Apparently at this company, the laws of common sense cease to exist as it takes them 2 months to refund you your money.  But when you ask them about it, they lie and say 4-6 weeks even though months have passed.  This will not be the last time you hear from me unless you refund my money immediately.  I know its hard to let go of that well earned scammed money, but do the right thing.  Better Business is next on my list.

227.   A victim of an unknown scam wrote on January 9, 2019 that: "this place is a sham.  I ordered pills and tried to return them and they didn't accept them."[101]

228.   And one victim wrote on May 7, 2014 to personally attack Defendant Ellis for his role in the fraud:[102]

> The point of these sites is to get your credit card data, full stop.  He will say/do anything to get that and then, "buh-bye".  Pure scam.  Nothing of

---

[99] Great Lakes Fulfillment Services Yelp Page, https://www.yelp.com/biz/great-lakes-fulfillment-services-lewiston (last visited Jan. 17, 2020).
[100] *Id.*
[101] *Id.*
[102] *Id.*

value being offered.  Lots of pseudo-science and fuzzy logic.  But it's about getting the credit card, not health.

The guy behind this runs lots of health connected sites, all cons. The umbrella "business" is "Great Lakes Fulfillment Service" which actually ships the crap. All cons, he's behind The Diet Spray LLC, Veloura International, Natural Health Network Postage only Trial, AU Esentials, Inc., Garcinia Cambogia 360, Inc. None of those trade names are registered or authorized to transact business in the State of Maine, so go no further to see that he is, in fact, a crook. The following is his contact information. The second contact is his lawyer. Between these two you can serve legal notices or just pay a visit and say howdy.

Kurt Ellis
41 Canal St, 3rd Floor
Lewiston, ME, 04240

229.   The victim proceeded to provide additional contact information regarding Defendant Ellis and the name and contact information for his lawyer. This victim posted the same review to a website called Ripoff Report, again personally calling out Defendant Ellis as a "crook" and a "con."[103]

230.   Another victim posted on Ripoff Report on June 18, 2014 to report Great Lakes Fulfillment Services by name and address for its involvement in a scam. After listing the company's name and address in a report titled "Great Lakes Fulfillment Service Garcinia Cambogia 360 Free Bottle Scam Lewiston Maine," the victim stated:[104]

I saw an ad for Garcinia Cambogia 360 which said that you could get a risk-free bottle of the supplement and all you had to pay was shipping and handling.

---

[103] Ripoff Report, https://www.ripoffreport.com/reports/great-lakes-fulfillment-service/lewiston-maine-04240/great-lakes-fulfillment-service-the-diet-spray-llc-veloura-international-natural-health-1144806 (last visited Jan. 17, 2020).
[104] Ripoff Report, https://www.ripoffreport.com/reports/great-lakes-fulfillment-service/lewiston-maine-04240/great-lakes-fulfillment-service-garcinia-cambogia-360-free-bottle-scam-lewiston-maine-1155638 (last visited Jan. 17, 2020).

The product looked promising so I went on their website and ordered my free bottle and paid the $5.95 necessary.

Nowhere on the order form did it say that this was a time-limited free trial and that if I did not cancel within 13 days that I would be charged $87.97 for the bottle containing 30 pills that I was supposed to have gotten for free.

I tried the product twice and it actually made me nauseaus, so I stopped using it but thought nothing of it since it was supposed to be a free bottle and I was only out $5.95...

This was less than 1 month ago, and today I just got charged another $87.97 for another supposed shipment that I did not sign up for.

I called customer service and the representative kept trying to get me to stick with the Auto-Shipment program that I did not sign up for. After a while she did cancel my account and gave me the RMA# necessary for returns as well as the return address where I have to send the shipment to once I receive it.

I am only going to be refunded the $87.97 that I got charged today, but they will not refund the other $87.97 even though that first shipment was supposed to be free.

Had I known that I was going to end up being charged that ridiculous amount I would never have even ordered the supposed "free" bottle.

Buyers be ware... If it sounds too good to be true it probably is.

These people need to be held accountable for this scam!!!

231.   In a review on RipOffReport posted on April 11, 2009 and titled "Acai Advanced - GLF ,Great Lakes Fulfillment Acai Advance 'free' trial is a scam. You are charged before trying product Lewiston Maine," a victim reported:[105]

---

[105] RipOff Report, https://www.ripoffreport.com/reports/acai-advanced-glf-great-lakes-fulfillment/lewiston-maine-04240/acai-advanced-glf-great-lakes-fulfillment-acai-advance-free-trial-is-a-scam-you-are-442784 (last visited Jan. 24, 2020).

Acai Advanced baits you in with a "Risk Free" 15 day trial offer. I received the product 2 days before the 15 days was up, and my credit card was charged in full. I called the 800 # to cancel, put on hold, no one ever answered. Up to 1 hr 40 min on hold. Sent several e-mails, no replies. To keep from being "ripped off" again, I had to cancel my credit card.

This is no "Risk Free" trial offer. They get you to pay for S/H and then charge you in full long before trail ends. You can't cancel your automatic subscription because they don't answer and don't respond.

232.   Multiple other complaints refer to the Great Lakes Fulfillment Services Defendants' address as the location for other free trial scams, even if the victims did not know their name.[106]

233.   The Great Lakes Fulfillment Services Defendants must have known about these various reviews and complaints. Several of them specifically named Mr. Ellis and one provided personal contact information for Mr. Ellis and for his lawyer, urging victims to "pay a visit and say howdy." A search for their own business name or street address would have revealed all of these complaints. And their intimate role as business consultants for these scammers (among the other services they provide) would have given them knowledge of the fraud they were enabling.

234.   On information and belief, Defendants Ellis and SFLG, Inc. were acting as consultants to assist free trial scammers in operating their scams in order to generate shipping business, and they did so from at least 2009 through the present. And on information and belief, Defendants Ellis and Great Lakes Fulfillment Services acted as consultants to assist the Barone/Chumenko Defendants in defrauding consumers of the

---

[106] RipOff Report, https://www.ripoffreport.com/reports/acai-advanced-glf-great-lakes-fulfillment/lewiston-maine-04240/acai-advanced-glf-great-lakes-fulfillment-acai-advance-free-trial-is-a-scam-you-are-442784 (last visited Jan. 24, 2020); RipOff Report, https://www.ripoffreport.com/reports/024-pain-management/lewiston-maine-04240/024-pain-management-revive-biosceince-uk-c0-glf-biosceince-uk-co-glf-41-canal-st-lew-925761 (last visited Jan. 24, 2020); RipOff Report, https://www.ripoffreport.com/reports/024-pain-management/lewiston-maine-04240/024-pain-management-revive-biosceince-uk-c0-glf-biosceince-uk-co-glf-41-canal-st-lew-925761 (last visited Jan. 24, 2020).

Nuvega Products, knew that the fraud was occurring, and intentionally continued to aid and support the Barone/Chumenko Defendants in their fraud despite this knowledge.

235.   Defendants Ellis and SFLG, Inc. purposely directed their activities towards California.

236.   Defendants Ellis and SFLG, Inc. committed intentional acts by shipping products to California residents, accepting and processing returns and complaints from California residents, consulting for the Barone/Chumenko Defendants on sales that they knew would be made to California residents, and otherwise providing the services listed on their website in connection with California customers.

237.   These intentional acts were expressly aimed at California residents. Defendants Ellis and SFLG, Inc. targeted their conduct at California residents, including the Plaintiff, and knew they were California residents by virtue of their shipping addresses and other contact information. These acts involved ongoing, systemic, and continuous contact with California because the shipment of Nuvega Products occurred from at least late 2016 through late 2019, a three year period. Those shipments occurred as part of subscriptions, meaning that Defendants Ellis and SFLG, Inc. shipped continually and regularly to their California victims over long periods of time. The acts were entirely commercial in nature, as Defendants Ellis and SFLG, Inc. marketed themselves as providing these services specifically to companies they knew would sell nationwide via the Internet.

238.   Defendants Ellis and SFLG, Inc. generated substantial profits from their acts aimed at California residents. They intentionally assisted the Barone/Chumenko Defendants in placing the Nuvega Products into the stream of commerce, knowing and intending that they would be advertised over the Internet to and purchased by California consumers.

239.   Defendants Ellis and SFLG, Inc. knew or should have foreseen that their actions would cause harm in California. As described above, they intentionally assisted "free trial" scammers over a lengthy period of time. They provided various services for a

three-year period to the Barone/Chumenko Defendants knowing that California consumers were being harmed by the scam, and specifically interacting with those consumers when they attempted to obtain refunds from the fraudulent charges. Had they not provided these services, the California consumers would not have been harmed because the Nuvega Products would not have been shipped to them and the Barone/Chumenko Defendants would not have benefitted from the experience of Defendants Ellis and SFLG, Inc. in helping other "free trial" scammers design their business processes.

240.   Because of these facts, personal jurisdiction is appropriate in California over Defendants Ellis and SFLG, Inc.

## **CLASS ACTION ALLEGATIONS**

241.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

242.   Plaintiff brings this class action pursuant to Fed. R. Civ. P. Rule 23, seeking certification of Plaintiff's claims and certain issues in this action on the Class, consisting of:

> **Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Nuvega Products.

243.   In the alternative, Plaintiffs seek certification of the following class:

> **California Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for the Nuvega Products.

244.   "Nuvega Products" means Nuvega Lash, Nuvega Eyelash Serum, Nuvega Brow, Nuvega Eyebrow Serum, Advanced Lash, Evolips, and Evolips Volumizing Gloss. Plaintiff expects that this definition will be modified in discovery as information is obtained from the John Doe Defendants. In particular, Plaintiff expects that there may be other products sold by the same Defendants with the exact same formulation, similar or identical injuries, but different labels or names. Plaintiff further expects that the conduct of the affiliates, the Defendants, or the "crooked processors" may be subject to a different and much broader class that encompasses identical injuries that go beyond this specific product line.

245.   Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

246.   Plaintiff reserves the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

247.   <u>NUMEROSITY</u>: Plaintiff is informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of consumers of injured by similar or identical Products by the Defendants would be so large as to make joinder impracticable as the Class (or Classes) would be comprised of thousands of consumers geographically dispersed throughout the United States. While the exact number of Class members is currently unknown, such information can be ascertained through appropriate discovery.

248.   <u>COMMONALITY</u>: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly

affected by having purchased and used the Products, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.

249.   <u>PREDOMINANCE</u>: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

    a) whether Defendants' representations discussed above are misleading, or objectively reasonably likely to deceive;

    b) whether Defendants' omissions discussed above involve facts the Defendants were obliged to disclose or facts contrary to representations by the Defendants;

    c) whether the Defendants' owed consumers a duty to disclose the omitted material facts;

    d) whether Defendants' alleged conduct is unlawful;

    e) whether the alleged conduct constitutes violations of the laws asserted;

    f) whether the Defendants' wrongful conduct was intentional or knowing;

    g) whether the Defendants' wrongful conduct warrants punitive damages;

    h) whether Defendants engaged in false or misleading advertising; and

    i) whether Plaintiff and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

250.   <u>TYPICALITY</u>: The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise from the same course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

251.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no interest adverse to the interests of the other Class members. Plaintiff has retained competent counsel with substantial

experience in complex litigation and litigation involving scientific and technical issues, who are committed to vigorously prosecuting this action on behalf of the Class.

252.   <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, are far superior than any difficulties that might be argued with regard to the management of this class action. This superiority makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

253.   Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiff's claims for class-wide treatment is also appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

254.   Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members.

Class notice can likely be directly sent to individual members of the Class because Defendants' own records and documents will likely identify all members of the Class and contain their contact information.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Consumer Legal Remedies Act

### Cal. Civ. Code § 1750, *et seq.*

255.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

256.   Plaintiff brings this claim individually and on behalf of the Class.

257.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

258.   Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of Defendants' Product for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

a.   § 1770(a)(2): misrepresenting the source, sponsorship, approval, or certification of goods or services, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

b.   § 1770(a)(3): misrepresenting the affiliation, connection, or association with, or certification by, another, in particular through the false celebrity endorsements and false presentation of websites as news articles described herein;

c.   § 1770(a)(5): representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do

not have, in particular through the false celebrity endorsements, the "false front" websites, the representations regarding limited supply, and the false presentation of websites as news articles described herein;

d. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another, in particular the false celebrity endorsements as described herein;

e. § 1770(a)(9): advertising goods with intent not to sell them as advertised, in particular in representing that they would be sold for the cost of shipping and handling as part of a free trial or for $0.00 when the Defendants in fact intended to sell them as part of an ongoing subscription;

f. § 1770(a)(13): making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, in particular the false representations of a "free trial," the false representations that the products would cost $0.00, and the false representations regarding limited supply as described herein;

259. Defendants profited from their sales of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

260. Plaintiff and members of the Class purchased the Products for personal use, in reliance on Defendants' false and misleading material claims as described herein.

261. Pursuant to Cal. Civ. Code § 1780(d), Plaintiff has attached its affidavit of venue hereto as Exhibit 2.

262. As a result of Defendants' violations of the CLRA, Plaintiff and the Class have suffered irreparable harm and seek injunctive relief prohibiting further violations of the CLRA. Plaintiff and the Class also seek to recover their attorneys' fees and costs.

263. Ms. Adam has standing to seek injunctive relief because she may be injured by the Defendants' conduct in the future. The Barone/Chumenko Defendants appear to be

cycling through product names and product types, and on information and belief, are now running another "free trial" scam for a product called Red Fortera. The Defendants may present other offers that result in fraudulent billing and which would be difficult to detect or identify as coming from them. The Defendants further have Ms. Adam's credit card and other personal information and could attempt to bill her in the future without her consent, just as they did in the past.

264.   Under Cal. Civ. Code § 1782(d), a plaintiff may without prior notification file a complaint alleging violations of the CLRA that seeks injunctive relief only. If the plaintiff later sends a CLRA notification letter and the defendant does not remedy the CLRA violations within 30 days of notification, the plaintiff may amend its CLRA causes of action without leave of court to add claims for damages.

265.   Pursuant to §1782 of the CLRA and concurrently with the filing/service of this complaint, Plaintiff will notify Defendants in writing of the particular violations of §1770 of the CLRA and demand Defendants rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and to give notice to all affected customers of their intent to do so.

266.   If Defendants fail to adequately respond to Plaintiff's demand within 30 days of the letter pursuant to §1782 of the CLRA, Plaintiff will then amend this claim to add additional claims for relief, including claims for compensatory and punitive damages.

## SECOND CAUSE OF ACTION

### Violation of the California False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

267.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

268.   Plaintiff brings this claim individually and on behalf of the Class.

269.   Pursuant to California Business and Professions Code § 17500, *et seq.*, it is unlawful to engage in advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

[or] to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

270.   Defendants have violated § 17500, *et seq.*, in particular as described herein through the false celebrity endorsements, the omissions regarding their "false front" websites, their presentation of the "false front" websites to banks and credit card companies, the representations regarding limited supply, their efforts to make it difficult to cancel subscriptions, the "free trial" representations, the false representation that the products would cost $0.00, and the false presentation of websites as news articles described herein.

271.   Pursuant to California Business and Professions Code § 17505, "No person shall state, in an advertisement of his goods, that he is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods, when such is not the fact, and no person shall in any other manner misrepresent the character, extent, volume, or type of his business."

272.   Defendants have violated § 17505, in particular through their representations of limited supply, the "false front" website, the false celebrity endorsements, and the false presentation of websites as news articles described herein.

273.   Defendants misled consumers by making misrepresentations and untrue statements about their products as described herein.

274.   Defendants misled consumers by omitting material information which they were under a duty to disclose as described herein. Defendants were under a duty to disclose this material information to Plaintiff and the Class Members.

275.   Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members. In particular and *inter alia*, this is

evidenced by the numerous negative reviews online regarding these products and others which were specifically directed at the Defendants or their companies by name, by customer complaints which, on information and belief, were communicated directly to the Defendants by victims, by the outlandishness of the conduct described and of the stories the Defendants concocted regarding Blac Chyna, Oprah, Shark Tank, and others, the significant publicity these illegal free trial schemes have received, prior FTC actions and criminal prosecutions against similar enterprises, and the fact that the prevalence and illegality of these activities is well known in the affiliate marketing and direct marketing industries.

276. As a direct and proximate result of Defendants' misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

277. Defendants' representations were material to the decision of Plaintiffs and the Class Members to purchase Defendants' products, and a reasonable person would have attached importance to the truth or falsity of the representations made by the Defendants in determining whether to purchase the Defendants' products. The suggestion that the products were endorsed by Blac Chyna was a factor in Ms. Adam's purchase and tended to lend credibility to the product, and a reasonable consumer who knew this was false would not have signed up for the "free trial." With respect to the omissions by Defendants as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had

Defendants disclosed the omitted information, that there would be an ongoing subscription and not a one-time free sample with only a shipping and handling charge, that there was not a limited supply, and that the Defendants intended to use the "false front" websites to defraud their banks and credit card companies if any of their victims attempted a chargeback, Plaintiff and the Class Members would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products.

278.   Defendants advertised to Plaintiff and other Class Members, through written representations and omissions made by Defendants and their employees that the Nuvega Products would be of a particular nature and quality.

279.   The misleading and false advertising described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Plaintiff is entitled to injunctive relief ordering Defendants to cease their false advertising, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their false advertising, or such portion of those revenues as the Court may find equitable.

**THIRD CAUSE OF ACTION**

**Violation of the Unfair and Fraudulent Prongs**

**of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

280.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

281.   Plaintiff brings this claim individually and on behalf of the Class under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, et seq., on behalf of themselves and the Classes against Defendants.

282.   As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because Ms. Adam was autobilled without her permission, was charged on her credit card without permission, and was unable to convince her bank to refund the charges. She further did not receive the benefits promised by the Nuvega Products, including a product endorsed by Blac Chyna and other celebrities. On information and belief, she further suffered injury because the Barone/Chumenko Defendants presented a "false front" website to Chase Bank or made other false representations to Chase Bank when they were investigating the chargebacks. Plaintiff suffered that injury at the time of purchase when Plaintiff bought products that do not deliver the benefits Defendants promise, as well as on the dates her credit card was billed without permission.

283.   The Unfair Competition Law, Business & Professions Code §17200, *et seq*. ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

284.   Defendants committed "unfair" business acts or practices by, among other things: (1) engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the Classes; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the Classes; and (3) engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Class Action Complaint.

285.   The utility of the conduct committed by Defendants and as described herein is nonexistent. There is no utility to falsely suggesting to customers that a product has been endorsed by celebrities, to falsely suggesting a customer is signing up for a free trial, to running a "false front" website to deceive banks and others, or to any of the other conduct by the Defendants. The harm to consumers caused by this conduct, by contrast,

is significant. The Defendants' conduct described herein not only deprived the consumers of the value they were expecting to receive, it also caused them to treat themselves with ineffective products rather than alternative options, deprived them of money, and interfered with their lawful efforts to convince their banks that a fraudulent transaction had occurred.

286.   Defendants' conduct as described in this Complaint offends established public policies. The Defendants' conduct violated numerous civil and criminal statutes, as described further herein and in detail in the Fourth Cause of Action. Those statutes exist for a reason: to protect consumers from unfair marketing practices, and in many cases to protect consumers' health. It is a particularly important public policy issue to avoid these kinds of violations in products that relate to health care or that are applied to the human body given the risks of such violations.

287.   Defendants' conduct as described in this Complaint is immoral, unethical, oppressive, and unscrupulous, as well as substantially injurious to Plaintiff and the Class. In particular and *inter alia*, this is evidenced by the outlandishness of the conduct described and of the story the Defendants concocted regarding Blac Chyna, Oprah, Shark Tank, and other celebrities, the significant publicity these illegal free trial schemes have received, prior FTC actions against similar criminal enterprises, and the fact that the illegality of these activities is well known in the affiliate marketing and direct marketing industries, and by the widespread dishonesty present in the Defendants' marketing materials.

288.   Defendants' conduct as described in this Complaint violates the letter, spirit, and intent of the consumer protection laws. Their products are marketed dishonestly and in violation of various consumer protection laws, as described herein and in the Causes of Action of this complaint.

289.   As detailed herein, Defendants' unfair and/or fraudulent practices include disseminating false and/or misleading representations, through their marketing and advertising.

290.   Defendants are aware that the claims or omissions they have made about the Products were and continue to be false and misleading.

291.   Defendants had an improper motive—profit before accurate marketing—in their practices related to their deceptive practices, as set forth herein.

292.   There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein. For example, Defendants could have removed the false and misleading representations from their advertisements, provided omitted information the Plaintiffs to avoid any deception, and could have complied with the law rather than violating the statutes as described in Plaintiff's Fourth Cause of Action.

293.   As a direct and proximate result of Defendants' unfair or fraudulent business acts and practices and misleading and false advertising, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

294.   Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products, as described in detail herein. With respect to the omissions by Defendant as described herein, those omissions were material and Plaintiff and the Class Members would have behaved differently if the information had been disclosed. Had Defendants disclosed the omitted information,

Plaintiff and the Class Members would have been aware of it and would not have purchased the products from Defendant or would not have paid the same price for those products. Similarly, had Defendants not engaged in the unfair and fraudulent business acts or practices described in this Complaint, Plaintiff and the Class Members would not have purchased the products from Defendant or would not have paid the same price for those products.

295.   As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

296.   The unfair and unlawful competitive practices described herein presents a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code **§** 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

**FOURTH CAUSE OF ACTION**

**Violation of the Unlawful Prong**

**of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

297.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

298.   Plaintiff brings this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq.*, individually and on behalf of the Class against the Defendants.

299.   The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits "unfair competition," which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

300.   As detailed in Plaintiff's First Cause of Action, Defendants' acts and practices are unlawful because they violate the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

301.   As detailed in Plaintiff's Second Cause of Action, the Defendants' acts and practices are unlawful because they violate the California False Advertising Law, Business & Professions Code §§ 17500, et seq.

302.   As detailed in Plaintiff's Third Cause of Action, the Defendants' acts and practices are unlawful because they violate the prongs of California's Unfair Competition Law,  Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibit any "unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...."

303.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the California Automatic Renewal Law,  Cal. Bus. & Prof. Code §§ 17600, *et seq.*

304.   As detailed in Plaintiff's Sixth Cause of Action, the Defendants' acts and practices are unlawful because they violate the Electronic Funds Transfer Act,  15 U.S.C. § 1693e.

**Bank Fraud**

**In Violation Of**

**18 U.S. Code § 1344**

305.   The Defendants' conduct here is unlawful because they have committed bank fraud and conspired to commit multiple counts of bank fraud in violation of 18 U.S. Code § 1344.

306.   Pursuant to 18 U.S. Code § 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises" is in violation of the statute.

307.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

308.   The Defendants here conspired to commit bank fraud and to receive money obtained from bank fraud in violation of federal law.

309.   The money obtained by the Defendants through the trynuvegalashnow.com/v2/ website was obtained through credit or debit cards and was thus under the custody or control of financial institutions (in the case of Ms. Adam, Chase Bank). That money was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were told that they would pay $0.00 for the Nuvega Products. The Defendants further "churned" the merchant accounts of various shell companies to deceive banking institutions and prevent them from identifying the billings as fraudulent (which would have enabled the banks to prevent the Defendants

from continuing to charge their customers). The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

310.   Defendants' actions with respect to the products as described above are in violation of 18 U.S. Code § 1344 and thus constitute unlawful business acts or practices under the UCL.

## Wire Fraud
## In Violation Of
## 18 U.S. Code § 1343

311.   The Defendants' conduct here is unlawful because they have committed wire fraud and conspired to commit multiple counts of wire fraud in violation of 18 U.S. Code § 1343.

312.   Pursuant to 18 U.S. Code § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice" is in violation of the statute.

313.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

314.   The Defendants here conspired to commit wire fraud and to receive money obtained from wire fraud in violation of federal law.

315.   The Defendants transmitted written communications by means of wire as part of their scheme to defraud, in particular through Internet ads, their websites, through e-mail, through telephone communications to consumers which were intended to prevent them from exercising their lawful right to a chargeback, and through telephone or Internet communications to banks and credit card companies asserting that their subscription

billings had been agreed to by customers or that their "false front" websites were the site consumers visited. Those transmissions crossed state lines, at least from New Jersey and Maine to California and other states.

316.   The money obtained by the Defendants through the trynuvegalashnow.com/v2/ website was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

317.   Defendants' actions with respect to its products as described above are in violation of 18 U.S. Code § 1343 and thus constitute unlawful business acts or practices under the UCL.

## Mail Fraud
## In Violation Of
## 18 U.S. Code § 1341

318.   The Defendants' conduct here is unlawful because they have committed mail fraud and conspired to commit multiple counts of mail fraud in violation of 18 U.S. Code § 1341.

319.   Pursuant to 18 U.S. Code § 1341, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of

executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing" is in violation of the statute.

320.   Pursuant to 18 U.S. Code § 1349, "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

321.   The Defendants here conspired to commit mail fraud and to receive money obtained from mail fraud in violation of federal law.

322.   The Defendants transmitted matter or things and took or received matter or things via the Postal Service or private or commercial interstate carriers as part of their scheme to defraud, in particular by accepting return packages from the Great Lakes Fulfillment address in Maine shipped across state lines from other states (including from the state of California), and by shipping unordered products through the mail system to victims of the scheme with the intent to fraudulently bill them for those unordered products.

323.   The money obtained by the Defendants through the trynuvegalashnow.com/v2/ website was obtained fraudulently. As described in this complaint, the Defendants intentionally used fake news stories and fake endorsements from celebrities, with the intent that Plaintiff and the Class rely upon them, in order to obtain their credit card numbers for the purpose of fraudulently billing them for subscriptions they did not agree to. The Defendants intentionally created "false front" websites for the purpose of defrauding banks and credit card companies into believing

that customers consented to these subscriptions, when in fact the customers were not even informed of them. The Defendants knowingly conspired together to commit these violations and to benefit financially from this illegal scheme.

324. Defendants' actions with respect to their products as described above are in violation of 18 U.S. Code § 1341 and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of Federal Trade Commission Regulations**

**Concerning Use of Endorsements and Testimonials in Advertising**

**16 C.F.R. pt. 255, *et seq.***

325. The Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of endorsements and testimonials in advertising.

326. Pursuant to 16 C.F.R. pt. 255.1(a), "an endorsement may not convey any express or implied representation that would be deceptive if made directly by the advertiser." Under 16 C.F.R. pt. 255(1)(c), "[a]dvertisers are subject to liability for false or unsubstantiated statements made through endorsements...."

327. The term "endorsement" means "any advertising message (including verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization) that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser." 16 C.F.R. pt. 255(b). "Endorsement" as used by the regulation means both endorsements and testimonials. *Id.* at 255(c).

328. Endorsers include consumers who receive free products from advertisers through their marketing programs. 16 C.F.R. pt. 255, Example 8. Endorsers also include third party bloggers who are compensated in any way by advertisers, and advertisers are

subject to liability for misleading or unsubstantiated representations made by paid endorsers on their websites. 16 C.F.R. pt. 255.1, Example 5.

329.   Under the regulations, advertisers have a duty to train endorsers and to monitor their statements, and to take necessary steps to halt continued publication of deceptive representations by endorsers: "In order to limit its potential liability, the advertiser should ensure that the advertising service provides guidance and training to its bloggers concerning the need to ensure that statements they make are truthful and substantiated. The advertiser should also monitor bloggers who are being paid to promote its products and take steps necessary to halt the continued publication of deceptive representations when they are discovered." 16 C.F.R. pt. 255.1, Example 5.

330.   Plaintiff incorporates by reference the Factual Allegations section of this Complaint.

331.   As that section describes, the Defendants faked various endorsements from celebrities and other third parties who in fact have no connection to the product, have not used it, and did not make the statements and endorsements the Defendants attributed to them.

332.   Under 16 C.F.R. pt. 255.2(c), "[a]dvertisements presenting endorsements by what are represented, directly or by implication, to be "actual consumers" should utilize actual consumers in both the audio and video, or clearly and conspicuously disclose that the persons in such advertisements are not actual consumers of the advertised product."

333.   The Defendants falsely presented endorsements from celebrities as if those celebrities were actual consumers, including photographs of those purported celebrity consumers.

334.   Members of the Class were injured by this unlawful conduct and the violations of these regulations, in that Ms. Adam and the other class members would not have purchased the products but for the fake endorsements from celebrities which made the product seem credible.

335.   Defendants' actions with respect to its endorsers as described above are in violation of 16 C.F.R. pt. 255, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**

**Sherman Food, Drug, & Cosmetic Law**

**Cal. Health & Safety Code, §§ 109875, *et seq.***

336.   The Defendants' acts and practices are unlawful under the California UCL because they violate the Sherman Food, Drug, & Cosmetic Law.

337.   The Defendants' products constitute cosmetics under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109900, a "cosmetic" is "any article, or its components, intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to, the human body, or any part of the human body, for cleansing, beautifying, promoting attractiveness, or altering the appearance." The Defendants' products are cosmetics under this definition because they are applied to the human body in some form, and the products product sold by them are designed to beautify, promote the attractiveness of, or alter the appearance of skin.

338.   The Defendants' products also constitute drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109925, a "drug" includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal" and "[a]n article other than food, that is used or intended to affect the structure or any function of the body of human beings or any other animal." The Defendants' products are drugs under this definition because they are not food and because they are intended to affect the structure or function of the eyelash and its hair cells, and claim to affect such structure or function.

339.   The Defendants' products also constitute new drugs under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109980, a "new drug" includes "[a]ny drug the composition of which is such that the drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the

safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling or advertising thereof," or one that "has become so recognized, but that has not, otherwise than in the investigations, been used to a material extent or for a material time under the conditions." The Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. Their products use a blend of various ingredients, and it is that blend—the "composition"—which is at issue.

340.   The Defendants' representations as described in this Complaint constitute advertisements under the Sherman Food, Drug, & Cosmetic Law. Pursuant to Cal. Health & Safety Code § 109885, an "advertisement" means "any representations, including, but not limited to, statements upon the products, its packages, cartons, and any other container, disseminated in any manner or by any means, for the purpose of inducing, or that is likely to induce, directly or indirectly, the purchase or use of any food, drug, device, or cosmetic." The representations as described herein were likely to induce, directly or indirectly, the purchase of the Defendants' products, which constitute drugs and cosmetics, and they did in fact induce such purchases as described in this Complaint. The representations were disseminated to the Plaintiffs and the Class using various means, including advertisements on Snapchat and on the Defendants' websites.

341.   Pursuant to Cal. Health & Safety Code § 110390, "[i]t is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular."

342.   Pursuant to Cal. Health & Safety Code § 110395, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food, drug, device, or cosmetic that is falsely advertised."

343.   The Defendants violated Cal. Health & Safety Code § 110390 and § 110395 by disseminating false and misleading advertisements, as described in detail throughout this Complaint, and by selling, delivering, and offering for sale their products which were falsely advertised.

344.   As stated above, Defendants' products are new drugs under the Sherman Food, Drug, & Cosmetic Law. *See* Cal. Health & Safety Code § 109980. New drugs are subject to specific approval requirements, and "[n]o person shall sell, deliver, or give away any new drug" unless the statutory requirements are satisfied. Cal. Health & Safety Code § 111550. One way to satisfy the requirements is that the product is a "new drug, and a new drug application has been approved for it and that approval has not been withdrawn, terminated, or suspended under Section 505 of the federal act (21 U.S.C. Sec. 355)." Cal. Health & Safety Code § 111550(a)(1). Another is that "[t]he department has approved a new drug or device application for that new drug or new device and that approval has not been withdrawn, terminated, or suspended." Cal. Health & Safety Code § 111550(b). The remaining methods are inapplicable to the Defendants' products, and on information and belief, Defendants have failed to satisfy the approval requirements for a new drug under the Sherman Food, Drug, & Cosmetic Law.

345.   In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

346.   Defendants' actions with respect to its products as described above are in violation of Cal. Health & Safety Code, §§ 109875, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**

**Federal Food, Drug, and Cosmetic Act**

**21 U.S.C. § 301, *et seq*.**

347.   The Defendants' acts and practices are unlawful under the California UCL because they violate the Federal Food, Drug, and Cosmetic Act.

348.   The Defendants' products constitute drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(g)(1), a "drug" includes "(C) articles (other than food) intended to affect the structure or any function of the body of man or other animals...."

349.   The Defendants' products are advertised as affecting the structure or function of the human body, and are intended to affect the structure or function of the human body. The Defendants advertise that their products are an "eyelash enhancement serum." They claim that it results in "[e]yelashes from 30 to 50% longer, thicker, and darker in 6 – 8 weeks." They also advertise that Nuvega Lash alters the functionality of the human eyelash as well as its hair cells: "NUVEGALash not only extends the growth cycle of lashes, but also nourishes and stimulates the hair cells." They state in the FAQ on trynuvegalashnow.com that Nuvega Lash can "help strengthen the root of the lash."[107] The FAQ further states that: "NUVEGALash's unique formula has been designed to help enhance your natural eyelashes and brows, not only by making them more flexible and stronger, but by also nourishing them."[108]

350.   The Defendants' products constitute new drugs under the Federal Food, Drug, and Cosmetic Act. Pursuant to 21 U.S.C. § 321(p)(1), a "new drug" includes "[a]ny drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to June 25, 1938, it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use...."

---

[107] FAQ, https://trynuvegalashnow.com/faq.php (last visited Jan. 12, 2020).
[108] *Id.*

351.   The Defendants' products are not generally recognized among experts as being safe and effective for the conditions they are advertised to treat. Their products use a blend of various ingredients, and it is that blend—the "composition"—which is at issue. Even the effectiveness of the individual ingredients in the Defendants' products is not generally recognized, but the composition itself is not even generally known to exist among experts in this field, let alone generally recognized as effective.

352.   Pursuant to 21 U.S.C. § 355(a), "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug."

353.   On information and belief, the Defendants have not filed a new drug application or obtained approval of any of their products from the Food and Drug Administration. As such, it was unlawful for them to introduce or deliver their products into interstate commerce, and **all** sales or deliveries of their products in the United States were unlawful.

354.   In addition to the various forms of harm alleged throughout this complaint, which Plaintiff incorporates here by reference, this particular violation specifically harmed Plaintiff and the Class by depriving them of the important and valuable protections of this statutory scheme, by causing them to purchase products whose efficacy and safety had not been verified, and by causing them to purchase the products at issue and pay more for those products than they were worth in the absence of statutory compliance.

355.   Defendants' actions with respect to its products as described above are in violation of 21 U.S.C. § 301, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of the**

**Federal Trade Commission Act**

**15 U.S.C. § 41, *et seq*.**

356.   Pursuant to 15 U.S.C. § 45(a)(1), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

357.   Pursuant to 15 U.S.C. § 52(a), "[i]t shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement—(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, services, or cosmetics; or (2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, services, or cosmetics."

358.   Defendant's products are both drugs and cosmetics.

359.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants engaged in unfair methods of competition in or affecting commerce, as well as unfair or deceptive acts or practices in or affecting commerce. The act of selling their products online satisfies the requirement of "in or affecting commerce."

360.   As described throughout this Complaint and in the First, Second, and Third Causes of Action, Defendants disseminated false advertisements online and sold their products online, which satisfies the requirement of "in or affecting commerce." Those advertisements were intended to induce and did in fact induce the purchase of Defendants' products.

361.   Defendants' actions with respect to its products as described above are in violation of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Unlawful Violations of Federal Trade Commission Regulations**

**Concerning Use of the Word "Free" and Other Similar Representations**

**16 C.F.R. pt. 251,** ***et seq.***

362.   Defendants' acts and practices are unlawful under the California UCL because they violate Federal regulations governing the use of the word "free" and other similar representations in advertising.

363.   Pursuant to 16 C.F.R. pt. 251.1(a)(2), "[b]ecause the purchasing public continually searches for the best buy, and regards the offer of 'Free' merchandise or service to be a special bargain, all such offers must be made with extreme care so as to avoid any possibility that consumers will be misled or deceived."

364.   "[A] purchaser has a right to believe that the merchant will not directly and immediately recover, in whole or in part, the cost of the free merchandise or service by marking up the price of the article which must be purchased, by the substitution of inferior merchandise or service, or otherwise." 16 C.F.R. pt. 251.1(b).

365.   Because of this right, Federal regulations strictly limit the duration of any 'free' offers in any given trade area: "So that a 'Free' offer will be special and meaningful, a single size of a product or a single kind of service should not be advertised with a 'Free' offer in a trade area for more than 6 months in any 12-month period. At least 30 days should elapse before another such offer is promoted in the same trade area. No more than three such offers should be made in the same area in any 12-month period. In such period, the offeror's sale in that area of the product in the size promoted with a 'Free' offer should not exceed 50 percent of the total volume of his sales of the product, in the same size, in the area."

366.   On information and belief, Defendants advertised their false "free trial" or $0.00 price for more than six months (from late 2016 through at least January 2020), and 100% of the sales were promoted with a "free" offer.

367.   Offers labeled as "free" must comply with strict Federal disclosure regulations: "When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood. Stated differently, all of

the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service. For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is not regarded as making disclosure at the outset." 16 C.F.R. pt. 251.1(c).

368.   Defendants failed to comply with these requirements to clearly and conspicuously disclose all terms, conditions, and obligations at the outset because on the trynuvegalashnow.com/v2/ website, the terms were not disclosed, false representations that the products would cost $0.00 were made, and any disclosure of a subscription was buried on another web page in a lengthy terms of service.

369.   Defendants' actions with respect to its use of the word "free" as described above are in violation of 16 C.F.R. pt. 251, *et seq.* and thus constitute unlawful business acts or practices under the UCL.

### Unlawful Violations of Federal Law Governing
### Negative Option Marketing On The Internet
### 15 U.S.C. § 8403, *et seq.*

370.   Pursuant to 16 C.F.R. § 310.2, "[n]egative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."

371.   Defendants utilize negative option features on their websites, offers, and agreements to sell their products because they purport to sign consumers up for a "free trial," and then interpret that as acceptance of a paid subscription if the consumer does not cancel shortly thereafter.

372.   Pursuant to 15 U.S.C. § 8403, "[i]t shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal

Regulations), unless the person—(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and (3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account."

373.   Defendants failed to follow any of these requirements, and in fact made it as difficult as possible to cancel the subscription, as described herein.

374.   Defendants' actions with respect to its products as described above are in violation of Federal law governing negative option marketing on the Internet, 15 U.S.C. § 8403, *et seq*. and thus constitute unlawful business acts or practices under the UCL.

**Injury from Defendants' Unlawful Actions**

375.   To extend that the unlawful conduct described above was based on misrepresentations, deception, or omission, Defendants knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive reasonable consumers like Plaintiff and other Class Members.

376.   As a direct and proximate result of Defendants' unlawful conduct and unfair competition, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, and as a result of Defendants' unlawful conduct and unfair competition, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful and unfair conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or

value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact.

377.   As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products and have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, Plaintiff and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

378.   The unfair and unlawful competitive practices described herein present a continuing threat to Plaintiff and the Class Members in that Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct will continue to cause irreparable injury to consumers unless enjoined or restrained. Under Business & Professions Code § 17203, Plaintiff is entitled to injunctive relief ordering Defendants to cease their unfair competitive practices, and Plaintiff and all Class Members are entitled to restitution of the entirety of the Defendants' revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

## FIFTH CAUSE OF ACTION

### Violation of the California Automatic Renewal Law

### Cal. Bus. & Prof. Code §§ 17600, *et seq.*

379.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

380.   Plaintiff brings this claim individually and on behalf of the Class.

381.   Pursuant to California Business and Professions Code section 17600, *et seq.*, "[i]t is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."

382.   California Business and Professions Code section 17602 prohibits "any business that makes an automatic renewal or continuous service offer to a consumer in this state" from engaging in certain activities.

383.   Pursuant to California Business and Professions Code section 17602(a)(1), it is unlawful for such a business to "[f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity… to the request for consent to the offer."

384.   Pursuant to California Business and Professions Code section 17602(a)(1), if an automatic renewal offer "also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial."

385.   Pursuant to California Business and Professions Code section 17601(c), "'Clear and conspicuous' or 'clearly and conspicuously' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."

386.   Pursuant to California Business and Professions Code section 17602(a)(2), it is unlawful for a business to "[c]harge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time."

387.   Pursuant to California Business and Professions Code section 17602(b), "[a] business that makes an automatic renewal offer or continuous service offer shall provide a toll-free telephone number, electronic mail address, a postal address if the seller directly

bills the consumer, or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a)."

388.   Pursuant to California Business and Professions Code section 17602(c), "a consumer who accepts an automatic renewal or continuous service offer online shall be allowed to terminate the automatic renewal or continuous service exclusively online, which may include a termination email formatted and provided by the business that a consumer can send to the business without additional information."

389.   Defendants violated the provisions of this statute, as described herein. They failed to inform consumers in a conspicuous manner or in visual proximity to the request for consent to the offer that they were signing up for an automatic renewal subscription. The Defendants further violated the statute by making cancellation of the subscriptions as difficult as possible, including by using tactics such as placing customers on hold for lengthy periods of time or otherwise being difficult with them on telephone calls, by failing to provide an easy method of cancellation, and by using their "false front" website to deceive customers and their banks into thinking there had been an agreement to a terms of service the victims never agreed to.

390.   Plaintiff and the Class were injured by these violations because their bank accounts or credit cards were automatically billed without their permission and in violation of the statute. As a result, they lost money and were charged for products they never agreed to purchase.

391.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing and an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute.

**SIXTH CAUSE OF ACTION**

**Violation of 15 U.S.C. § 1693e**

**of the Electronic Fund Transfer Act**

392.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

393.   Plaintiff brings this claim on behalf of the Class.

394.   15 U.S.C. § 1693e(a) provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

395.   15 U.S.C. § 1693a(10) provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals."

396.   Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b), provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

397.   Section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Official Staff Commentary to Regulation E further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), cmt. 6, Supp. I.

398.   On information and belief, Defendants debited consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated writing from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

399.   Further, on information and belief, Defendants debited consumers' bank accounts on a recurring basis without providing a copy of written authorization signed or similarly authenticated writing by the consumer for preauthorized electronic fund

transfers from the consumer's account, or without providing clear and readily understandable terms of the preauthorized transfer, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

400.   Pursuant to 15 U.S.C. §1693m(a), Defendants are civilly liable to all injured victims of the class for these violations.

401.   Plaintiff and the Class seek all available damages under this statute, including full refunds for any automatic billing, an injunction barring the Defendants from automatically billing any other customers of any product or automatically shipping any products to customers in the future absent compliance with the statute, costs, reasonable attorney's fees, and statutory penalties.

## SEVENTH CAUSE OF ACTION
### Violation of the Racketeer Influenced and
### Corrupt Organizations Act
### ("RICO")
### 18 U.S.C. §§ 1961, *et seq.*
### (Defendants Frank V. Barone, Kirill Chumenko, and Kurt Ellis)

402.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

403.   Plaintiff brings this claim individually and on behalf of the Class under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, on behalf of themselves and the Classes against Defendants Frank V. Barone, Kirill Chumenko, and Kurt Ellis.

404.   18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

405.   18 U.S.C. § 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

406.   Defendants Frank V. Barone, Kirill Chumenko, and Kurt Ellis have committed violations of these sections, as described in further detail below.

407.   Defendants Frank V. Barone, Kirill Chumenko, and Kurt Ellis are "persons" within the meaning of 18 U.S.C. § 1961(3), which defines a person as "any individual or entity capable of holding a legal or beneficial interest in property."

408.   Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Each of these entities is a corporation, and collectively they are associated in fact as described herein.

409.   SFLG Inc. constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because it is a corporation.

410.   Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; Advanced Beauty LLC; and SFLG Inc. together constitute an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because they are associated in fact with respect to the Nuvega Products.

411.   Defendants Frank V. Barone and Kirill Chumenko operated Improved Nutraceuticals, LLC; Green Pogo LLC (New Jersey); Green Pogo LLC (Delaware); Fortera Nutra Solutions LLC (previously Next Gen Health Solutions LLC); Natural Beauty Line LLC; Vegan Beauty LLC; and Advanced Beauty LLC as an enterprise and operated these corporate entities in violation of RICO. They conducted the affairs of

these corporations through illegal acts, namely the mail fraud and wire fraud described herein.

412.   Frank V. Barone and Kirill Chumenko agreed to facilitate the operation of an enterprise through a pattern of racketeering activity, and they did so knowingly and intentionally. The fraudulent representations and omissions are so outlandish and so prevalent in the Nuvega Products' advertising, and are highlighted in so many customer complaints, that it would have been impossible for either Frank V. Barone or Kirill Chumenko not to have been aware of them and to have agreed to them. Moreover, the bank fraud committed by Defendants Barone and Chumenko occurred using shell companies who were listed as operating from their home addresses, and on information and belief did so at their direction and with their knowledge.

413.   Frank V. Barone and Kirill Chumenko conspired to commit and agreed to the commission of at least two predicate acts.

414.   18 U.S.C. § 1961(1) defines racketeering activity to include "any act which is indictable under any of the following provisions of title 18, United States Code... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud)...."

415.   Frank V. Barone and Kirill Chumenko have committed both wire and mail fraud, as well as bank fraud, as explained further herein in the Fourth Cause of Action. These predicate acts occurred from roughly late 2016 through the present, and were reflected in the Defendants' websites, the trynuvegalashnow.com/v2/ landing page which on information and belief has been live since late 2016, the fake celebrity news articles as described herein whose dates are unknown, and the "false front" websites as described herein.

416.   Defendants Barone and Chumenko first registered trynuvegalashnow.com on November 11, 2016, which is the earliest currently known predicate act. This is consistent with the negative customer reviews reporting fraud, which began as early as January 4, 2017, in a Better Business Review for Green Pogo LLC which reported having

signed up for a Nuvega Lash trial more than a month earlier (placing the date the scam began in roughly December 2016).

417.   The "false front" websites, which on information and belief were used to defraud banks, were first registered as follows: lashesbynuvega.com (July 21, 2017); www.nuveganlashes.com (March 10, 2017); www.nuvegavegan.com (November 21, 2017); www.nuveganbrows.com (March 10, 2017); www.shopnuvega.com (October 13, 2017); www.browbynuvega.com (August 28, 2017); www.bestveganlash.com (August 28, 2017); www.bestveganbrow.com (August 28, 2017); and www.nuvegalashforvegans.com (August 19, 2016). On information and belief, these dates roughly comport to when Defendants Barone and Chumenko first began using these "false fronts" to commit wire fraud and bank fraud, as described further in Plaintiff's Fourth Cause of Action.

418.   These acts of wire and mail fraud were committed willfully and intentionally as described further herein, and were made in furtherance of the scheme and common course of conduct in that they were designed to defraud customers of the Nuvega Products of money and property.

419.   These acts constitute a pattern of racketeering activity, defined in 18 U.S.C. § 1961(1) as "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." There are countless acts individual acts of wire and mail fraud identified here which occurred from at least December 2016 to the present, including a minimum of 2,000 victims who were defrauded based on the invoices provided by Affiliati and described further herein. These acts were related to one another in that all had a common purpose to defraud potential customers of the Nuvega Products, that the victims were directed to the trynuvegalashnow.com/v2/ landing page, that the participants were the same, and that the methods were the same or similar. These acts occurred over a period of more than two years, and they are currently ongoing in that on information and belief, many individuals

are still being billed and shipped products on a monthly basis for products they purchased based on past acts of fraud, the deceptive websites are still operative, and many of the misrepresentations are actively being made to new customers. On information and belief, additional predicate acts may have occurred far earlier and may be uncovered in discovery, particularly through Defendant Barone and Chumenko's sale of earlier products and their current sales of the Red Fortera product and products related to it.

420.   On information and belief, and based on the evidence described further herein, Defendant Kurt Ellis was aware of these predicate acts and conspired to commit and agreed to the commission of at least two predicate acts. Defendant Kurt Ellis further caused Defendant SFLG Inc. to directly commit mail fraud by shipping the Nuvega Products to victims through the Postal Service, despite knowing that those shipments were being made in support of a fraudulent scheme. As described further herein, Defendant Kurt Ellis caused Defendant SFLG Inc. to consult on a routine basis for companies running fraudulent "free trial scams," and caused the company to provide a menu of services enabling that fraud which was used to further the predicate acts committed by Defendants Barone and Chumenko. On information and belief, these activities also occurred from December 2016 through the present.

421.   The predicate acts by the Defendants affected interstate commerce, in that the shipments crossed state lines and the advertisements were transmitted via wire across the country, resulting in purchases of the Nuvega Products through interstate commerce which were sent via United States mail.

422.   The RICO violations alleged here have caused harm to a specific business or property interest. In particular, as a result of the misrepresentations and omissions described herein, Plaintiff reasonably relied upon Defendants' representations regarding their products. In reasonable reliance on Defendants' false representations, and as a result of the RICO violations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they would have had they been aware that Defendants' representations were false or had the Defendants not engaged in the unlawful

conduct described herein. Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered specific harm to a property interest, the money they paid to the Defendants. Plaintiff's banks were further harmed through the "false front" websites and the churning of merchant accounts.

423.   The RICO violations here have caused concrete financial loss. In particular, as described above, money was paid by Plaintiff and members of the Classes to the Defendants in reliance on their misrepresentations and omissions. Plaintiff and the Class Members were overcharged for those products relative to their actual value, and the value was substantially inflated by the various misrepresentations and omissions as described further herein.

424.   The RICO violations were both the but-for cause and the proximate cause of these injuries. But for the violations, as described herein, Plaintiff and the Class Members would not have purchased the products or would not have paid an inflated price for them. But for the bank fraud, the scheme would have been shut down or the Plaintiff and the Class Members would have been able to successfully execute chargebacks. The violations were the proximate cause of these injuries because the violations led directly to the injuries—the fraudulent representations and omissions were designed to induce customers to purchase the Nuvega Products, and it was because of these representations and omissions that the customers made their purchases.

425.   Because of these violations and pursuant to 18 U.S.C. § 1964(c) and 1964(d), Defendants Frank V. Barone, Kirill Chumenko, and Kurt Ellis are liable to Plaintiff and the Class Members for three times the damages Plaintiff and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION
### Aiding and Abetting

426.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

427.   On information and belief, Defendants Ellis and SFLG, Inc. knew that the tortious conduct alleged in this complaint was occurring and that it constituted a breach of duties to Plaintiffs. Defendants Ellis and SFLG, Inc. had actual knowledge of the wrongful conduct described herein. It is widely known among these scammers and among the various companies that provide them aid and assistance (the fulfillment companies and payment processing companies) that the Federal Trade Commission has branded these schemes illegal and is aggressively pursuing them.

428.   Defendants Ellis and SFLG, Inc. gave substantial assistance or encouragement to the other Defendants as described further herein.

429.   Defendants Ellis and SFLG, Inc. participated in this conduct for personal gain or in furtherance of their own financial advantage.

430.   Defendants Ellis and SFLG, Inc. are thus jointly and severally liable for the conduct alleged herein by all of the other Defendants.

431.   Plaintiff expects that there will be multiple John Doe Defendants ultimately discovered to have participated in this scheme, and based on the BBB report, that they will be separate companies or individuals conspiring together. To the extent the tortious conduct alleged was not personally committed by them, the Defendants aided and abetted the tortious conduct alleged in this complaint by working together as a group to defraud consumers as described in the BBB report. Ex. 1.

432.   On information and belief, the John Doe Defendants knew that the tortious conduct alleged in this complaint constituted a breach of duties to Plaintiffs. The John Doe Defendants had actual knowledge of the wrongful conduct described herein. It is widely known among these scammers and among the various companies that provide them aid and assistance (the fulfillment companies and payment processing companies) that the Federal Trade Commission has branded these schemes illegal and is aggressively pursuing them.

433.   The John Doe Defendants gave substantial assistance or encouragement to the other Defendants in their actions by performing their roles as described in the BBB report (affiliate, affiliate network, and "crooked processor" who helps evade fraud detection efforts by banks and credit card companies). Ex. 1.

434.   The John Doe Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

435.   Each of the John Doe Defendants is thus jointly and severally liable for the conduct alleged herein by all of the other Defendants.

436.   The Barone / Chumenko Defendants knew of, directed, and had the right to control the conduct of Defendants Ellis and SFLG, Inc. as well as the John Doe Defendants. The Barone / Chumenko Defendants participated in this conduct for personal gain or in furtherance of their own financial advantage.

437.   The Barone / Chumenko Defendants are thus jointly and severally liable for the conduct alleged herein by all of the other Defendants.

## NINTH CAUSE OF ACTION
## Civil Conspiracy

438.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

439.   The Defendants ("the Conspirators") formed a conspiracy to commit the tortious and unlawful conduct described herein.

440.   On information and belief, there was an agreement among the Conspirators to commit those wrongful acts and to cooperate in furtherance of the commission of those wrongful acts. This agreement is implied by the conduct of the conspirators because of the common knowledge among these scammers that their conduct is illegal, because of their contracts with one another, because the fulfillment companies and "crooked processors" target this kind of scammer specifically to be their customers, and because of the nature of their close interaction as an economic unit.

441.   The Defendants were aware of the conduct of each other, and specifically of its unlawful nature. The Defendants agreed with one another that this conduct would be committed and intended that it be committed. It was in the Defendants' interests that this conduct be committed because they were specifically financially compensated for their participation. The Defendants acted in furtherance of their own financial gain as evidenced by this compensation.

442.   Plaintiff and the Class were harmed by the wrongful conducted committed by the Conspirators as part of the conspiracy, as described throughout this Complaint in the Causes of Action underlying the Conspiracy claim. As a direct and proximate result of the Conspirators' wrongful conduct, Plaintiff and the other Class Members have suffered injury in fact and have lost money or property, time, and attention. In reasonable reliance on the Conspirators' misrepresentations, Plaintiff and other Class Members purchased the products at issue and paid more for those products than they otherwise would have. In turn, Plaintiff and other Class Members ended up with Products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendants, and therefore Plaintiff and other Class Members have suffered injury in fact. Defendant's representations were material to the decision of Plaintiffs and the Class Members to purchase Defendant's products, and a reasonable person would have attached importance to the truth or falsity of the representations made by Defendant in determining whether to purchase Defendant's products.

443.   Each of the Defedants listed in this Cause of Action is thus jointly and severally liable for the conduct committed by the conspiracy.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment as follows:

A.   An order declaring that this action may be maintained as a class action pursuant to Fed. R. Civ. Proc. 23, certifying this case as a class action, appointing Plaintiff as representative of the Class, and designating their attorneys as Class Counsel;

B.   Declaratory judgment that Defendant's actions are unfair and unlawful;

C.     An award of injunctive relief as permitted by law or equity including an order prohibiting Defendant from engaging in the unlawful and tortious acts described above, as well as prohibiting Defendants from charging any further subscription payments to members of the Class without first informing them of the misrepresentations and omissions, correcting them, and gaining affirmative consent to continue those subscriptions;

D.     A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

E.     For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendant's practices, along with punitive damages;

F.     For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendant obtained from Plaintiff and the Class as a result of its unlawful, unfair, and deceptive business practices described herein;

G.     As to Defendants Barone, Chumenko, and Ellis, for damages of three times the damages Plaintiff and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) and (d);

H.     An award of attorney's fees and costs;

I.     For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

J.     Such other and further relief as is necessary and appropriate.

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all issues so triable.

DATED: February 1, 2020

Respectfully submitted,

**KNEUPPER & COVEY, PC**

 /s/Kevin M. Kneupper

Kevin M. Kneupper, Esq.

*Attorneys for Plaintiff*
*Cindy Adam*
*and the putative Class*