**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
4475 Peachtree Lakes Dr.
Berkeley Lake GA 30096
Tel: 512-420-8407

*Attorneys for Plaintiff Cindy Adam*
*and the putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY ADAM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> FRANK V. BARONE; KIRILL CHUMENKO; GREEN POGO LLC (DELAWARE); GREEN POGO LLC (NEW JERSEY); NATURAL BEAUTY LINE LLC; VEGAN BEAUTY LLC; IMPROVED NUTRACEUTICALS LLC; FORTERA NUTRA SOLUTIONS LLC; ADVANCED BEAUTY LLC; SFLG INC.; KURT ELLIS; and JOHN DOES 1-10, <br><br> Defendant(s) | Case No.: 4:20-cv-00761-EMC <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO F.R.C.P. RULE 12(b)(1), (2) AND (6); OR, IN THE ALTERNATIVE, TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)** |

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    DEFENDANTS' MOTION FOR TRANSFER SHOULD BE DENIED ........................................ 2

III.   DEFENDANTS' SUBJECT MATTER JURISDICTION CHALLENGES MUST BE DENIED IN
       LIGHT OF THE SUPREME COURT'S RULING IN CAMPBELL-EWALD .............................. 8

IV.    THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS ....................... 10

   A.   Facts Relevant to Personal Jurisdiction .................................................................. 12

      1)   Facts Relating to Barone/Chumenko Defendants ................................................. 12

      2)   Facts Relating to Ellis/SFLG .............................................................................. 15

   B.   The Barone/Chumenko Defendants are Alter Egos of One Another............................ 18

   C.   All of the Defendants are Subject to Specific Jurisdiction ........................................ 19

      1)   All Defendants Satisfy the Purposeful Direction Test ........................................... 20

      2)   All Defendants satisfy the Relation to Forum test. ............................................... 22

      3)   The exercise of jurisdiction over all Defendants is reasonable................................ 23

   D.   Jurisdiction Is Proper Under The Ends of Justice Provision of RICO........................... 24

   E.   Jurisdictional Discovery is Proper If the Court Finds No Prima Facie Case................ 24

   F.   The Fiduciary Shield Doctrine Does Not Protect Defendants From Jurisdiction............ 25

V.     PLAINTIFF HAS STATED A CLAIM AGAINST BOTH ELLIS AND SFLG............................ 26

   A.   Defendants' Carmack Preemption Arguments are Baseless......................................... 26

      1)   Defendants SLFG and Ellis Offer No Proof That They Are "Carriers" Under the Carmack
           Amendment.................................................................................................... 26

      2)   The Carmack Amendment Does Not Preempt The Plaintiff's Claims ........................ 27

      3)   Carmack does not apply to Plaintiff's federal law claims. ...................................... 30

   B.   Ellis/SFLG's 9(b) Argument is Based Entirely on False Statements About the Complaint ........ 30

VI.    DEFENDANTS' NATIONWIDE CLASS ARGUMENTS ARE MERITLESS ............................. 31

VI.    CONCLUSION............................................................................................................. 33

# TABLE OF AUTHORITIES

Cases

*A. J. Indus., Inc. v. United States Dist. Court for Cent. Dist.*, 503 F.2d 384 (9th Cir. 1974) .................. 3

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004) ............... 24

*Adobe Sys. v. Bargain Software Shop, LLC*, No. C-14-3721 EMC, 2014 U.S. Dist. LEXIS 169710 (N.D. Cal. Dec. 8, 2014) ......................................................................................................... 4, 6

*Allstar Mktg. Group, LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109 (C.D. Cal. 2009) .............. 5

*Andersen v. Griswold Int'l, LLC*, No. 14-cv-02560-EDL, 2015 U.S. Dist. LEXIS 177848 (N.D. Cal. Mar. 25, 2015) ...................................................................................................... 22

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Trump Card, Inc.*, No. 18-cv-01497-RS, 2019 U.S. Dist. LEXIS 56000 (N.D. Cal. Apr. 1, 2019) .................................................... 26

*Bowerman v. Field Asset Servs.*, No. 3:13-cv-00057-WHO, 2018 U.S. Dist. LEXIS 84214 (N.D. Cal. May 18, 2018) ...................................................................................................... 7

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir.1986) .................................. 24

*Cal. Serv. Emples. Health & Welfare Tr. Fund v. Command Sec. Corp.*, No. C-12-1079 EMC, 2012 U.S. Dist. LEXIS 95352 (N.D. Cal. July 10, 2012 ..................................................... 4, 5, 6

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) .......................................................... 8, 9

*Chubb Group of Ins. Cos. v. H.A. Transp. Sys., Inc.*, 243 F. Supp.2d 1064 (C.D. Cal. 2002) ......... 26, 27

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011) ........................................ 23

*Copeland Surveying, Inc. v. Richard Goettle, Inc.*, Civil Action No. 06-1189 (JHR), 2006 U.S. Dist. LEXIS 39409 at *6-9 (D.N.J. June 12, 2006) ........................................................... 3

*Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009) ..................................................... 27

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280 (9th Cir. 1977) ................................ 11

*Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834 (9th Cir. 1986) .............................. 4, 5

*Dickert v. Sanyo Energy (U.S.A.) Corp.*, No. 18-cv-04664-EMC, 2019 U.S. Dist. LEXIS 39871 (N.D. Cal. Mar. 12, 2019) ............................................................................................... 25

*Dynatrace LLC v. Ramey*, No. 16-cv-01777-EMC, 2016 U.S. Dist. LEXIS 170205 (N.D. Cal. Dec. 8, 2016) ................................................................................................................. 20, 22, 23

*Espinosa v. Ahearn (In re Hyundai & Kia Fuel Econ. Litig.)*, 926 F.3d 539 (9th Cir. 2019) ............... 32

*Ferriss v. All. Publ'g, Inc.*, No. 15-cv-05675-EMC, 2016 U.S. Dist. LEXIS 168576 (N.D. Cal. Dec. 6, 2016) ................................................................................................................. 20, 21, 22

*Figy v. Lifeway Foods, Inc.*, No. 13-cv-04828-TEH, 2016 U.S. Dist. LEXIS 108755 (N.D. Cal. Aug. 16, 2016) ........................................................................................................................ 33

*Flint v. UGS Corp.*, No. C07-04640, 2007 U.S. Dist. LEXIS 94643 (N.D. Cal. Dec. 12, 2007) ............. 6

*Goldman v. Seawind Grp. Holdings Pty Ltd.*, No. CV 13-01759 SI, 2013 U.S. Dist. LEXIS 124052 (N.D. Cal. Aug. 29, 2013) ......................................................................................... 18, 19

*Gordon v. United Van Lines, Inc.*, 130 F.3d 282 (7th Cir. 1997) .......................................................... 28

*GT Sec., Inc. v. Klastech GmbH*, No. C-13-03090 JCS, 2014 U.S. Dist. LEXIS 88237 (N.D. Cal. June 27, 2014) ....................................................................................................................... 20

*Gucci Am., Inc. v. Huoqing*, No. C-09-05969 JCS, 2011 U.S. Dist. LEXIS 783 (N.D. Cal. Jan. 3, 2011) ......................................................................................................................................... 23

*Hansell v. TracFone Wireless, Inc.*, No. C-13-3440 EMC, 2013 U.S. Dist. LEXIS 167423 (N.D. Cal. Nov. 22, 2013) ............................................................................................................... 5

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) ............... 11, 16

*Helm v. Alderwoods Grp., Inc.*, 696 F. Supp. 2d 1057 (N.D. Cal. 2009) ........................................ 11, 26

*Hymes v. King*, No. SA CV 17-0463-DOC (DFMx), 2017 U.S. Dist. LEXIS 220007 (C.D. Cal. July 27, 2017) ........................................................................................................................ 26

*In re Big Heart Pet Brands Litig.*, No. 18-cv-00861-JSW, 2019 U.S. Dist. LEXIS 229340 (N.D. Cal. Oct. 4, 2019) ........................................................................................................... 10

*In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580 (M.D. Pa. 2009) ........................ 18

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018) ........................................................................................................ 33

*j2 Glob. Communs., Inc. v. Blue Jay, Inc.*, No. C 08-4254 PJH, 2009 U.S. Dist. LEXIS 1616 at *13 (N.D. Cal. Jan. 5, 2009) ......................................................................................... 25, 26

*Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622 (7th Cir. 2017) ...................................... 9

*Lawrence v. FCA US LLC*, No. CV 16-5452 PSG (MRWx), 2017 U.S. Dist. LEXIS 216120 (C.D. Cal. Sep. 12, 2017) .......................................................................................................... 10

*Leek v. Cooper*, 194 Cal. App. 4th 399 (2011) ........................................................................ 19

*Long v. Graco Children's Prods.*, No. 13-cv-01257-JD, 2014 U.S. Dist. LEXIS 174347 (N.D. Cal. Dec. 17, 2014) ...................................................................................................................... 9

*Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056 (9th Cir. 2011) ............. 29, 30

*Meadowgate Techs., LLC v. Fiasco Enters.*, No. 17cv230-LAB (KSC), 2018 U.S. Dist. LEXIS 45857 (S.D. Cal. Mar. 19, 2018) ................................................................................................ 28

*Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) ................................................................ 32

*Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377 (5th Cir. 1998) ................................... 28

*Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929 (N.D. Cal. 2014) ................................... 11

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) ..................... 4

*Piping Rock Partners, Inc. v. David Lerner Assocs.*, No. C 12-04634 SI, 2012 U.S. Dist. LEXIS 161643 (N.D. Cal. Nov. 9, 2012) ....................................................................................... 11, 13

*Prussin v. Bekins Van Lines, LLC*, No. 5:13-cv-02874 HRL, 2015 U.S. Dist. LEXIS 12740 (N.D. Cal. Feb. 3, 2015) ................................................................................................................. 26

*Quach v. CVS Pharmacy, Inc.*, No. C-13-2695 EMC, 2014 U.S. Dist. LEXIS 15013 (N.D. Cal. Feb. 6, 2014) .................................................................................................................... 33

*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015) .................................................................. 18

*Rini v. United Van Lines*, 104 F.3d 502 (1st Cir. 1997) ............................................................ 28

*Schlesinger v. Collins*, No. 19-cv-03483-EMC, 2019 U.S. Dist. LEXIS 167193 (N.D. Cal. Sep. 25, 2019) ................................................................................................................. 21, 23

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ............................... 11, 20

*Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371 (D.D.C. 2012) ..................................... 6

*Silvestri v. Bekins Van Lines, Inc.*, No. CV 19-08229-CJC(AFMx), 2019 U.S. Dist. LEXIS 185559 (C.D. Cal. Oct. 24, 2019) .............................................................................................. 27

*Smallwood v. Allied Pickfords, LLC*, No. 08cv2196 BTM(RBB), 2010 U.S. Dist. LEXIS 153318 (S.D. Cal. Feb. 4, 2010) ............................................................................................................. 28

*Sonoda v. Amerisave Mortg. Corp.*, No. C-11-1803 EMC, 2011 U.S. Dist. LEXIS 72234 (N.D. Cal. July 6, 2011) ...................................................................................................................... 4, 5

*Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC, 2020 U.S. Dist. LEXIS 36747 (N.D. Cal. Mar. 3, 2020) ...................................................................................................................... 33

*T. K. v. Adobe Sys.*, No. 17-CV-04595-LHK, 2018 U.S. Dist. LEXIS 65557 (N.D. Cal. Apr. 17, 2018) . ............................................................................................................................. 9, 10

*Travelers Prop. Cas. Co. of Am. v. Legacy Transp. Servs.*, No. C 10-00505 JSW, 2010 U.S. Dist. LEXIS 143922 (N.D. Cal. Apr. 13, 2010) ............................................................................... 26

*United States v. Acad. Mortg. Corp.*, No. 16-cv-02120-EMC, 2018 U.S. Dist. LEXIS 144648 (N.D. Cal. Aug. 24, 2018) ................................................................................................. 3, 5, 7

*United States v. Wilde*, 74 F. Supp. 3d 1092 (N.D. Cal. 2014) ........................................................... 32

*Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, No. C-08-2973 MMC, 2008 U.S. Dist. LEXIS 108783 (N.D. Cal. Sep. 16, 2008) ................................. 3

*Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353 (N.D. Cal. 2007) ............................................. 6

*Vu v. Ortho-Mcneil Pharm., Inc.*, 602 F. Supp. 2d 1151 (N.D. Cal. 2009) ........................................... 4

*White v. Mayflower Transit, L.L.C.*, 543 F.3d 581 (9th Cir. 2008) .............................................. 27, 28

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, No. 19-cv-00792-EMC, 2019 U.S. Dist. LEXIS 193100 (N.D. Cal. Nov. 6, 2019) ....................................................................................................... 7

Statutes

18 U.S.C. § 1965 .......................................................................................................................... 24

28 U.S.C. § 1404(a) .................................................................................................................... 2, 8

49 U.S.C. § 13102 ........................................................................................................................ 27

Cal. Bus. & Prof. Code § 17600 ................................................................................................. 7, 23

## I.    INTRODUCTION

The Defendants in this case are a group of individuals and entities that operate a well-known kind of Internet scam called the "free trial scam," of which Nuvega Lash is a textbook example. After advertising a fake celebrity endorsement by Blac Chyna to Ms. Adam, dkt. 33 at 13-14 ¶ 42-44, the Defendants repeatedly represented to her that she was signing up for a free trial, *id.*, *see also id.* at 19 ¶ 65; that she would pay $0.00 for the products and that she would "just pay a small shipping fee," *id.* at 26 ¶ 83. Buried in tiny text that was not even visible to most users was the "disclosure" that the products were not in fact "free" as represented, and Ms. Adam was actually being signed up for an expensive monthly subscription which she needed to cancel virtually immediately after the products were shipped. Dkt. 33 at 23-26, ¶ 75-81; *see also* Exs. 1, 2, 3.

One of the most notable things about the Defendants' motion is that they fail to deny any of the substantive allegations of the Complaint except to half-heartedly claim that they disclosed the trial's terms to Ms. Adam. Dkt. 35 at 2. But "disclosing" an expensive monthly subscription in the middle of a lengthy terms of service after having repeatedly and prominently represented that the products are "free" is no disclosure at all. There is a reason that the Better Business Bureau has flagged the "free trial scam" as a fraud, the Federal Trade Commission has repeatedly shut down such scams, and federal prosecutors have prosecuted those involved in near-identical scams seeking lengthy prison sentences.[1]

Most disturbing about the Defendants' motion is the repeated factual inaccuracies in the sworn statements offered by Barone, Chumenko, and Ellis. The Defendants are well aware that they have no substantive defense to offer in this case. They cannot deny the fraud—and so they attempt to pin it on one of their shell companies, and that shell company alone. But this finger-pointing game is just that: a game. All of the Defendants were involved, and their protestations to the contrary are sometimes based on outright falsehoods, sometimes based on deceptive omissions. The sacrificial lamb they seek to place the blame upon—Natural Beauty Line LLC—did not even exist when the website at issue, trynuvegalashnow.com, was registered by Tracey Meyer, an employee of Fortera Nutra Solutions LLC.

---

[1] Dkt. 33, Ex. 1; *Texas Man Indicted In Puerto Rico For Wire And Bank Fraud Scheme*, *available at* https://www.justice.gov/usao-pr/pr/texas-man-indicted-puerto-rico-wire-and-bank-fraud-scheme (last visited June 15, 2020).

And as described herein, the shell companies Barone and Chumenko created were little more than pieces of paper used to create additional merchant accounts that could be used to circumvent fraud detection mechanisms by financial institutions. Human beings have to operate an Internet scam, and nowhere do Barone or Chumenko deny that they were the ones who created and operated the Nuvega scam.

As for Ellis and SFLG, who claim merely to operate a shipping company, they have done far more than that. Their own website offers services including handling returns, handling inbound calls, database management, payment processing, and merchant processing. Ellis's declaration was carefully worded to avoid denying that he himself provided these services to the Barone/Chumenko Defendants. This is for good reason: Ellis has spent the last twenty years running a boiler room in New York that handles calls for free trial scams, and the online descriptions of its employees of the lies they were forced to tell consumers sound eerily similar to what consumers have to say about Nuvega Lash.

Finally, the threat of legal liability has not deterred these Defendants from escalating their scam. Post-suit, Barone and Chumenko launched an IPO of a company called CanaFarma Hemp Products Corp., which hawks CBD products to consumers using the same tactics as Nuvega Lash. They have raised millions from investors by hyping their revenue without disclosing their marketing tactics. Ellis/SFLG are shipping these products, and they continue to do so even after receiving this lawsuit and being clearly informed of how Barone and Chumenko operate. And worse, Barone, Chumenko, and CanaFarma are now targeting people with serious illnesses including cancer, Alzheimer's, and mental health issues such as bipolar disorder. They ply victims with tales of endorsements from Shark Tank or fake clinical trials and urge them to quit chemotherapy or quit taking "meds" to use a hemp oil called Yooforic instead. The Defendants' declarations are utterly untrustworthy in light of their willingness to do this. This conduct cannot be allowed to continue. This is about more than money. People's lives and health are quite literally at risk, and the Court should take this into account in considering this Motion.

## II.     DEFENDANTS' MOTION FOR TRANSFER SHOULD BE DENIED

Defendants seek to transfer this action to the District of New Jersey. As a threshold matter, 28 U.S.C. § 1404(a) permits transfer only to a District where all parties have consented (Plaintiff has not), or to a District where the action "might have been brought." To meet this standard, the transferee court

must have personal jurisdiction over **<u>all</u>** defendants. *Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, No. C-08-2973 MMC, 2008 U.S. Dist. LEXIS 108783 at *3 (N.D. Cal. Sep. 16, 2008). Here, New Jersey is not eligible as a transferee court because it did not have personal jurisdiction over Ellis/SFLG at the time of filing. "The party seeking transfer bears the burden of showing that transfer is appropriate." *United States v. Acad. Mortg. Corp.*, No. 16-cv-02120-EMC, 2018 U.S. Dist. LEXIS 144648 at *12 (N.D. Cal. Aug. 24, 2018). Defendants have not met that burden.

Defendants' sole argument is a brief statement that Ellis/SFLG, who are located in Maine, "do business in New Jersey and have customers in New Jersey...." Dkt. 35-3 at ¶ 28. It is unclear exactly what this even means, but nevertheless, this bare assertion is nowhere near what New Jersey courts require to establish general jurisdiction via continuous and systemic contact. *See Copeland Surveying, Inc. v. Richard Goettle, Inc.*, Civil Action No. 06-1189 (JHR), 2006 U.S. Dist. LEXIS 39409 at *6-9 (D.N.J. June 12, 2006). And as to specific jurisdiction in New Jersey over Ellis/SFLG, "[t]he fact that a non-resident has contracted with a resident of the forum State is not, by itself, sufficient to justify personal jurisdiction over the non-resident." *Id.* at *10. The hurdle is even higher for Defendants here because they must show that Ms. Adam could establish specific jurisdiction over Ellis/SFLG in New Jersey, not that the Barone/Chumenko Defendants could establish specific jurisdiction over Ellis/SFLG there. Defendants have not even attempted an analysis of New Jersey law, and have not provided the Court any details that would enable it to do so. They appear to recognize this failure, arguing that Ellis/SFLG have "conceded" personal jurisdiction in New Jersey. Dkt. 43 at 6. But jurisdiction is determined at the time of filing, and Ellis/SFLG cannot concede their way to a transfer in a post-filing motion. *A. J. Indus., Inc. v. United States Dist. Court for Cent. Dist.*, 503 F.2d 384, 386 (9th Cir. 1974) (holding that "the posture of the case at the time of filing in the transferor district is determinative of whether the action was one which 'might have been brought' in the proposed transferee district."). Ellis/SFLG have thus not met their threshold burden of showing that this action "might have been brought" in New Jersey.

Even had they done so, Defendants cannot satisfy the requirements for transfer. Courts in this District articulate the relevant venue factors on a transfer motion as follows: "(1) plaintiffs' choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the

evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation with other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum." *Cal. Serv. Emples. Health & Welfare Tr. Fund v. Command Sec. Corp.*, No. C-12-1079 EMC, 2012 U.S. Dist. LEXIS 95352, at *9 (N.D. Cal. July 10, 2012) (quoting *Vu v. Ortho-Mcneil Pharm., Inc.*, 602 F. Supp. 2d 1151, 1156 (N.D. Cal. 2009)).

**Factor 1**, the plaintiff's choice of forum, weighs against transfer. "As a general matter, a plaintiff's choice of forum should be afforded deference when a district court considers a motion to transfer." *Cal. Serv.*, 2012 U.S. Dist. LEXIS 95352, at *9. "In addition, 'a plaintiff's choice of forum is entitled to greater deference when [as here] the plaintiff has chosen the home forum.'" *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) (citations omitted)). "A defendant seeking transfer must make a 'strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum.'" *Adobe Sys. v. Bargain Software Shop, LLC*, No. C-14-3721 EMC, 2014 U.S. Dist. LEXIS 169710 at *6 (N.D. Cal. Dec. 8, 2014) (quoting *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)). This District is Ms. Adam's home forum, and as such, deference to the Plaintiff's choice is warranted. Dkt. 33 at 3 ¶ 8. It is where the sale took place, where the chargeback was initiated, where the advertisements were sent to, and where Ms. Adam banks.

The Defendants argue that because this is a class action—and because there is a nationwide class—the Plaintiff's choice is entitled to no deference. Dkt. 35 at 13. This Court has specifically rejected identical arguments, holding that if the choice of forum was not "purely fortuitous," a plaintiff's choice was entitled to deference even where a nationwide class claim was asserted. *Sonoda v. Amerisave Mortg. Corp.*, No. C-11-1803 EMC, 2011 U.S. Dist. LEXIS 72234 at *10-13 (N.D. Cal. July 6, 2011). This Court gave three reasons why the choice was not fortuitous there: (1) the Plaintiff resided in the District they chose, (2) the Defendant had "made its website available to California residents" and the Plaintiff had purchased from it, and (3) the Plaintiff also asserted a California sub-class involving CLRA and UCL claims. *Id.* at *11-13. This case meets all three, and even involves the same CLRA and UCL laws for the California sub-class. *See* Dkt. 33 at 74 ¶ 249 (sub-class). In another case, this Court gave significant weight to a class action plaintiff's choice of forum because the plaintiff

relied on an advertisement that ran in California and the purchase was made in California. *Hansell v. TracFone Wireless, Inc.*, No. C-13-3440 EMC, 2013 U.S. Dist. LEXIS 167423 at *7-8 (N.D. Cal. Nov. 22, 2013). In this case, the false advertising ran in California, featured a fake endorsement from a celebrity who is a California resident (Blac Chyna), ex. 4, ran on a California-based advertising platform (SnapChat), ex. 5, and the purchase was made here.

**Factor 2**, the convenience of the parties, is neutral. This Court has held that this factor is neutral where one District is more convenient for the Plaintiff and another for the Defendants. *Cal. Serve*, 2012 U.S. Dist. LEXIS 95352 at *6-7 (citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (transfer is inappropriate when it "would merely shift rather than eliminate the inconvenience")); *see also Sonoda*, 2011 U.S. Dist. LEXIS 72234 at *8 (holding that this factor is neutral "when the plaintiff resides in the chosen forum and the defendant resides in the proposed transferee district"). The Defendants' argue that while their counsel reside in New Jersey, the Plaintiff's lead counsel, Mr. Kneupper, lives in Georgia. This is false—while Kneupper & Covey PC maintains offices in Georgia, the undersigned resides in Glendale, California. *See* Decl. of K. Kneupper at ¶ 2. In any event the location or convenience of counsel is irrelevant to a transfer analysis. *Hansell,* 2013 U.S. Dist. LEXIS 167423 at *10.

**Factor 3**, convenience of the witnesses, is neutral. "This factor turns primarily on the convenience of non-party witnesses and places particular focus on whether the court's subpoena power, more so than the convenience of party witnesses or witnesses employed by a party." *Acad. Mortg. Corp.*, 2018 U.S. Dist. LEXIS 144648 at *13-14. But the only witnesses who Defendants list by name are not just party witnesses but parties (Barone, Chumenko, and Ellis). "The court accords less weight to the inconvenience of *party* witnesses, however, as they can be compelled to testify regardless of the forum in which the lawsuit is ultimately litigated." *Cal. Serve*, 2012 U.S. Dist. LEXIS 95352 at *15 (quoting *Allstar Mktg. Group, LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1132 (C.D. Cal. 2009) (emphasis in original)).

The Defendants claim that there are third party vendors in New Jersey "who provide website and technology services" and who "may" have relevant information. But the Defendants fail to identify these witnesses by name or explain anything about what they are expected to testify to. "The Court

cannot base a decision to transfer on speculation as to the relevance of potential, but unnamed, witnesses in this case." *Flint v. UGS Corp.*, No. C07-04640, 2007 U.S. Dist. LEXIS 94643 (N.D. Cal. Dec. 12, 2007). And it is quite possible that such vendors are not "third parties" but in fact parties, as the Plaintiff is seeking to add any John Doe vendors to this case who assisted the Defendants knowing Nuvega Lash was a scam.

The unnamed party employees cited in Barone and Chumenko's declarations similarly cannot be considered under *Flint*. As to the only three witnesses identified by name—Barone, Chumenko, and Ellis—they are parties, they each chose to do business in California, they harmed people in California, and they cannot complain if they must testify here.

The Defendants have further dismissed any inconvenience to Ms. Adam on the grounds that it would be a "remarkable event" if this case were to go to trial and her deposition would occur in the same location regardless of venue. Dkt. 35 at 12. But this is a double-edged sword: if the Defendants concede a trial is unlikely, then none of the other witnesses would face inconvenience from keeping the case here because they, too, would be deposed in the same location regardless and there would be little likelihood of them having to travel to trial.

**__Factor 4__**, ease of access to the evidence, is neutral. This is a case involving an Internet scam, and most of the records are likely to be stored electronically. Even if they are not, as this Court has recognized, "there is nothing to indicate that 'transporting records or reducing them to electronic form would cause [Defendant] significant hardship.'" *Cal. Serve*, 2012 U.S. Dist. LEXIS 95352 at *7-8 (quoting *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1362 (N.D. Cal. 2007)). At best this factor "is not entitled to much weight given the likelihood that the documents will need to be digitized at some point regardless of the forum." *Id.* at *8. Further, "the location of evidence in this action is likely insignificant as this case involves sales conducted over the internet, and modern technology has rendered the location of documents 'much less important to determining the convenience of the parties than it once was.'" *Adobe Sys.*, 2014 U.S. Dist. LEXIS 169710 at *6-7 (quoting *Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 378 (D.D.C. 2012)). The Defendants claim in a declaration that this case will involve paper "copies" of documents, but do not identify or describe what these paper "copies" supposedly are, or whether the originals of these "copies" are already digitized. Dkt. 35-1 at ¶

6

38. Given the credibility issues described herein with Barone's declaration, the Court should give no consideration to this bare assertion. As for inspections of electronic systems, those materials are digitized and exporting digital records is a simple matter.

**Factor 5**, familiarity of each forum with the applicable law, weighs against transfer. This case involves a UCL claim, which is equitable and will require a separate bench trial under California law. *Bowerman v. Field Asset Servs.*, No. 3:13-cv-00057-WHO, 2018 U.S. Dist. LEXIS 84214 (N.D. Cal. May 18, 2018). A California court would be more familiar with this law and better suited to conduct such a trial.

**Factor 6**, feasibility of consolidation with other claims, is neutral because there are no other matters that may be consolidated with this case. *Acad. Mortg. Corp.*, 2018 U.S. Dist. LEXIS 144648 at *17.

**Factor 7**, any local interest in the controversy, weighs against transfer. Where California has a "strong public policy" on an issue, it tips the scales on this factor against transfer. *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, No. 19-cv-00792-EMC, 2019 U.S. Dist. LEXIS 193100 at *27-28 (N.D. Cal. Nov. 6, 2019). The Plaintiff is raising a California state law claim under the state's Automatic Renewal Law. Dkt. 33 at 105-107. That law specifically asserts a strong public policy interest as to protecting its citizens from this kind of fraud: "It is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product...." Cal. Bus. & Prof. Code § 17600.

**Factor 8**, the relative court congestion and time of trial in each forum, weighs against transfer. The time to trial in this District is currently 22 months. Exs. 6, 7. The time to trial in New Jersey is currently 40.8 months. *Id.* There are 896 pending cases per judge in this District, and 2,379 per judge in New Jersey. *Id.* Even if trials in class action cases are rare, time to trial still matters: it is frequently the pressure of trial deadlines that forces parties to be realistic and come to terms. And in this case, time is of the essence: Defendants continue intentionally injuring people with no intention of stopping until they are forced to, and they are literally risking people's lives by telling consumers their products are a viable alternative treatment for cancer.

And finally, the Court should consider that this case involves John Does with a realistic chance of being identified. The number of affiliate advertisers/networks for Nuvega is unknown but likely to be widely spread geographically. "Crooked processors" are likely to be potential defendants as well. This is not a case where the existence of John Does is speculative—there are certainly others who assisted in this scheme, and the only issue is their knowledge and intent. A transfer to New Jersey is thus likely to simply create additional evidentiary and convenience problems. The John Does will contest jurisdiction there, when they would have been subject to jurisdiction in this District for directing their advertisements or payment processing into the State of California. The evidence is in fact far-flung, not concentrated in New Jersey. All that would be achieved by disturbing the Plaintiff's choice of forum is to create yet another round of jurisdictional motions in a district with connections to some Defendants, but no connection whatsoever to others who may have very different views about a suit in New Jersey.

A transfer analysis is ultimately about what is in the interest of justice. 28 U.S.C. § 1404(a). Transfer here is not only unjust, but risks real and avoidable harm to the Defendants' victims. Plaintiff will be forced from her choice to a congested forum in New Jersey. And Defendants will take advantage of the delay to continue hurting people, both financially and physically, as they hawk untested products to innocent victims as cures for cancer or bipolar disorder.

## III. DEFENDANTS' SUBJECT MATTER JURISDICTION CHALLENGES MUST BE DENIED IN LIGHT OF THE SUPREME COURT'S RULING IN CAMPBELL-EWALD

The Defendants' claim that an unaccepted pre-suit refund offer can moot a plaintiff's claim was once a controversial and disputed issue in the 9th Circuit and elsewhere. But the issue was resolved long ago, and in the Plaintiff's favor, by the United States Supreme Court in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016). *Campell-Ewald* confronted a split in authority on whether an unaccepted offer could moot a case or deprive a plaintiff of standing and concluded that it could not: "an unaccepted settlement offer has no force. Like other unaccepted contract offers, it creates no lasting right or obligation. With the offer off the table, and the defendant's continuing denial of liability, adversity between the parties persists." *Id.* at 666. The Supreme Court "granted certiorari to resolve a disagreement among the Courts of Appeals over whether an unaccepted offer can moot a plaintiff's

claim, thereby depriving federal courts of Article III jurisdiction." *Id.* at 669. The Court held that "an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case, so the District Court retained jurisdiction to adjudicate Gomez's complaint." *Id.* at 672. Defendants suggest that *Campbell-Ewald* does not apply to pre-suit offers, but they cite no authority and that contention is simply wrong. "*Campbell-Ewald's* core lesson is that unaccepted contract offers are nullities; settlement proposals are contract offers; and therefore unaccepted settlement proposals are nullities. Nothing about that logic turns on whether a suit has been filed." *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 627-28 (7th Cir. 2017); *see also T. K. v. Adobe Sys.*, No. 17-CV-04595-LHK, 2018 U.S. Dist. LEXIS 65557 at *27-33 (N.D. Cal. Apr. 17, 2018).

It should be noted that the Defendants cannot prevail even under the pre-*Campbell-Ewald* case law. *See Long v. Graco Children's Prods.*, No. 13-cv-01257-JD, 2014 U.S. Dist. LEXIS 174347 (N.D. Cal. Dec. 17, 2014). The *Long* case considered a virtually identical fact pattern to this one—a manager submitting a declaration summarizing a purported conversation between a customer service representative and the plaintiff. The parties disputed whether the refund offer was full or partial. The Court concluded that the evidence submitted was insufficient to meet the Defendants' burdens. And here, the facts are even worse: there is no dispute between the parties that the unaccepted refund offer would not have completely made Ms. Adam whole, because the Defendants conditioned it on her first paying for the postage and shipping costs to return the unordered products to the Defendants. Dkt. 33 at 16 ¶ 54; 35-1 at ¶ 32. And Defendants never even attempted to contravene Plaintiff's allegation that (i) Defendants did not actually provide refunds to victims even after forcing them to ship back the unordered products, and (ii) their "refund offers" were just a stalling tactic. Dkt. 33 at 16 ¶ 55. It is not "manufacturing" a lawsuit to quit negotiating with a scammer.[2]

But post-*Campbell-Ewald*, this argument is foreclosed entirely: because both parties agree that Ms. Adam did not accept the offer of a refund, dkt. 32 at 9-10, the offer had no force, could not legally moot the claim, and this court has subject matter jurisdiction under **current** law. *See, e.g., Lawrence v.*

---

[2] Defendants suggest (in a post-motion filing, dkt. 43) that there is a CLRA issue under Cal. Civ. Code 1781(b). Beyond the fact that they raise this as a footnote in a motion to stay discovery, not to dismiss, it is incorrect: this applies only to individual claims, and only in the 30-day period after a CLRA notice. It further does not apply to class actions—1781(c) governs, and Defendants do not meet its requirements.

*FCA US LLC*, No. CV 16-5452 PSG (MRWx), 2017 U.S. Dist. LEXIS 216120 (C.D. Cal. Sep. 12, 2017) (rejecting an identical argument that an unaccepted pre-suit refund offer mooted a claim because "[i]t would contradict principles of contract law and the Supreme Court's decision in *Campbell-Ewald* to hold that a plaintiff cannot claim that she suffered damages because of a unilateral offer by the defendant to which the plaintiff did not agree."); *T. K. v. Adobe Sys.*, 2018 U.S. Dist. LEXIS 65557 at *29 ("a claim becomes moot when a plaintiff *actually* receives complete relief on [a] claim, not merely when that relief is offered or tendered") (emphasis in original).

Indeed, a recent case in this District recognizes that post *Campbell-Ewald* the question as to mootness is not whether a refund was offered, but whether it was accepted—and whether other forms of relief were sought by Plaintiff which have not been redressed. *In re Big Heart Pet Brands Litig.*, No. 18-cv-00861-JSW, 2019 U.S. Dist. LEXIS 229340 (N.D. Cal. Oct. 4, 2019) ("Here, Plaintiffs do not allege they accepted a refund from Defendant, and Defendant does not put forth any evidence that shows they have done so. Further, in addition to restitution, Plaintiffs seek punitive damages. Although Defendant argues that the allegations are insufficient to demonstrate Plaintiffs have a right to obtain punitive damages, the Court cannot conclude as a matter of law Plaintiffs could not seek such relief. In addition, some of the consumer protection statutes at issue provide for treble damages.").

As in *Big Heart Brands*, the Plaintiff does not merely seek a refund. She seeks, among other things, to represent a class of plaintiffs, punitive damages, treble damages, and other relief, none of which has been provided by the Defendants. Both parties agree that she did not accept the refund and was not made whole. The Defendants admit that there was a charge of $92.94 for which Ms. Adam was not granted a chargeback and for which she did not accept a refund. Dkt. 35-1, Ex. A at 6-7. Indeed, their entire argument is premised on it. Dkt. 35 at 9-10. As such, there is no legal basis for the Defendants' mootness argument.

## IV. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS

Defendants concede that Natural Beauty is subject to personal jurisdiction in California. They attempt to pin blame for the scam on this single shell company, despite a failure to follow corporate formalities and the company existing solely as part of a merchant account rotation scheme. All Defendants were involved in the sale here, and all are subject to specific jurisdiction in California.

As an initial matter, the posture of this motion is important: Defendants are seeking a dismissal without jurisdictional discovery and without an evidentiary hearing. Dkt. 38 at 5; *id.* at 5 n.6. The standards for such a dismissal are higher, and the burden on the Plaintiff is lower: "[i]f a district court acts on the defendant's motion to dismiss without holding an evidentiary hearing, the plaintiff 'need only demonstrate facts that if true would support jurisdiction over the defendant.'" *Helm v. Alderwoods Grp., Inc.*, 696 F. Supp. 2d 1057, 1066 (N.D. Cal. 2009) (quoting *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). "**Unless directly contravened**, the plaintiff's version of the facts is taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *Id.* (emphasis added); *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) ("Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor.").

It is also important that conclusory denials in an affidavit from Defendants do not suffice to rebut a complaint's allegation as to personal jurisdiction. *Piping Rock Partners, Inc. v. David Lerner Assocs.*, No. C 12-04634 SI, 2012 U.S. Dist. LEXIS 161643 at *23-25 (N.D. Cal. Nov. 9, 2012). ("Moreover, just as '[m]ere allegations of the complaint, when contradicted by affidavits' are not enough to confer personal jurisdiction, a 'conclusory denial' does not rebut a complaint's allegation such that it defeats personal jurisdiction.") (citations omitted). Instead, a Defendants' affidavits must be "supported by contravening evidence or factual assertions" to defeat personal jurisdiction. *Id.* The vast majority of Defendants' denials here are conclusory, with only a single exhibit supporting them and no effort to explain contradictory evidence in the Complaint.

And while Defendants now argue that the Court can simply ignore documents submitted as evidence by Plaintiff, dkt. 43 at 7, this is false: the 9th Circuit expressly contemplates submission of "affidavits plus discovery materials." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). The case cited by Defendants refusing to consider an attorney declaration involved an attorney who copy-pasted arguments and factual assertions from his motion into a "declaration" and expected the Court to consider it as testimony. *Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 946 (N.D. Cal. 2014). Here Plaintiff submits publicly available documents (largely from the

Defendants themselves) and the declaration merely describes the technical process for creating the exhibits and where they were accessed from.

### A. Facts Relevant to Personal Jurisdiction

#### 1) Facts Relating to Barone/Chumenko Defendants

**Plaintiff's uncontroverted allegations** as to the Barone/Chumenko Defendants include the following: Someone from the Defendants advertised, sold, and shipped Nuvega Lash to Ms. Adam in California, knowing that she lived in California. Dkt. 33 at 13-16 ¶ 42-54. They did so using a sales funnel with fake celebrity endorsements and false claims that it was a "free trial." Ex. 1 (affiliate landing page); Ex. 2 (trynuvegalashnow.com/v2/); Ex. 3 (checkout page). Trynuvegalashnow.com was the website on which the Nuvega Products were actually sold. Dkt. 33 at 22-23 ¶ 74; 32 ¶ 98; 34 ¶ 103; 46 ¶ 144. The domain was registered by Tracey Meyer, a Fortera employee, two months before Natural Beauty even existed. Dkt. 33 at 16-17 ¶ 56. In addition to this domain, all of the shell company defendants created "false front" websites which did not actually sell Nuvega Products, but were used to defraud banks when customers requested chargebacks, resulting in injury to Ms. Adam and others when the chargebacks were denied. Dkt. 33 at 17 ¶ 57, 32-38 ¶ 97-118. Natural Beauty's "false front" websites used Chumenko's home address. Dkt. 33 at 34 ¶ 104, 107; *id.* at 35 ¶ 108. Barone and Chumenko personally manage the shell company defendants and controlled their activities in selling the Nuvega Products. Dkt. 33 at 52-53 ¶ 171-178. Three employees of Fortera accessed Ms. Adam's account information and circulated it among themselves using Fortera e-mail addresses. Dkt. 33 at 16-17 ¶ 56. Chumenko and Vegan Beauty signed a contract to advertise Nuvega Lash with an affiliate network and were responsible for at least 2,265 victims. Dkt. 33 at 53 ¶ 178; ex. 8. Consumers have reported that the names of the other Defendants were appearing on their bank statements when they were billed for Nuvega Lash, sometimes with multiple Defendants billing at once. Dkt. 33 at ¶ 117, 184-187, 190-192, 194.

**Plaintiff makes the following allegations that Defendants deny** in their affidavits (albeit with conclusory statements): Fortera is the ultimate owner and operator of trynuvegalashnow.com. Dkt. 33 at 16-17 ¶ 56. The Defendants used a single Customer Relationship Management ("CRM") software implementation containing a load balancer to rotate the merchant accounts billed on

trynuvegalashnow.com in order to prevent the fraud from being flagged and stopped. Dkt. 33 at 17 ¶ 57. Each of the shell company Defendants created separate merchant accounts which were then used collectively to bill for Nuvega Products to minimize chargeback levels. Dkt. 33 at 17 ¶ 57. Advanced Lash's merchant account was used to bill Ms. Adam for Advanced Lash. Dkt. 33 at 17 ¶ 59. All of the Defendants' merchant accounts were used to bill from trynuvegalashnow.com. Dkt. 33 at 17 ¶ 57.

The declarations of Barone and Chumenko largely consist of conclusory statements and copy-pastes of allegations by the Plaintiff coupled with denials, without facts or evidence to support them. This is not enough to constitute "contravention," and Plaintiff's allegations still must be taken as true. *Piping Rock*, 2012 U.S. Dist. LEXIS 161643 at *23-25. There are further significant credibility issues with these declarations and numerous demonstrably false statements.

For example, Barone denies under oath that the Barone/Chumenko Defendants were running CRM software at all. Dkt. 35-1 at 24. This is false, as the source code for trynuvegalashnow.com invokes Konnektive and Limelight, two CRM programs with load balancers designed to rotate merchant accounts. Ex. 9 at 3, 7. The code even labels Konnektive as a CRM. *Id.* at 7. Konnektive markets its software as a "CRM" containing a load balancer, ex. 10, and specifically describes the software as being able to automate a merchant account scheme as alleged herein, ex. 11. As Konnektive describes its software:

> We have a proprietary technology in place that allows trial advertisers to continue processing transactions without losing customers when one of their merchant account is shut down. We have built a charge-back tracking/management feature. This feature will allow you to set chargeback thresholds, and based upon those thresholds the system will direct more transaction volume to the account that may be experiencing a higher chargeback ratio. For instance, if you set the threshold at 2%, and you merchant processor is sending chargebacks to the system, the platform will calculate the chargeback percentage and redirect more volume to that account to bring the threshold back down to an acceptable level.

Ex. 11. The source code (ex. 9) means the Barone/Chumenko shell companies were all using a single Konnektive implementation, disregarding formalities by comingling all of their customer data together (and comingling their merchant accounts in the software so it could perform the load balancing described above for all Defendants on an ongoing basis). It also means that it was not just Natural Beauty targeting California residents—it was all of the shell companies, and Natural Beauty's merchant account is simply the one the software happened to assign to Ms. Adam as part of the fraud. All of the

companies' merchant accounts were needed and used to defraud Ms. Adam, because this common rotation scheme was the only thing preventing them all from being cancelled.

Barone also swore under oath that only Natural Beauty merchant accounts are used to bill on this website. Dkt. 35-1 at ¶ 25. He gives no explanation for how or why consumers are reporting that the names of the other Defendants were appearing on their bank statements when they were billed for Nuvega Lash. Dkt. 33 at ¶ 117, 184-187, 190-192, 194. He gives no explanation for why these other companies were creating "false fronts" for Nuvega Lash if they did not even sell it. Dkt. 33 at ¶ 105-106, 114. He gives no explanation for why so many separate shell companies would be created to sell a single product online independently.

Both Barone and Chumenko swore under oath that none of the "nonselling entities" are "a parent, subsidiary, or affiliated company of Natural Beauty." Dkt. 35-1 at ¶ 10; 35-2 at ¶ 10. But this sworn testimony is false; there is clearly an affiliation. All of the companies appear to operate out of the same offices. Both Barone and Chumenko are principals in all of the companies. Dkt. 35-1 at ¶ 1; 35-2 at ¶ 1. They share the same employees. Barone's declaration included an email in which three employees of Fortera Nutra Solutions circulated Ms. Adam's personal information among their "forterans.com" email accounts. Dkt. 35-1, Ex. A. He then swore that this was a "Natural Beauty" email despite the fact that Fortera employees accessed Ms. Adam's account information and circulated it on Fortera e-mail accounts.

Trynuvegalashnow.com, the single website on which the products were actually sold regardless of shell entity, was registered on November 3, 2016 by Tracey Meyer using an adesig.com e-mail address under the name of a company, "Associated Designs LLC," which does not appear to actually exist. Ex. 12 at 2. Tracey Meyer is an employee of Fortera. Dkt. 35-1, Ex. A. Natural Beauty—the entity that supposedly owns trynuvegalashnow.com—did not exist until December 22, 2016, two months after the site was created. Ex. 13. The adesig.com e-mail addresses were used repeatedly and across corporate lines for these supposedly unaffiliated companies. For example, Vegan Beauty LLC listed an adesig.com e-mail address for its contact information for "kate" in a contract to advertise Nuvega. Ex. 8 at 1. This appears to be Kate Shakhlevich, an executive assistant employed by Fortera. Dkt. 35-1, Ex. A. And Vito Sforza, a VP of Sales employed by Fortera, listed an adesig.com e-mail

address on a Fortera-owned website recruiting affiliate advertisers. Ex. 14. These same three individuals are the Fortera employees who accessed and circulated Ms. Adam's personal information using their Fortera e-mail accounts, despite Defendants' claims that Natural Beauty is unaffiliated with the others and was the only entity involved. Dkt. 35-1, Ex. A. Not only are the corporate defendants affiliated with one another, they are not real entities—they are just pieces of paper, and they are being treated as such.

These falsehoods would be enough to disregard the Defendants' declarations in their entirety. But the Court should also take into account Barone and Chumenko's ongoing misrepresentations to their customers and the sheer dangerousness of what they are telling people. Even post-suit, the Barone/Chumenko Defendants are advertising Yoofiric CBD products for a company called CanaFarma for which they are executives. Dkt. 42 at 6. They claim that Yooforic is a Shark Tank-endorsed substitute for chemotherapy and that chemotherapy patients who use it can stop taking their "meds," ex. 15 at 3; that Yooforic can treat Alzheimer's, *id.* at 3; and even that Yooforic can treat cancer, ex. 16 at 1. On the sales pages run by Fortera, Barone/Chumenko and CanaFarma tell people suffering from bipolar disorder that Yooforic "may offer a safe remedy for depression and bipolar disorders." Ex. 17 at 2; ex. 18 (site registered to Fortera). Words cannot express how awful this conduct is—or how dangerous it is to be telling people with cancer or serious mental illness that they no longer need their "meds" because of the Yooforic hemp oil. They continue to run these advertisements even post-suit. It is not an exaggeration to state that people are likely to die or suffer serious health consequences if no one forces Defendants to change their behavior. That is what is at stake in this motion. And anyone who lies this freely to victims of cancer, Alzheimer's, or mental health issues is almost certain to lie to this Court as well.

### 2) Facts Relating to Ellis/SFLG

**Plaintiff's uncontroverted allegations include the following:** Ellis is in charge of SFLG and directs its operations. Dkt. 33 at 63 ¶ 212. SFLG was listed as the Return Department for Nuvega Lash on the websites at issue. *Id.* at 64 ¶ 214-216. SFLG shipped the Nuvega Lash products to Ms. Adam and the Class via USPS. *Id.* at 64 ¶ 213; Dkt. 35-1, Ex. A.

**Plaintiff makes the following allegations that Defendants deny** in their affidavits (albeit with conclusory statements): Ellis/SLFG have a lengthy history of running scam operations, acting as consultants on free trial scams, and had full knowledge of the Barone/Chumenko Defendants' fraud. *Id.* at 64-72, ¶ 217, 220-226, 230-240. Ellis/SFLG handled returns and customer complaints of Nuvega, and consulted with the Barone/Chumenko Defendants regarding their business. *Id.* at 64-65 ¶ 213, 218; 67 ¶ 228. Ellis/SFLG provided a suite of non-shipping services to their customers, including for Nuvega Lash, that included "Returns Processing," "Continuity/Autoship programs," "Order Management System," "Database Management," "Inbound Call Center," "Merchant Processing," and "Payment Processing." *Id.* at 65 ¶ 219; 61 ¶ 200.

Defendant Ellis has submitted a carefully worded declaration—one which is notable more for what it doesn't say than what it does. The declaration does not deny any personal involvement by Ellis in the scam, instead focusing on SFLG. Dkt. 35-3 at 2-4, ¶ 6-26. These omissions are fatal to the motion to dismiss as to Ellis, because his declaration does not "directly contravene" **any** of the Plaintiff's allegations as to Ellis as an individual. *Harris*, 328 F.3d at 1129. And the omissions are no accident. The declaration was designed to give the impression of non-involvement, while avoiding perjuring himself by actually saying it. Ellis leaves it to his attorneys to wax indignant about his inclusion in the case, dkt. 35 at 30.

In fact, Plaintiff has recently discovered that Ellis's activities extend far beyond what was originally known. Not only does he run SFLG, but he is also a co-owner and co-manager of a boiler room call center operating out of New York called Mountain Valley Integrated Solutions Inc. ("MVIS"), and has been since 2003. *See* Ex. 19 (listing Ellis as a "Managing Partner" of MVIS since April 23, 2003); ex. 20 (listing Ellis as the "manager" of MVIS under a prior name); ex. 21 (listing Ellis as a "founder and managing partner" who plays "an active role in the day-to-day operation of our call center"); ex. 22. SFLG was founded in late 2002 (meaning the companies were created near-simultaneously). Ex. 23. MVIS also purports to offer "fulfillment services" despite being a call center—a fact that suggests a partnership between the companies to provide packages of services. Ex. 24.

Employee reviews of MVIS make clear what Ellis was doing there. For example, one employee stated on Indeed.com: "A typical day would consist of numerous phone calls for different campaigns that customers would say they was scammed out of for their money. I learned to read the terms and conditions whenever i buy or purchase something or signing any contracts or papers." Exhibit 25 at 3 (sic). Several other employees referenced dealing with numerous irate customers because of "false advertising." *Id.* at 3, 5. Another said: "MVIS come up with wordplay to deter customers getting their money back." *Id.* at 3 (sic). Another said: "You spend most of your day getting yelled at by angry customers who felt like they were getting tricked into something that they didn't know they had to pay for." *Id.* at 5. Another said "they (the company) encourage reps to lie to customers who think they are trying a free trial base item." *Id.* at 3.

If this sounds familiar, it should—it sounds exactly what Nuvega Lash customers experienced when calling in to try to cancel their subscriptions or get refunds. Dkt. 33 at 192. These facts raise serious credibility issues about the candor of Ellis's declaration, particularly in claiming that SFLG does not handle inbound calls or customer complaints. Dkt. 35-3 at ¶ 15-16. Providing such services through a partnership with a co-owned company does not mean SFLG is not involved in providing the services. And MVIS is one of five "featured partners" of a call center software company called Intelemedia. Ex. 26 at 1. Intelemedia's home page features an endorsement of their software from none other than Defendant Kirill Chumenko of "NextGen" (the prior name of Fortera), a connection which strongly suggests that Ellis/SFLG were in fact assisting with inbound calls. Ex. 27 at 3.

Finally, even though Ellis attempts to contravene some of Plaintiff's factual allegations, his declaration lacks credibility. While Ellis claims SFLG "simply distributed products on behalf of its customers to consumers," dkt. 35-3 at ¶ 12, and denies SFLG provided the various non-shipping services alleged, he does not explain why the company advertised precisely the services alleged by Plaintiff (inbound calls, merchant process, payment processing, etc.) on its own website. Ex. 28 at 2. Ellis further claims that SFLG does not "handle returns," dkt. 35-3 at ¶ 13—even though its website advertises that the company specializes in "handling returns" so that its customers do not have to. Ex. 29 at 1. While he claims SFLG is unfamiliar with the methods its customers use to market their products, dkt. 35-3 at ¶ 17, Ellis directly assists with that marketing via the MVIS boiler room, and he

does not contravene Plaintiff's allegations that he and SFLG were repeatedly informed of these methods via customer complaints, dkt. 33 at 64-72, ¶ 217, 220-226, 230-240. The fact that Ellis/SFLG continue to work with the Barone/Chumenko Defendants to ship the Yooforic CBD product post-suit, even after indisputably knowing the unlawful marketing techniques they use, is further evidence that his declaration is simply a self-serving falsehood. Dkt. 42 at 6; exs. 30; ex. 31 at 1 (showing that dailysavingsnews.com website advertising Yooforic was created post-suit).

## B. The Barone/Chumenko Defendants are Alter Egos of One Another

As to the Barone/Chumenko Defendants, the Defendants have a preliminary issue to the personal jurisdiction analysis backwards. The Court should not evaluate the Barone/Chumenko Defendants one-by-one but as a consolidated entity because they operated as alter egos of one another. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1072 (9th Cir. 2015) ("When two organizations assume alter ego status, they effectively operate as a single, unified entity notwithstanding the superficial corporate boundaries between them. The consolidated entity is subject to jurisdiction in any forum where it operates regardless of which formal corporation maintains an in-forum presence.") (quoting *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 599 n.25 (M.D. Pa. 2009)).

"If a corporation is the alter ego of an individual defendant, or one corporation is the alter ego of another, a court may 'pierce the corporate veil' and attribute the 'contacts' of the corporation to the individual." *Goldman v. Seawind Grp. Holdings Pty Ltd.*, No. CV 13-01759 SI, 2013 U.S. Dist. LEXIS 124052 at *8-9 (N.D. Cal. Aug. 29, 2013). *Goldman* explained the analysis as:

> To make a prima facie showing that Ward is an alter ego of the companies, plaintiffs must show: "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (citation and quotation omitted). When courts consider the alter ego doctrine they look to numerous factors, including inadequate capitalization, commingling of funds and other assets, the holding out by one entity that it is liable for the debts of the other, identical equitable ownerships, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245, 121 Cal. Rptr. 2d 1 (2002).

*Id.* at *9-10. "To recover on an alter ego theory, a plaintiff need not use the words 'alter ego,' but must allege sufficient facts to show a unity of interest and ownership, and an unjust result if the corporation is treated as the sole actor." *Leek v. Cooper*, 194 Cal. App. 4th 399, 415 (2011).

Here, there has not even been any discovery and Plaintiff already has evidence that the Barone/Chumenko shell companies share the same employees, use the same offices, share the same principals, commingled their assets (by all selling the Nuvega Products from trynuvegalashnow.com), allowed each other to use their merchant accounts, used the same vendors (SFLG), allowed Ms. Adam's records to be shared across corporate lines, and used the same Konnektive load balancing software. Indeed, the very allegation here is that these shell companies existed solely so that Barone/Chumenko could sign up for additional merchant accounts and reduce the load of chargebacks to avoid fraud detection. Defendants give no contrary explanation for why they would create so many separate companies, create a fake website for each one for the same Nuvega products, and then only sell the Nuvega products from a single website. None of this makes sense otherwise, and Defendants do not even try to explain their behavior.

As for prong two of the alter ego analysis, "that failure to disregard their separate identities would result in fraud or injustice," this is easily met: the Complaint alleges throughout that the entire purpose of this corporate structure was to facilitate the fraud. Now Defendants seek to inflict an injustice, namely pinning all liability on Natural Beauty despite it existing only as a piece of paper used to sign up for a fraudulent merchant account. This is more than enough, and the Court should impute the contacts of the Barone/Chumenko Defendants to one another and consider them as a consolidated unit. *Goldman*, 2013 U.S. Dist. LEXIS 124052 at *11.

## C.    All of the Defendants are Subject to Specific Jurisdiction

The 9th Circuit has a three-part test for specific jurisdiction: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Dynatrace*

*LLC v. Ramey*, No. 16-cv-01777-EMC, 2016 U.S. Dist. LEXIS 170205 at *3-4 (N.D. Cal. Dec. 8, 2016). "The plaintiff must prove the first two prongs, at which point, 'the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable.'" *Id.* (citation omitted). Defendants concede Natural Beauty is subject to personal jurisdiction. This amounts to a functional concession that Barone and Chumenko are as well, because as discussed *supra*, Barone and Chumenko personally controlled and directed the shell companies' activities. Dkt. 33 at 52-53 ¶ 171-178. The concession further establishes personal jurisdiction over all of the Barone/Chumenko Defendants because Natural Beauty's contacts are imputed to them under the alter ego theory.

### 1) All Defendants Satisfy the Purposeful Direction Test

In tort cases, the purposeful direction analysis requires that a defendant must have: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803.

"The first prong of purposeful direction is easily satisfied and generally glossed over by the courts." *GT Sec., Inc. v. Klastech GmbH*, No. C-13-03090 JCS, 2014 U.S. Dist. LEXIS 88237 at *41-42 (N.D. Cal. June 27, 2014). This requires "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." All Defendants easily satisfy this test: Barone/Chumenko by advertising Nuvega in California and selling to Ms. Adam, Ellis/SFLG by shipping the products and providing other services, and the shell company defendants by creating "false fronts," showing them to California banks, and using their merchant accounts to help hide the levels of chargebacks banks would see. *See Ferriss v. All. Publ'g, Inc.*, No. 15-cv-05675-EMC, 2016 U.S. Dist. LEXIS 168576 at *11-12 (N.D. Cal. Dec. 6, 2016) (creating advertising campaign is intentional act).

The second prong, express aiming, and the third prong, causing harm the defendant knows is likely to be suffered in the forum state, are likewise easily met. It is decisive on the second and third prongs that the fraud here involved signing Ms. Adam up for an ongoing subscription and shipping unordered products to her **after** the Defendants had obtained knowledge of her California address and billing information for her California account. "The problem for Mr. Collins is that, even if he did not act in a 'premeditated' fashion — i.e., plan in advance to target California — he (or someone acting on

his behalf) ultimately did target California, and with sufficient knowledge of such based on the California area code for Mr. Schlesinger's phone number. Under these circumstances, the second and third elements of the Calder effects test have been sufficiently satisfied." *Schlesinger v. Collins*, No. 19-cv-03483-EMC, 2019 U.S. Dist. LEXIS 167193 at *6-8 (N.D. Cal. Sep. 25, 2019).

Here, Barone/Chumenko directed Natural Beauty and SFLG/Ellis to bill/ship to Ms. Adam for a subscription to Nuvega after they obtained her California address and account. *Ferris*, 2016 U.S. Dist. LEXIS 168576 at *12-13. Both sets of Defendants had her ZIP code, which would have been stored in their CRM systems (which all of the shell company employees could freely access as proven by the e-mail attached to Barone's declaration as Exhibit A). "As a result, the harm occurred in California...." *Id.* at *12. The California harm was thus foreseeable to all Defendants because they knew Ms. Adam lived here. *Id.* The Barone/Chumenko Defendants further submitted a "false front" to Ms. Adam's bank in response to Chase's chargeback investigation, which is why her chargeback was denied. And the Barone/Chumenko shell companies allowed their merchant accounts to be used for Nuvega with the specific intent that victims, including Ms. Adam, would not be able to receive a chargeback because none of the accounts would have sufficient fraudulent activity individually in any given month to be flagged and cancelled. Dkt. 33 at ¶ 57, ¶ 116. The Konnektive "load balancer" Barone/Chumenko used puts caps on the accounts each month based on how many chargebacks they accrue, and does so on an ongoing basis, meaning that after the subscription was initiated as to Ms. Adam, **all** of the shell companies were assisting in concealing the fraud from Ms. Adam's bank and in obstructing Chase's chargeback investigation. *See* Ex. 11 ("For instance, if you set the threshold at 2%, and you merchant processor is sending chargebacks to the system, the platform will calculate the chargeback percentage and redirect more volume to that account to bring the threshold back down to an acceptable level."). They all knew the harm would occur in California because they knew her address and shared common employees, and had their merchant accounts not been used post-purchase for load balancing, Ms. Adam would have recovered her money through the chargeback she sought because the fraud would have been identified.

As for Ellis/SFLG, the act of shipping the product alone while knowing that this was a free trial scam suffices.[3] While they may contest that knowledge, there is a valid dispute on that issue, and Plaintiff's version must be assumed to be true. Their provision of inbound call services, payment processing services, and merchant processing services for Nuvega, again subject to disputed evidence, must be resolved in Plaintiff's favor. Such activities were aimed at Ms. Adam in California in this case.

Defendants suggest that they were not selling any products at the time of filing, and therefore cannot be subject to specific jurisdiction even though they targeted Ms. Adam in California. They cite no law for this proposed rule, and it would lead to absurd results and upend all existing caselaw on this issue. While personal jurisdiction is determined at the time of filing, it is decided by considering all past acts **up to** and including the date of filing. *Andersen v. Griswold Int'l, LLC*, No. 14-cv-02560-EDL, 2015 U.S. Dist. LEXIS 177848 at *5-6 (N.D. Cal. Mar. 25, 2015). As for their suggestion that this is a "limited sale" case, it is not: Nuvega was marketed for years, with more than 2,000 sales across the country in a short time period from one affiliate network and undoubtedly countless more that Plaintiff cannot yet identify because there has been no discovery. Dkt. 33 at ¶ 178.

### 2) All Defendants satisfy the Relation to Forum test.

"For the second prong, the Ninth Circuit relies on a "'but for' test to determine whether a particular claim arises out of forum-related activities." *Dynatrace*, 2016 U.S. Dist. LEXIS 170205 at *10. "This test asks whether the cause of action would not have arisen, but for the contacts between the defendant and the forum state." *Ferriss*, 2016 U.S. Dist. LEXIS 168576 at *15-16. Here, this is met for all Defendants. Had Barone and Chumenko not created, directed, and supervised the scam and Natural Beauty's activities, Ms. Adam would not have been defrauded. Had the shell companies not allowed their merchant accounts to be used for load balancing (including after they knew Ms. Adam had been scammed), the fraud would have been detected in the months after Ms. Adam was billed and either Chase would have returned her money, or the subscription payments would never have been processed. Had Ellis/SFLG not shipped the product, not agreed to handle calls, and not been involved in merchant

---

[3] Defendants' Carmack Amendment challenge does not purport to bar the act of shipping from being considered on a personal jurisdiction analysis—nor could it, because Carmack at best affects the choice of remedy (state law or the federal Carmack remedy).

and payment processing for Nuvega, Ms. Adam would not have been billed for unordered products because they would not have been shipped.

### 3) The exercise of jurisdiction over all Defendants is reasonable.

A Defendant "shoulders the burden of proving that the exercise of jurisdiction would be unreasonable, and, under Ninth Circuit law, must 'present a compelling case' of unreasonableness." *Schlesinger*, 2019 U.S. Dist. LEXIS 167193 at *9. The Defendants have not made a compelling case here. The Court considers:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Dynatrace*, 2016 U.S. Dist. LEXIS 170205 at *10-11. As to these factors: (1) Defendants purposely injected themselves into California's affairs by defrauding customers and financial institutions here. (2) Defendants cannot fairly complain of the burden of defending here when they chose to defraud citizens here. The 9th Circuit has recognized that the burden of litigating here from other states is increasingly minimized with technological advances. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1080 (9th Cir. 2011). And the standard in this context is high—it must be so burdensome that Defendants are deprived of due process. *Gucci Am., Inc. v. Huoqing*, No. C-09-05969 JCS, 2011 U.S. Dist. LEXIS 783 at *26 (N.D. Cal. Jan. 3, 2011). (3) Defendants make no argument that there is any conflict of sovereignty. (4) California has a strong interest in adjudicating the dispute, and indeed the Legislature has specifically asserted a public policy of stopping this kind of scam. Cal. Bus. & Prof. Code § 17600. Ms. Adam and other California residents were victimized, and California has an interest in stopping it. (5) The efficient judicial resolution factor is no longer weighted heavily due to modern technology, and is neutral where, as here, there are witnesses in both states. *Gucci*, 2011 U.S. Dist. LEXIS 783 at *26. (6) and (7) There is further no alternative forum, as explained *supra* in response to the motion to transfer. And "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." *CollegeSource,* 653 F.3d 1066 at 1080. New Jersey might be more convenient to Defendants, but it is not "unreasonable" for them to defend an action in California

where they are targeting victims for fraud. It is further important that the only two cases Defendants cite in which a "compelling case" was made that jurisdiction was unreasonable are *Callway Golf* and *Core-Vent*, both of which involved Defendants from foreign countries with minimal contacts with the U.S., let alone California. Defendants from a sister state who have sold products to Californians for a multi-year period cannot claim they have been deprived of due process by facing a lawsuit here.

### D. Jurisdiction Is Proper Under The Ends of Justice Provision of RICO

Even in the event that the Court concludes Plaintiff has not made out its prima facie case under the minimal burdens applicable here, it should exercise personal jurisdiction under the ends of justice provision of RICO. *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538-39 (9th Cir.1986); 18 U.S.C. § 1965(b). "For nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Butcher's Union*, 788 F.2d at 539. This provision was intended "to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial." *Id.* at 539. This is precisely the situation here: the Defendants are located in at least two Districts for general jurisdiction purposes, Maine and New Jersey, and their contacts with the Plaintiff for specific jurisdiction purposes were directed into this District in California. As discussed *supra*, Ellis/SFLG are not subject to jurisdiction in New Jersey, and the only contacts the Barone/Chumenko Defendants have with Maine are their contract with Ellis/SFLG. To the extent the Court disagrees with the specific jurisdiction analysis herein, it should exercise jurisdiction over the RICO claim under the ends of justice provision, and exercise pendent personal jurisdiction over the remaining state law claims. *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004).

### E. Jurisdictional Discovery is Proper If the Court Finds No Prima Facie Case

Defendants have asked the Court to decide this motion on the papers. Plaintiff believes that the motion to dismiss can easily be denied on the papers—the bulk of the Defendants' declarations do not consist of the specific factual assertions or evidence required to contravene facts asserted by Plaintiff, and instead are barebones denials. Plaintiff has submitted substantial contrary evidence, there are

serious credibility issues with the declarations, and these conflicts must be resolved in Plaintiff's favor. To the extent the Court disagrees, jurisdictional discovery is appropriate, and is routinely granted where Plaintiff has not made out a *prima facie* case but has provided at least a "colorable basis" or "some evidence" for jurisdiction. *Dickert v. Sanyo Energy (U.S.A.) Corp.*, No. 18-cv-04664-EMC, 2019 U.S. Dist. LEXIS 39871 (N.D. Cal. Mar. 12, 2019). There can be no dispute that Plaintiff has at least met this standard.

## F.    The Fiduciary Shield Doctrine Does Not Protect Defendants From Jurisdiction

As part of their attempt to pin the blame on the Natural Beauty shell company, Defendants argue that the fiduciary shield doctrine protects all of the remaining defendants. Dkt. 35 at 28-29. "The fiduciary shield doctrine protects **<u>individuals</u>** from being subject to jurisdiction solely on the basis of their employers' minimum contacts within a given jurisdiction." *j2 Glob. Communs., Inc. v. Blue Jay, Inc.*, No. C 08-4254 PJH, 2009 U.S. Dist. LEXIS 1616 at *13 (N.D. Cal. Jan. 5, 2009) (emphasis added). At the outset, this makes it entirely inapplicable to the other corporate defendants—they are corporations themselves, not individuals or corporate officers.

As for Barone, Chumenko, and Ellis, the fiduciary shield doctrine cannot protect them from consideration of their own conduct as to personal jurisdiction. "If acts taken by a corporate officer subjects the officer to personal liability (i.e., the corporate officer authorized, directed or participated in tortious conduct), and those acts create contact with the forum state, such acts are not only acts of the corporation but also acts of the individual, and may be considered contacts of the individual for purposes of determining whether long-arm jurisdiction may be exercised over the individual." *j2 Glob.*, 2009 U.S. Dist. LEXIS 1616 at *15.

Throughout their briefing, Defendants act as if the Nuvega scam was conjured from nowhere. Natural Beauty did it alone, they claim, apparently without the assistance of human beings. And yet nowhere in their affidavits do Barone or Chumenko contravene Plaintiff's allegations that they personally created and directed the Nuvega scam, or that they directed employees to implement the scheme as to Ms. Adam. Dkt. 33 at 18 ¶ 60; 52-54 ¶ 171-179. They do not explain how their home addresses came to be on the "false fronts" or why they were personally negotiating with affiliate networks running ads for Nuvega. They do not say who committed the fraud if not them. They are the

principals for all of the companies. Defendants did not dispute allegations of their direct participation, so they cannot rely on the fiduciary shield doctrine because Plaintiff's allegations must be assumed to be true. *Helm*, 696 F. Supp. 2d at 1066. And if the Barone/Chumenko Defendants are found to be alter egos of one another, they similarly cannot invoke the fiduciary shield. *j2 Glob.*, 2009 U.S. Dist. LEXIS 1616 at \*14.

The same goes for Ellis, who nowhere denies his own personal involvement. He is alleged to have acted personally as the CEO and to have directed the company's conduct. Dkt. 33 at 63-65 ¶ 212-213, 217; *id.* at 72-74 ¶ 239-246. He is alleged to have known Nuvega Lash was a fraud and to have personally directed SFLG to ship it anyway, as well as to have directed SFLG's other activities. *Id.* at 113 ¶ 427. This is more than enough to establish personal jurisdiction, as discussed *supra*. The fiduciary shield doctrine thus has no application to any defendant here.

## V. PLAINTIFF HAS STATED A CLAIM AGAINST BOTH ELLIS AND SFLG

### A. Defendants' Carmack Preemption Arguments are Baseless.

#### 1) Defendants SLFG and Ellis Offer No Proof That They Are "Carriers" Under the Carmack Amendment.

To claim Carmack Amendment preemption, Defendants SFLG and Ellis must first prove that they are, in fact, carriers under the statute. "The Carmack Amendment subjects common carriers and freight forwarders transporting cargo in interstate commerce to absolute liability for actual loss or injury to property. The statute entirely preempts state claims against such carriers and freight forwarders. The Carmack Amendment, however, does not govern brokers." *Prussin v. Bekins Van Lines, LLC*, No. 5:13-cv-02874 HRL, 2015 U.S. Dist. LEXIS 12740, at \*6 (N.D. Cal. Feb. 3, 2015) (internal citations omitted); *see also Travelers Prop. Cas. Co. of Am. v. Legacy Transp. Servs.*, No. C 10-00505 JSW, 2010 U.S. Dist. LEXIS 143922 (N.D. Cal. Apr. 13, 2010); *Bd. of Trs. of the Leland Stanford Junior Univ. v. Trump Card, Inc.*, No. 18-cv-01497-RS, 2019 U.S. Dist. LEXIS 56000 (N.D. Cal. Apr. 1, 2019); *Chubb Group of Ins. Cos. v. H.A. Transp. Sys., Inc.*, 243 F. Supp.2d 1064, 1069 (C.D. Cal. 2002); *Hymes v. King*, No. SA CV 17-0463-DOC (DFMx), 2017 U.S. Dist. LEXIS 220007 at \*12 (C.D. Cal. July 27, 2017).

A broker is "one who 'sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation.'" *Chubb*, 243 F. Supp.2d at 1070 (quoting 49 U.S.C. § 13102(2)). This is distinct from the carrier, who actually transports the goods. The only evidence or argument offered to support the claim that SFLG is a "carrier" is a short line in Ellis's declaration: "SFLG was merely a common carrier similar to UPS, FedEx, or the United States Postal Service, which simply distributed products on behalf of its customers to consumers." Dkt. 35-3 at 2, ¶ 12.

But on its BBB page, SFLG, doing business as "Great Lakes Fulfillment Services," holds itself out not as a carrier but a broker that arranges shipments through UPS: "UPS requires GLF to put their name and address on all packages shipped by their service." Ex. 32. And Barone's declaration includes proof that the products were "shipped via USPS" (the actual carrier here) to Ms. Adam. Dkt. 35-1, Ex. A. Dropping a package off at the post office does not render one a carrier. And on a 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). Ellis's bare assertion via declaration cannot overcome this contradictory evidence.

### 2)     The Carmack Amendment Does Not Preempt The Plaintiff's Claims

The Carmack Amendment does not purport to regulate all transactions just because a carrier and shipper are involved. *Silvestri v. Bekins Van Lines, Inc.*, No. CV 19-08229-CJC(AFMx), 2019 U.S. Dist. LEXIS 185559 at *5-6 (C.D. Cal. Oct. 24, 2019). Instead, "[t]he typical case of Carmack Amendment preemption involves a plaintiff asserting state law breach of contract and negligence claims against a carrier who allegedly damaged their goods in transit or unreasonably delayed shipment." *Id.* at *6-7.

This is not such a case. The Carmack Amendment does not grant carriers blanket immunity from state laws for all their actions, even those unrelated to the shipment of products. Instead, the Carmack Amendment "completely preempts state law claims **alleging delay, loss, failure to deliver and damage to property.**" *White v. Mayflower Transit, L.L.C.*, 543 F.3d 581 (9th Cir. 2008) (emphasis added).

The Ninth Circuit in *White* recognized that a line must be drawn between tortious conduct that is preempted by Carmack and tortious conduct that is not. The court considered various Circuits' approaches to determining where to draw this line as to other tortious conduct by a carrier, specifically an intentional infliction of emotional distress claim. In *White*, this claim arose out of a shipping contract, and the plaintiff alleged that the defendant intentionally inflicted emotional distress on him because "several of his items were missing or damaged" during delivery. *White* held that an intentional infliction of emotional distress claim was preempted "to the extent that it arises from the same conduct as the claims for delay, loss or damage to shipped property. In this case, White's claim for intentional infliction of emotional distress is preempted because it is based solely on the same conduct giving rise to his claims for property damage." *White*, 543 F.3d at 586.

This principle from *White*—that state law claims are not preempted if they do not arise from conduct claiming delay, loss or damage to shipped property—is generally accepted, as outlined in *Meadowgate Techs., LLC v. Fiasco Enters.*, No. 17cv230-LAB (KSC), 2018 U.S. Dist. LEXIS 45857 at *4 (S.D. Cal. Mar. 19, 2018):

> At the same time, the Carmack Amendment does not purport to regulate all transactions merely because a carrier and a shipper are involved. *See, e.g., Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 382 (5th Cir. 1998) (explaining that the Carmack Amendment does not preempt claims where the shipper 'alleges injuries separate and apart from those resulting directly from the loss of shipped property.'); *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 289 (7th Cir. 1997) ('[N]ot every claim even remotely associated with the transfer of goods from one place to another is necessarily a claim for damages to the shippers' goods . . . .') *See also Rini v. United Van Lines*, 104 F.3d 502, 506 (1st Cir. 1997) (giving examples of claims between carrier and shipper that would not be preempted).

In *Smallwood v. Allied Pickfords, LLC*, No. 08cv2196 BTM(RBB), 2010 U.S. Dist. LEXIS 153318 (S.D. Cal. Feb. 4, 2010), the court recognized that the Carmack Amendment's preemptive scope is limited to the extent the claims arise from the act of shipping itself: "In sum, Plaintiff's state-law claims for intentional infliction of emotional distress, defamation, and fraudulent deceit, are all outside the scope of the Carmack Amendment. This is because these claims arise from Defendants' alleged deceptive luring of Plaintiff to the port in Abu Dhabi, not from the shipping of his possessions. Thus, these state-law causes of action are not within the preemptive scope of the Carmack Amendment."

And in *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056 (9th Cir. 2011), the Ninth Circuit analyzed Carmack preemption at length and provided guidance on what kinds of claims should not be preempted. A Court deciding preemption questions should consider the purpose of Congress in enacting Carmack, should determine whether there is a significant conflict between federal policy and use of state law, and should presume that matters left unaddressed by Congress are left to state law. *Id.* at 1061-62. The purpose of Carmack is to create a uniform national liability scheme for shipping across state lines, and the federal interest "does not extend beyond ensuring a carrier's predictable maximum liability" for delay, loss or damage to shipped property. *Id.* at 1061.

Defendants represent to the Court, without citation or explanation, that "Plaintiff **admits** that neither SFLG nor Ellis had anything to do with the sale of the products in question...." Dkt. 35 at 30 (emphasis in original). Plaintiff admits nothing of the sort. Instead, the Complaint contains detailed allegations that Defendants SFLG and Ellis are not a mere shipper or fulfillment company, but instead are simply pretending to be. The Complaint alleges that they provided consulting services to the Barone/Chumenko Defendants on their business processes. Dkt. 33 at 64 ¶ 213. It cites SFLG's own website touting the consulting services it provided to customers on their business processes—which as the Complaint lays out in detail, includes multiple testimonials from Internet scammers running identical free trial scams to the one at issue here. Dkt. 33 at 66-67, ¶ 221-226; ex 29. It provides extensive evidence that Ellis and SFLG were involved in a large number of these scams and knew exactly how they worked. Dkt. 33 at 66-72, ¶ 221-239. It alleges that SFLG and Ellis taught the Barone/Chumenko Defendants tactics from these other scammers (who used identical "false front" techniques). Dkt. 33 at 67 ¶ 226.

And the Complaint cites SFLG's own description of its activities on its website, which are hardly that of a mere carrier. Dkt. 33 at 65 ¶ 219; ex. 28. SFLG advertised that it provided its customers "Returns Processing," "Continuity/Autoship programs," "Order Management System," "Database Management," "Inbound Call Center," "Merchant Processing," and "Payment Processing," among other services. *Id.* The Complaint specifically alleges that Ellis/SFLG provided these non-shipping services to the Barone/Chumenko Defendants, and this must be taken as true on a 12(b)(6) motion. Dkt. 33 at 65 ¶ 219. None of these allegations—business consulting, advising on how to set up fraudulent

websites, providing software and database services, running a boiler room specifically designed to deflect victim's attempts to get refunds for products they didn't order, or assisting with merchant processing and payment processing of unordered products—are even remotely within the scope of Carmack. These Defendants are not UPS—they are scam consultants who drop off packages there.

The allegations here are not that there was something wrong with the shipments themselves. In part, it is that they were made without consent and not subject to any agreement to ship them whatsoever. Dkt. 33 at 26 ¶ 81 (alleging an unenforceable and undisclosed browsewrap agreement). This allegation alone should defeat preemption—Carmack is premised on the existence of a bill of lading or other contract for an **agreed** shipment, not a scenario where a carrier knowingly ships products to people who didn't order them as part of a scheme to bill them without consent. *See* 49 U.S.C. § 14706(a). There is a difference between claiming damage to a shipment and that a shipment was an unauthorized fig leaf for a fraud, and the interest identified by Congress does not apply here. *Mason,* 632 F.3d at 1061-62.

But another aspect of the claims is that SFLG and Ellis were not mere shippers but instead were providing a broad suite of support services specifically targeted at helping a particular kind of Internet scammer. These non-carrier activities are well on the other side of the line drawn in *White* for determining preemption.

It is also notable that the Aiding and Abetting and Conspiracy claims allege that Ellis and SFLG are vicariously liable for the actions of the Barone/Chumenko Defendants. Dkt. 1 at 111-114. Nothing in the caselaw surrounding Carmack suggests that a carrier cannot, through consulting or other non-shipping activities, become vicariously liable under state law for the actions of non-carriers in perpetrating an advertising fraud.

### 3) Carmack does not apply to Plaintiff's federal law claims.

Two of the Plaintiff's claims, the RICO claim and the EFTA claims, are federal law claims and thus not even arguably subject to the Carmack Amendment's preemption of state law claims.

### B. Ellis/SFLG's 9(b) Argument is Based Entirely on False Statements About the Complaint

Ellis/SFLG's 9(b) argument is largely a rehash of the Carmack argument. Defendants' only other basis for this argument is to claim—falsely—that all of the claims as to Ellis/SFLG providing non-shipping services to the Barone/Chumenko Defendants are based solely on "information and belief." Dkt. 35 at 31-32. But this is not true—they are based on SFLG's own website which purports to offer these services. Exs. 28, 29; Dkt. 33 at 65-66 ¶ 218-221. They are also based on the Nuvega Lash websites listing SFLG as its "Return Department." Dkt. 33 at 64 ¶ 214-216. And in light of the evidence presented *supra* that Ellis was operating the MVIS boiler room call center for free trial scams in parallel to SFLG, and that Chumenko publicly endorsed a software product with a small set of partners including MVIS, Plaintiff's allegations are more than reasonable.

Moreover, Defendants cannot keep their argument straight. In a footnote they do an about-face and acknowledge that, in fact, SFLG's own website is the source of Plaintiff's allegations because SFLG offers the very services Plaintiff alleged they did. Defendant then claims that despite SFLG being listed as the Nuvega Lash Returns Department, "Plaintiff does not allege that SFLG was a return department for those entities or that SFLG ever held itself out as one." Dkt. 35 at 32 n.6. Again, this is false. *See* Dkt. 33 at 64 ¶ 213 ("The Great Lakes Fulfillment Services Defendants shipped the Nuvega Products to consumers, handled returns and customer complaints via mail....); *id.* at 61 ¶ 200 (alleging that Barone/Chumenko hired Ellis/SFLG to "to accept and process returns and complaints from California residents, and to otherwise provide the services listed on their website...."); *see also id.* at 65 ¶ 218; 67 ¶ 227; 93 ¶ 328.

## VI. DEFENDANTS' NATIONWIDE CLASS ARGUMENTS ARE MERITLESS

At the outset, Defendants' arguments against a state law nationwide class ignore a key distinction between this case and the others they cite: there will be a nationwide class in this case regardless of what happens to the state law claims because the Plaintiff has asserted federal law RICO and EFTA claims. Dkt. 33 at 107, 109. These federal laws are uniform nationwide, and thus the nationwide discovery the Defendants raise as a specter will happen inevitably anyway.

As to the question of whether California state law can be applied nationwide, Defendants' motion should be denied because they have failed to meet their burden to conduct a choice-of-law analysis showing that California law should not apply. "Subject to constitutional limitations and the

forum state's choice-of-law rules, a court adjudicating a multistate class action is free to apply the substantive law of a single state to the entire class.... By default, California courts apply California law 'unless a party litigant timely invokes the law of a foreign state,' in which case it is 'the foreign law proponent' who must 'shoulder the burden of demonstrating that foreign law, rather than California law, should apply to class claims.'" *Espinosa v. Ahearn (In re Hyundai & Kia Fuel Econ. Litig.)*, 926 F.3d 539, 561 (9th Cir. 2019) (citations omitted). The Defendants were required to conduct a three-step analysis including proving that the law of the foreign states materially differs from California, that a "true conflict" exists between the interests of the states, and that the foreign state's interests would be more impaired than California's. *Id.* at 562. "If the objectors fail to meet their burden at any step in the analysis, the district court 'may properly find California law applicable without proceeding' to the rest of the analysis." *Id.* (citations omitted). The Defendants have not even attempted this analysis, *see* dkt. 35 at 32-33—and they cannot do so in a reply brief. *United States v. Wilde,* 74 F. Supp. 3d 1092, 1099-1100 (N.D. Cal. 2014) (new arguments in reply briefs are waived).

As to the standing argument, Defendants recognize, dkt. 33 at 35, that the 9th Circuit has adopted the "class certification approach" to challenges to the standing of a named plaintiff:

> The "standing approach" treats dissimilarities between the claims of named and unnamed plaintiffs as affecting the "standing" of the named plaintiff to represent the class. In other words, if there is a disjuncture between the injuries suffered by named and unnamed plaintiffs, courts applying the standing approach would say the disjuncture deprived the named plaintiff of standing to obtain relief for the unnamed class members. *See, e.g., Blum v. Yaretsky*, 457 U.S. 991, 999-1002, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982). The "class certification approach," on the other hand, "holds that once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." Newberg on Class Actions § 2:6.

> We adopt the class certification approach. This approach has been embraced several times (though not always) by the Supreme Court, and is the one adopted by "most" other federal courts to have addressed the issue.

*Melendres v. Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015). Because Ms. Adam has standing for her individual claim, *see supra*, any issues as to whether she can represent other plaintiffs as part of a class should be deferred to the class certification stage. Defendants do not acknowledge that this Court itself has specifically applied *Melendres* to questions of whether a California plaintiff can represent a

nationwide class under other states' laws. *See Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC, 2020 U.S. Dist. LEXIS 36747 (N.D. Cal. Mar. 3, 2020) (holding that *Melendres* applied to plaintiffs who sought to represent 25 states they had not purchased products in); *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 955-56 (N.D. Cal. 2018) (holding that *Melendres* established a "*per se*" rule that applied to this issue). As this Court noted in *Chrysler-Dodge-Jeep*, even if *Melendres* was not a *per se* rule, the Court would still have discretion to defer this issue to class certification. *Id.* There, as here, nationwide discovery was inevitable (here because of the federal law RICO claim, there because 43 states were indisputably involved). *Id.* at 956.

And as for the Defendants' complaint about the pleadings, they do not identify any state law cited by Plaintiffs containing an element which was not pled. Even if they could, leave to amend is to be granted with extreme liberality. *Quach v. CVS Pharmacy, Inc.*, No. C-13-2695 EMC, 2014 U.S. Dist. LEXIS 15013 at *7 (N.D. Cal. Feb. 6, 2014). And other courts in this District have held that this kind of state-by-state comparison of law is a choice of law analysis to be conducted at the class certification stage, not the pleadings stage. *Figy v. Lifeway Foods, Inc.*, No. 13-cv-04828-TEH, 2016 U.S. Dist. LEXIS 108755 at *16-18 (N.D. Cal. Aug. 16, 2016). Given this Court's prior rulings on *Melendres* and given Defendants' failure to conduct a choice of law analysis, Plaintiff believes that this is best addressed through a trial plan grouping various state laws at the class certification stage. But amendment would not be futile if the Court disagreed, because Plaintiff could certainly perform this exercise even if it would likely involve a lengthy and rote statute-by-statute recitation of facts already alleged in the Complaint.

## VI. CONCLUSION

Defendants' Motion to Dismiss should be denied. But should the Court find Plaintiff has not made out a *prima facie* case of personal jurisdiction, it has at least made out a colorable one, and should be granted jurisdictional discovery given the serious credibility issues with the declarations here. Further, Plaintiff should be given an opportunity to amend as to any pleading defects because of the 9th Circuit's liberal amendment rules and because Plaintiff could likely correct any issues.

DATED: June 29, 2020

Respectfully submitted,

**KNEUPPER & COVEY PC**

/s/ Kevin M. Kneupper
Kevin M. Kneupper Esq.
*Attorney for Plaintiff Cindy Adam*
*and the Putative Class*